IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| NEAL S. SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:S 02-3049 |
| | ) | |
| CONTINENTAL CASUALTY COMPANY | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGEMENT

Plaintiff, by and through counsel, in accordance with Rule 56 of the Federal Rules of Civil Procedure, hereby sets forth the following Cross Motion for Summary Judgement, and, in doing so, states the following:

SUMMARY OF CLAIM:

Plaintiff, Neal S. Smith, was employed as Vice-President of Sales for the Floor Covering Department at J.J. Haines & Company and was a participant in an employee welfare plan (Hereinafter, "Plan") as defined by 29 U.S.C. § 1002(1), (7) which was insured by Continental Casualty Company and administered by its parent company Continental National Assurance (Hereinafter, "CNA") as reflected in the Corporate Disclosure Statement filed.

On or about February 23, 2001, Plaintiff became disabled from and unable to work because of a combination of impairments, including but not limited to post lumbar laminectomy syndrome, advanced lumbar spondylosis at several levels, lumbar radiculopathy among other conditions.

Claimant applied for long term disability benefits from the Defendant for disability as defined in the provisions of the Group Long Term Disability Policy defining "disability" as

1

follows:

> **Occupation Qualifier**
> "*Disability* or *Disabled* means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
> 1.  continuously unable to perform the *Material and Substantial Duties* of *our Regular Occupation*; and
>
> 2.   not working for wages in any occupation for which *You* are or become qualified by education, training, or experience.
> (0577)

On or about 4/16/01, CNA denied benefits to Plaintiff stating in its termination letter that Plaintiff was not disabled from performing the material duties of his occupation in accordance with the policy definition of " Disability" as previously set forth.(0500 - 0502)

Plaintiff appealed the decision in accordance with the review procedures set forth in the summary plan description and 29 U.S.C. 1133 on July 25, 2001.  The appeal was supported with reports and records from treating physician, an independent medical examination, and a vocational expert assessment, all of which supported Plaintiff's claim for disability. (0344 - 0424, 439 - 455 attachments, 0425 - 0438 appeal letter)

Defendant's reviewer, CNA,  reversed its decision and approved benefits on 11/6/01 and paid all back benefits due and owing.(0309 - 0310)

 By letter dated 11/21/02, CNA denied payment of any additional long term disability benefits, stating that an "independent peer review" concluded that Plaintiff was not precluded from performing the duties of his occupation. (0290 - 1)

Plaintiff administratively appealed the denial decision by two letters dated 3/21/02 (0222 - 0250) and 4/1/02 (0217 - 8) which included additional treating physician reports, a functional capacity evaluation, a subsequent vocational expert assessment, and Plaintiff's favorable

disability decision by the Social Security Administration, all of which supported a finding of disability.

CNA again denied benefits by letter dated 5/2/02 which stated that Plaintiff could still perform the duties of his regular occupation. (0210 - 4)

By letter dated 5/13/02, CNA separately denied Plaintiff's claim for Waiver of Premium Coverage under the Group Life Insurance policy stating that the benefits specialist had "partnered" with the long term disability specialist in denying the claim based on the same record as the LTD denial (PLS0011). This denial was appealed by Plaintiff (PLS0010) and denied by CNA by letter dated 7/5/02 stating that Claimant was not disabled from his regular occupation.(PLS0006 - 0008, CCC0002)

Plaintiff filed this action pursuant to 29 U.S.C. §1132(a)(1)(B), 29 U.S.C. §1132(e)(1), 29 U.S.C. § 1132 (g)(2)(D) and 1132(f) of the Employee Retirement Income Security Act of 1974 (ERISA) seeking a declaration of his entitlement to long term disability income benefits retroactive to February 23, 2001,  at a rate equivalent to 60% of his salary, equaling a benefit of $6255.38/month ($7952.18/month less Social Security Disability offset of 1696.80/month) with waiver of premium in addition to $100,000.00 in term life insurance in addition to interest on all unpaid benefits outstanding.

MEDICAL EVIDENCE OF PLAINTIFF'S DISABILITY:

Plaintiff has undergone difficult lower lumbar surgeries including a L3-4, L4-5 laminectomy on 5/14/97, a laminectomy with fusion at L2-5 laminectomy with fusion on 9/28/98 and a hemilaminectomy and foraminotomy at L4-5, L5-S1 on 5/3/00 (R0045).  Claimant did his best to recover from the surgeries, but injured his back again on 1/14/01 which led to his current

disabled state (Summary at 0009, 0137 - 8)) with application for disability benefits on 2/23/01 (0081).

Claimant surgeries were performed by neurosurgeon, Clifford Solomon. Dr. Solomon stated that Plaintiff suffers from "tremendous" pan-stenosis of the lumbar spine, noting that it would be "insanity" to perform any further surgery in his report dated 3/13/01.(0038 with prior MRI confirmation at 0056 - 9) Dr. Solomon noted that Plaintiff's condition had declined from a functional rating index of 34/40 to 29/40 on 4/25/01. (0029)

Plaintiff's primary physician, Jon B. Lowe, made the following findings:

- 2/9/01:  Plaintiff was functioning on 1/14, but reinjured his back celebrating a Baltimore Ravens touchdown and came to his office bent over with back pain (0043)

- 2/16/01 on Physician Statement with disability application: diagnosed degenerative disc and joint disease of lumbar spine with persistent pain and decreased range of motion, unable to stand or walk more than 5 minutes, unable to sit in chair for 10 minutes, with a poor prognosis for recovery and return to work(0082 - 3)

- 2/23/01: Could not walk more than five minutes or sit longer than ten minutes (0042)

- Needed to remain in the water during a vacation described his trip to and from his destination as "horrible."(0040)

Plaintiff was examined by pain management specialist, Brian Kahan (C.V. at 0359 - 0367), on 3/28/01 (0031 - 3) who diagnosed lumbar radiculopathy and post lumbar laminectomy

4

syndrome (as previously objectively confirmed by EMG/NCV testing at 0064 -5), noting an antalgic gait, pain at neutral back position and with end range flexion.

Plaintiff was examined by his previous orthopedist, Frederick Sutter, (C.V. at 00357 - 8)on 6/11/01 (0027  - 8) and rendered a diagnosis of advanced lumbar spondylosis at multiple levels, most notably at L4-5 where there was no meaningful disc space present with L5 numbness with a significant posterior element spondylosis and some scoliosis induced by pelvic inequity (left leg 1cm shorter than right).

Plaintiff underwent an independent medical examination by orthopedic surgeon, William Launder dated 7/2/01. (0009).  Dr. Launder (C.V. at 0024 - 6) diagnosed Claimant with a failed back syndrome stating that Plaintiff "has reached maximum medical improvement and is completely disabled permanently" despite "exemplary" treatment.  Dr. Launder set forth a series of functional capacity limitations (0017 - 0023) which recited that Plaintiff :

- • Can only stand or sit for less than thirty minutes and cannot alternate between these positions on a continuous basis throughout an eight hour day without interruption due to pain.
- • Can stand or walk less than one hour throughout an eight hour workday.
- • Can sit for less than one hour during an eight hour workday.
- • Cannot walk without experiencing pain.
- • Is only able to lift less than ten pounds on an intermittent basis (a few times, but unable to do consistently).
- • Is unable to climb, balance, crouch, crawl, stoop, bend, and reach; and can kneel only on an intermittent basis

5

- Requires three to more hours of rest during daytime hours and suffers a 36% or greater loss of productivity (in terms of the inability to sustain concentration, attention, focus, persistence and pace) due to the effects of pain and pain medication.

- Is unable to complete an eight hour work day on a sustained basis (five days per week, 50 weeks per year with one to one and half sick days per month).

Claimant underwent a functional capacity evaluation on 12/20/21 (0232 - 0234) performed by physiatrist, Stephen Macedo (C.V. at 0235 - 0237) and Eric Myer, D.C. This testing included National Institute for Occupational Safety and Health (NIOSH) postural testing, static muscle/joint tests, and dynamic functional analysis. The anticipated result of a normal patient should fall within 75% of the population. Due to his condition, Plaintiff failed to make this standard. The static muscle testing revealed that Claimant suffered weakness in his lumbar and hip areas with the left side testing weaker than the right. The dynamic functional analysis demonstrated that the Claimant was unable to stand or walk for period greater than 3 minutes, squat for longer than 5 minutes, or sit for longer than 10 minutes. It was noted that Claimant could not stand without severe pain and could only find relief in a reclined posture. The job strength analysis demonstrated that the Claimant could lift 12.7 to 28lbs. on an occasional basis and 5.3 to 14lbs. on a frequent basis. Dr. Macedo stated that although the lifting results are compatible with light duty, the postural deficits clearly preclude even sedentary labor. The functional limitations were wholly related to Claimant's spinal injuries.

Claimant's medications include large doses of oxycontin and neurontin (0344), the side effects of which include drowsiness, lethargy, etc. as noted in the attached pertinent portions of

6

the *Physicians Desk Reference*, 55th ed.( 2001) (0469 - 0483)

VOCATIONAL EVIDENCE SUPPORTING PLAINTIFF DISABILITY:

Plaintiff's position as Vice-President of Sales for the Floor Covering Department (0079 - 0080), included the following duties:

Role Priorities:

C    Strategic Planning

C    Sales Growth

C    Customer Service

C    Problem Resolution

SUMMARY

Directs and coordinates activities of one or more divisions of the sales department and aids other administrative officers in formulating and administering organization policies by performing the following duties personally or through subordinate managers.

ESSENTIAL DUTIES AND RESPONSIBILITIES include the following.  Other duties may be assigned.

C    Participates in formulating and administering company policies and developing long-range objectives

C    Directs and coordinates activities of department for which responsibility is delegated to further attainment of goals and objectives.

C    Reviews analyses of activities, costs, operations, and forecast data to determine department progress toward stated goals and objectives.

C    Confers with administrative personnel to review achievements and discuss required

changes in goals or objectives resulting from current status and conditions.

C      Serves as member of management committees on special studies.

C      Develops annual sales plan in support of organizational strategy and objectives.

C      Directs implementation and execution of sales policies and practices.

C      Ensures communications are coordinated, support sales plan objectives and meet

       organizational expenditure requirements in conjunction with VP of Marketing.

C      Recommends sales strategies for improvement based on market research and competitor

       analyses.

C      Implements approved distribution strategies.

C      Builds, develops, and manages sales team capable of carrying needed sales & service

       initiatives.

SUPERVISORY RESPONSIBILITIES

C      Leadership: a demonstrated ability to lead people and get results through others.

C      Planning an ability to think ahead and plan over a 1 -1 year time span.

C      Management: the ability to organize and manage multiple priorities.

C      Problem analysis and problem resolution as both a strategic and functional level.

C      Technical skills in strategic planning and sales planning.

C      Employee Training and development.

C      Commitment to company values and ethics.

C      High performance teams and a strong team player.

C      Strong Organizational skills.

QUALIFICATIONS

C  Strong customer orientation.

C  Excellent interpersonal and communication skills including presentation skills.

C  Computer proficiency to include Work, Excel and PowerPoint.

C  Ability to travel independently up to 60% of the time within the Domestic United States to attend various meeting with other personnel and public.

C  Ability to visit suppliers and customers.

C  Possess a current and valid driver's license.

C  Ability to regularly work 50+ hours a week and occasional weekends

EDUCATION and/or EXPERIENCE

C  Bachelor's degree (BA) from four-year college or university and a least five years of senior level management experience preferably in sales.

LANGUAGE SKILLS

C  Ability to read, analyze, and interpret financial reports and legal documents.

C  Ability to respond to common inquiries or complaints from customers, regulatory agencies, or members of the business community.  Ability to write speeches and articles for publication that conforms to prescribed style and format.

C  Ability to effectively present information to top management, public groups, and/or boards of directors

MATHEMATICAL SKILLS

C  Ability to work with mathematical concepts, read financial and understand financial statements such as probability and statistical inference.

C  Ability to apply concepts such as fractions, percentages, ratios, and proportions to

practical situations.

REASONING ABILITIES

C    The physical demands described her are representative of those that must be met by an

employee to successfully perform the essential functions of this job.

C    While performing the duties of this job, the associate is frequently required to sit; use

hands to finger, handle, or feel; reach with hands or arms; and talk or hear.  The associate

is required to stand and walk.  The associate must occasionally lift and/or move up to 10

pounds.  Specific vision abilities required by this job include close vision, distance

vision, color vision, peripheral vision, depth perception, and ability to focus.

C    Extensive automobile required to visit suppliers and customers

WORK ENVIRONMENT

C    The noise level in the work environment is usually moderate.

Plaintiff was assessed by vocational rehabilitation expert, Martin Kranitz, MA, CRC,

CVE, CPS.  In his report dated 7/19/01 (R0012 - 6), Mr. Kranitz (C.V. at 0351 - 4) summarized

Claimant's medical conditions, residual physical functional capacity, recreational activities and

work duties as well as including a personal interview.   Following this summary, Mr. Kranitz

concluded as follows:

Neal Smith, is a 59 -year-old college graduate who has worked in
wholesale sales for many years.  In 1995, he began experiencing back
problems which resulted in three surgeries (2 fusions) between 1997 and
2000.  Since his last surgery,  he experienced a brief recovery followed by
a gradual decline which currently limits his physical functioning
considerably.  He reports and physicians support, that he is unable to
stand, walk or sit for any length of time and, indeed, finds that he lays
down the vast majority of the day.  He reports a pain level of 5 if he stays
in the house which increases to 7 - 8 if he leaves that house.  Even without
leaving the house, he experiences a level 10 pain at least once a day,

10

lasting for about 45 minutes on each occasion.

Given these kinds of limitations...it is my belief and opinion that he is not capable of performing any significant gainful employment. That is, competitive employment which requires consistent and ongoing activities in the range of 35 - 40 hours per week.

Given the difficulties with walking, standing, and sitting I do not believe there is competitive work which he could perform.

Given the decrease in production, described by Dr. Launder (36%), it is my belief and opinion that an individual with a 36 percent decrease in production would not be able to perform any type of competitive employment.

Given an individual who has to lay down 75 percent of the day, it is my belief and opinion that there is no competitive employment that such an individual could perform.

The above are my findings and opinions to reasonable degree oprofessional certainty....

As part of his report, Vocational expert Kranitz reviewed the entire medical record including functional capacity findings and interviewed the Plaintiff, at which time he noted that the Plaintiff was restricted to 15 minutes sitting then lied down on the floor for the remainder of the interview.

The Addendum Report by Vocational Expert, Martin Kranitz, dated 2/8/02 (0238 - 242) states the following:

I have reviewed the Functional Capacity Evaluation, dated December 20th, 2001, signed by P. Stephen Macedo, M.D. and Eric Meyer, D.C., performed on Neal Smith. This report based on objective findings, helps to confirm my opinions concerning Mr. Smith. It is significant that Mr. Smith failed six of the postural tests and functioned below the 75th percentile on many tasks he was asked to perform.

The limitations for sitting, standing, and walking are even greater than those estimated by Mr. Smith in July, 2001. The report goes on to say that: when the lifting ability is combined with the patient's dynamic

11

functional deficits, his functional capacity is below the sedentary work
threshold.

I see nothing in this report that would contradict my conclusions stated in
my July, 2001 report.  In fact, I believe the limitations found in the
Functional Capacity Evaluation strengthen my conclusions.

PERSUASIVE DISABILITY FINDING BY THE SOCIAL SECURITY ADMINISTRATION:

Claimant received a fully favorable decision from Administrative Law Judge Douglas R.

Due dated 2/25/02 (0244 - 250).  As the decision states, there was sufficient evidence in the

claims record so that a hearing was not necessary.  As part of his decision, Judge Due stated that

Claimant was unable to perform his past work or other work for which he was qualified by work

experience and functional capacity.  Specifically, Claimant was found disabled as of 2/23/01, the

date he ceased working at his former place of employment.

SPECIFIC INSTANCES OF ARBITRARY AND CAPRICIOUS CLAIMS HANDLING BY
DEFENDANT

During a phone interview on 3/16/01 (0084 - 87 at 0085) with CNA representative Pam

Ward, Plaintiff needed to lie down on floor for first 12 minutes and stated activities of daily

living consistent with his condition including inability to sit, walking to get his mail, using

combination cane/stool, sleep disturbance, limited driving, among others.  Job duties noted

included traveling up to 60% of time three times of week by air and car to visit clients (0086 - 7)

Defendant ignored the letter from Marilyn Schwartz, Director of Human Resources of J.J.

Haines, which stated her concerns about the denial of benefits to Plaintiff since he was unable to

function in his capacity, being unable to travel for the purpose of seeing clients or training sales

employees. (0111) The same observation that Plaintiff could not perform his job despite

accommodations was made by Bob Thompson, President of J. J. Haines & Comp., noting

Plaintiff's difficulty with travel (limited to once a week with interruptions to lie down)and spending most of workday lying on the floor (0211).

Despite this information, Plaintiff's file was remanded back on 9/17/01 for further findings by the insurer to determine how his condition "impacts his functionality." (0342) This additional review was not authorized in the Plan, but was undertaken by the insurer in order to create evidence on which to base a claim denial.

Surveillance was attempted by Defendant's contractor, Investigative Options, on 10/9, 10/11, 10/12 and 10/13/01 with no success.  On 10/17/01, a 1 minute 30 second videotape of Claimant walking to and from his vehicle was obtained on 10/17/01.  (Videotape marked and submitted for review).  Despite having no other videotape evidence, the unnamed investigator filed a report which stated that Claimant was seen walking with a cane demonstrating an obvious limp. The investigator stated that h had been seen walking in a restricted and unrestricted manners, yet had no videosurveillance evidence to demonstrate this claim despite his extensive surveillance efforts. (0007 - 8, 0331 - 0335).  This is the same cane with attached stool seat utilized by Claimant observed by IME examiner, William Launder (0009).  For its efforts, Investigative Options received payment in the amount $1,386.53 (0319).

Defendant made little or no medical inquiry into Plaintiff's condition.  It requested Dr. Lowe to answer a single question on 4/9/01 asking if Plaintiff could perform work which allowed him to control the amount of sitting or standing he performed. (0039) The answer to this question alone was used to justify denial of the claim (CNA record of Pam Ward dated 4/12/01)(0207).

The insurer has based its final benefits denial on the report from M.. Marc Soriano, M.D.

13

from Elite Physicians, a subsidiary of Network Medical Review Company (NMR) (0283 - 0287). For this service, Network Medical Review was paid $915.00 by CNA for its "rush" claim review (0282).

Dr. Soriano states that Claimant's only basis for his disability are complaints of pain and such evidence such as a slow and shuffling gait are "a patient controlled phenomenon" and "are often an indication of functional illness and symptom exaggeration." His statement that Plaintiff has no limb atrophy is contradicted by the 7/2/01 findings of examining orthopedic surgeon, William Launder (00018) who noted mild noted limb atrophy.

The substance of Dr. Solomon's comments are absolutely undermined by the subsequent signed verification by Dr. Solomon stating that he has not expressed any opinion concerning Claimant's condition or functional capacity which extends past his last date of examination of 6/11/01. (0231) Since Dr. Solomon had made no finding beyond his original findings of post-surgical disability extending for three months, there was no contradictory evidence for Claimant to return to work based on the previous estimated opinion at which time Claimant had been approved for benefits by CNA. All subsequent opinions all other treatment providers, IME by Dr. Launder and FCE by Dr. Macedo all confirmed Plaintiff's continuing disability.

LEGAL AUTHORITY AND ARGUMENT:

Summary Judgement is appropriate in this matter.

A motion for summary judgement should be granted when it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to judgement as a matter of law." Fed.R.Civ.P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgement "bears the initial responsibility of informing the district court

14

of the basis for its motion, and identifying [which materials]...it believes demonstrates the

absence of a genuine material fact." *Celotex Corp.*, 477 U.S. at 323.  A fact is "material" only

the fact "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty

Lobby*, 477 U.S. 242, 248 (1986). A dispute regarding a material fact is "genuine...if the

evidence is such that reasonable jury could return a verdict for the nomoving party." *Id*.  A party

"must do more than simply show that there is some metaphysical doubt as to the materials facts."

*Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The material facts in this case are well-established and are not contested.  Therefore,

summary judgement is appropriate.

<u>The modified abuse of discretion standard due to the conflict of interest should be applied.</u>

ERISA-governed benefit claims are to be given a "full and fair review."  ERISA §503, 29

U.S.C.  The origin of the applicable standard of review was set forth in *Firestone Tire & Rubber

Co. v. Bruch*, 489. U.S. 101 (1989) in which the Supreme Court plainly stated:

> if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion." *Id*. at 115 quoting Restatement (Second) of Trusts § 187 (1959).

This decision went on to specifically state that even the most careful and sensitive fiduciary in

those circumstances may unconsciously favor its profit interest over the interests of the plan,

leaving beneficiaries less protected than when the trustee acts without self-interest and solely for

the benefit of the plan. *Id*., *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80, 86-7

(4th Cir. 1993).

A fiduciary with a conflict of interest must act if he is "free" of such a conflict.  *Bedrick

v. Travelers Ins.* 93 F.3d 149, 154 citing *Doe*, 3 F.3d at 87.  "Free" is an absolute.  There is no

15

balancing of interests; ERISA commands undivided loyalty to the plan participants.  *Id*.  More succinctly, a claims decision must not only be reasonable, but appropriate. *Hines v. Unum*, 110 F. Supp. 2d 458, 464 (W.D.Va. 2000) citing <u>*Klebe v. Mitre Group*</u>, 894 F. Supp. 898, 903 (D. Md. 1995), aff'd. 91 F.3d 131 (4th Cir. 1996); James F. Jorden, *et al*, *Handbook on ERISA Litigation*, § 4.049c0, at 4-42 (2ed. 2000).   Under this reasoning, the conflict of interest bears on the deference to be given to a claims decision applying the abuse of discretion standard of review.

The instant case presents the typical conflict of interest which arises in the ERISA context where both companies serves as plan administrator for an employee benefits plan while remaining responsible for paying out benefits from its own assets rather than a trust of assets. ERISA imposes on fiduciaries a duty of loyalty to act "with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits..." 29 U.S.C. § 1104(a)(1)(A), Restatement (Second) of Trusts § 170(1).  In doing so, plan administrators are required to give claims made by plan participants "full and fair review." 29 U.S.C.A. §1333(2)   A full and fair review accomplishes two goals: to allow plan fiduciaries to administer plans without a formal adversarial process; and to protect a participant from arbitrary or unprincipled decision-making.  *Bedrick v. Travelers Ins. Comp*., 93 F.3d 149 (4th Cir. 1996);  *Weaver v. Phoenix Home Life Mut. Ins. Co.* 990 F.2d 154, 157 (4th Cir. 1993) quoting *Grosmuller v. Int'l. Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 715 F.2d 853, 857 (3d Cir. 1983).

It has been specifically held that "each time [a fiduciary] approves a payment of benefits, the money comes out of its own pocket." *Edmonds v. Hughes Aircraft Comp. and Hartford Life*

16

*& Accident Ins. Comp.*, 1998 U.S. App. LEXIS 9419 (4th Cir.) (Unpublished).  The *Edmonds* decision described the duties of a fiduciary by quoting Justice Benjamin Cardozo's holding in *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928) as follows:

> Many forms of conduct permissible in a workaday world for those acting at arm's length, are strictly forbidden to those bound by fiduciary ties.  A trustee is held to something stricter than the morals of the market place.  Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.  As to this there has developed a tradition that is unbending and inveterate.  Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the "disintegrating erosion" of particular exceptions.  Only thus has the level of conduct for fiduciaries been kept at a level high than that trodden by the crowd.  It will not consciously be lowered by any judgment of this court.

Therefore, the fiduciary role of decisionmaker in approving benefits under the plan "lies in perpetual conflict with its profitmaking roles as a business." *Doe v. Group Hospitalization & Medical Services*, 3 F.3d 80, 86 (4th Cir. 1993) citing *Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1561 (11th Cir. 1990), cert. denied, 498 U.S. 1040, 112 L.Ed. 2d 701, 111 S.Ct. 712 (1991).   For this reason, it has been held that:

> The more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable the administrator or fiduciary's decision must be and the more substantial the evidence.  *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999) quoting *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997).

Because of the substantial conflict presented by a fiduciary acting in the dual role of administrator/insurer, the standard of review is altered.  To this end, it is the Court's role to examine the merits of the decision to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of interests that conflict with those of the beneficiaries.  Although the fiduciary decision is entitled to some deference, this deference must be lessened to

17

the degree necessary to neutralize any untoward influence resulting from the conflict. *Doe*,

*supra*, at 87, citing Restatement (Second of Trusts § 187 comment d, *Brown*, *supra*, at 1566,

*Bernstein v. CapitalCare, Inc.*, 70 F.3d 783 (4th Cir. 1995), *Jenkins v. Montgomery Industries,*

*Inc.*, 77 F.3d 740 (4th Cir. 1996), *Baker v. Provident Life and Accident Insurance Company*, 171

F.3d 399 (4th Cir. 1999), *Lewis v. Trustmark Insurance Company*, 1999 U.S. App. Lexis 1999

(4th Cir.), *Smith v. George Sydnor, Jr.and the McGraw Group, Inc.*, 184 F.3d 356 (4th Cir. 1999).

   A more thorough recitation of this standard was set forth in *Bedrick v. Travelers Ins. Co.*,

93 F.3d 149, 152 (4th Cir. 1996) which stated:

> the problem...is that every exercise of ...discretion has a direct financial
> effect on Travelers...Inasmuch as the law is highly suspect of "fiduciaries"
> having a personal interest in the subject of their trust, the "abuse of
> discretion" standard is not applied in as deferential manner to [plans
> where] the insurer processes and pays claims and acts as plan
> administrator.

This flexible standard of review allows for due consideration of the conflict of interest as part of

the abuse of discretion standard. The *Bedrick* holding was expanded upon in *Williamson v. T. A.*

*Massey Coal Comp., Inc.*, 56 F. Supp. 2d 656, 660 (S.D. W.Va. 1998) which stated that a

defendant similarly situated:

> has a direct financial interest in determining whether or not a participant is
> disabled. If a participant is found disabled, defendant sustains the
> financial burden of paying the participant benefits.

   The abuse of discretion standard of review was first addressed by this Court in *Klebe v.*

*Mitre Group*, 894 F. Supp. 898, 903 (D. Md. 1995), aff'd. 91 F.3d 131 (4th Cir. 1996), which

reconciled the cases of *Doe*, *supra*, *Brown*, *supra*, and *Anderson v. Blue Cross/Blue Shield of*

*Alabama*, 907 F.2d 1072 (11th Cir. 1990), modifying the abuse of discretion review standard as

follows:

18

> Taken together, these cases suggest the following rule: Whenever the less deferential standard applies, a court may substitute its own judgment if it disagrees with the conflicted decisionmaker, even if the decisionmaker's determination is reasonable. However, the court may give latitude to that decisionmaker to demonstrate that its determination was not only reasonable, but appropriate, i.e., that the decision was in the interest of all the participants in the plan. Under the same standard, if the court believes the decision both reasonable and correct, it may simply affirm the decision notwithstanding the conflict.

Recent holdings have further defined the abuse of discretion standard. In *Edmonds v. Hughes Aircraft Comp. and Hartford Life & Accident Ins. Comp.*, 1998 U.S. App. LEXIS 9419 (4th Cir. 1998) (unpublished), the court addressed the situation of a conflicted fiduciary held to act "solely in the interest of the participants and beneficiaries" in accordance with 29 U.S.C. § 1104(a)(1)(A) as follows:

> In an insurer-funded, insurer-fiduciary plan, the legitimate consideration can be very difficult to distinguish from the wholly illegitimate consideration of the insurer's own profits. After all, once the premium is paid, the plan is "fully funded" in the sense that the risk of the unanticipated expenses is shifted from the plan's sponsor and beneficiaries to the insurer. A fiduciary that bears such a risk and simultaneously has the discretion to lessen it has a direct conflict of interest. **ERISA tolerates the existence of this conflict of interest, but it does not tolerate any adverse consequence to plan beneficiaries.** As we noted earlier, the fiduciary must act solely in the interest of the plan's participants and beneficiaries. (Emphasis added)

Similarly, in *Adelson v. GTE Corp.*, 790 F. Supp. 1265 (D. Md. 1992) the administrator/insurer conflict situation was described as follows:

> Under these circumstances, particularly against the background of an economic recession and the unfortunate emphasis which American business places upon short-term profits, a more direct conflict of interest could scarcely be imagined. *Id.* at 1270 citing *Newell v. Prudential Ins. Co. of Am.*, 904 F.2d 644, 650-52 (11th Cir. 1990); *Jader v. Principal Mut. Life Ins. Co.*, 723 F. Supp. 1338 (D. Minn. 1989).

As disclosed by Defendant's counsel pursuant to Local Rule 103.3, CNA Financial Corporation is the parent company of Continental Casualty Company.  For this reason, the Defendant is functioning in the dual role as insurer and administrator of the subject Plan.  Where it is clear that CNA determines who receives benefits under the plan and also pays those benefits, a heightened standard of review is warranted.  *Thorpe v. Continental Casualty Co.*, 2002 WL 31845876 (E.D. Pa.); *Edgerton v. CNA Ins. Co.*, 215 F. Supp.2d 541, 548 (E.D. Pa. 2002)..  It has been held that CNA deciding an appeal of its own denial of benefits to a claimant would result in a presumption of a conflict of interest for the its dual role.  *Spanos v. TJX Companies, Inc.*, 220 F. Supp.2d 67, FN10 (D. Ma. 2002) citing *Nord v. Black & Decker Disability Plan*, 296 F.3d 823, 828 (9th Cir. 2002) quoting *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 797 (9th Cir. 1997).

Plaintiff argues that such heightened scrutiny is required in the present matter, which involves similar self-dealing by Defendants.

The sliding scale analysis must be adopted in order to address the Defendant's instances of arbitrary and capricious claims review.

Material, probative evidence of a conflict of interest a conflict of interest may consist of inconsistencies in the plan administrator's reasons, *Lang v. Long Term Disability Survivorship Plan*, 266 F.3d 794m 799 (9th Cir. 2001), insufficiency of those reasons, *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 977 (9th Cir. 1999), or procedural irregularities, *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999).  Procedural anomalies should be reviewed with under a sliding scale due to the conflict presented with decisions reviewed with a "high degree of skepticism." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 - 395 (3rd Cir. 2000) or receive close scrutiny of the plan administrator's decision by the court.  *Austin v. Continental Casualty Co.*,

20

2002 WL 1969342 (W.D.N.C.) citing *Holder v. Woodmen of the World*, 11 Fed. Appx. 104 (4th Cir. 2001); *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993).

In this case, Continental Casualty Company and CNA are related corporate entities with a concert of interest. But for being given different names, the same corporation is serving as both the insurer and the third party administrator. This results in an immediate conflict of interest since the corporate interest to preserve it assets runs contrary to the fiduciary duty to the Plaintiff to undertake an full and fair review of his disability claim.

Material, probative evidence of a conflict of interest may consist of inconsistencies in the plan administrator's reasons, *Lang v. Long Term Disability Survivorship Plan*, 266 F.3d 794m 799 (9th Cir. 2001), insufficiency of those reasons, *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 977 (9th Cir. 1999), or procedural irregularities, *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999). Procedural anomalies should be reviewed with under a sliding scale due to the conflict presented with decisions reviewed with a "high degree of skepticism." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 - 395 (3rd Cir. 2000) or receive close scrutiny of the plan administrator's decision by the court. *Austin v. Continental Casualty Co.*, 2002 WL 1969342 (W.D.N.C.) citing *Holder v. Woodmen of the World*, 11 Fed. Appx. 104 (4th Cir. 2001); *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993).

A. *Following Approval of Plaintiff's Disability Benefits, CNA Terminated Benefits Despite A Complete Absence of Any Evidence Demonstrating Improvement in His Condition.*

Termination of benefits without a change in claimant's condition and sudden rejection of the treating physician opinion has been ruled to be a material, probative evidence of conflict for these purposes. *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1134, 1146

21

- 7 (9th Cir. 1999)   The facts in this matter demonstrate material, probative evidence beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breached in its fiduciary duty to the beneficiary.  *Frost v. Intel Corp.*, 2002 WL 1287889 (9th Cir. Ariz.) citing *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1323 (9th Cir. 1995).  For these reasons, sliding scale analysis as set forth in *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997) should have been undertaken in this case.

A decision by the insurer that a claimant was no longer disabled is unreasonable when contradicted by contrary evidence in the claims record. *Hozschuh v. Unum Life Ins. Co. of Am.*, 2002 U.S. Dist. LEXIS 13205, *22-26 (E.D. Pa. 2002);   *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001) citing *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996..  It is incumbent upon an insurer previously paying benefits to produce evidence that a claimant had recovered the ability to perform his past work.  *Walke v. Group Long Term Insur.*, 256 F.3d 835 (8th Cir. 2000).  This includes a "sudden and thinly supported departure from the prevailing diagnosis"offered by the treating doctors.  *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1130, 1147 (9th Cir. 1999) as was evidence in this case where no significant change in the claimant's condition had been demonstrated by the insurer.  See also *Carugati v. LTD Plan for Salaried Employees* 2002 WL 441479 (N.D.Ill.); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.2d 586, 589 (8th Cir. 2002)

A reversal of a decision to grant long term disability benefits without sufficient new medical information to justify that decision is reason to treat that decision with "significant skepticism." *Thorpe v. Continental Casualty Co.*, 2002 WL 31845876 (E.D. Pa.) at *4 citing *Holzschuh v. Unum Life Ins. Co. of Am.*, 2002 U.S. Dist. LEXIS 13205, at *18 (E.D.Pa.)

Even cursory examination of the defendant's decision-making process indicates that it failed to consider all of plaintiff's medical evidence or consider all of his conditions in conjunction with each other and took an "adversarial" approach. *Laser v. Provident Life & Accident Insur. Co.*, 211 F. Supp.2d 645, 656 (D. Md. 2002) citing *Williamson v. A.T. Massey Coal Co., Inc.*, 56 F. Supp.2d 656, 661 (S.D.W.Va. 1998) and as cited favorably in *Willis v. Baxter Int'l, Inc.* , 175 F. Supp.2d 819, 831 (W.D.N.C. 2001).  To this end, where plans repeatedly hire the same experts as physicians, there is a conflict of interest.  *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1134(9th Cir. 1999) cited favorably in *Walker v. LTD Plan of Sponsor Tri-Valley Growers*, 2002 WL 467684 (N.D.Ca. 2002).

B.  *The Treating Physician Findings Should Be Afforded Greater Weight Than the Nonexamining Reviewer Findings Relied upon by CNA.*

In the Social Security disability context, the treating physician rule states that greater weight is to be afforded to the opinion of the treating physician as compared to that of an examining or reviewing physician.  20 C.F.R. §§404.1527/(d)m 416.927(d)(2001).  Social Security disability decisions in the fourth circuit have supported this rule.  *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983).

The Fourth Circuit has not indicated whether the treating physician rule should be applied in the ERISA disability determination context, *Laser v. Provident Life & Accident Insur. Co.*, 211 F. Supp.2d 645 (D. Md. 2002), but rather has only made the decision not to apply this rule where medical determination of prescribed treatment.  *Sheppard & Enoch Pratt Hosp., Inc. v. Travelers Ins. Co.*, 32 F.3d 120, 126 (4th Cir. 1994).  Treatment of the physician treatment rule in the ERISA context was intimated in *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir. 1999), but persuasive contradictory evidence existed. In this case, no credible contradictory has

been set forth to oppose the strong concert of opinion as to Claimant's inability to engage in any employment which commands consideration of this rule in the instant case.

Noting that the Fourth Circuit had failed to rule definitively on this issue, it was ruled that a treating physician should be given greater deference than an employee of the administrator/insurer. *Davidson v. Kemper Nat'l. Servs., Inc.* 2002 U.S. Dist. LEXIS 20198 at *20 (W.D.Va. 2002). Similarly, and with nearly identical general facts, in *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp. 2d 645, 655 (D.Md. 2002) it was held that it was arbitrary and capricious for a plan administrator to deny a claimant benefits where there no conflicting reports from treating physicians, no independent examation undertaken, and where the administrator determined that the limitations set forth by the treating physician were inappropriate.

The leading cases in cited are *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1134 (9th Cir. 1999) and *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996). The *Regula* court specifically found that the treating physician rule is not inconsistent with the discretion afforded plan administrators, stating:

> Whereas differences exist between ERISA and Social Security in the discretion afforded the plan administrators and ALJs interpreting the terms of benefits coverage, we are not convinced that their roles differ significantly when it comes to deciding whether the facts of a particular case fall withing clearly established definitions of what constitutes disability. As in the Socials Security disability context, a rule requiring plan administrators to give special weight to the opinions of treating physicians is a similarly common sense requirement that, while inconsistent with the exercise of *absolute* discretion, is perfectly consistent with the plan administrator's role in properly determining whether a particular claimant is disabled. *Id*. At 1143 - 4.

Under *Regula*, an opinion of a treating physician may be rejected by a nontreating

physician if the [plan administrator] gives specific, legitimate reasons for doing so that are based on substantial evidence of record. *Id*. At 1140 citing *Morgan v. Commissioner*, 169 F.3d, 595, 600 9th Cir. 1999).

Rejection of the opinion of Claimant's treating physicians is sufficient to establish conflict of interest. *Nord v. Black & Decker Disability Plan*, 296 F.3d 823 (9th Cir. 2002) (*cert. granted* argument scheduled for 4/29/03)citing *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1130 (9th Cir. 1999); See Also *Ehrensaft v. Dimension Works, Inc. Long Term Disability Plan*, 2002 SL 770611 (9th Cir.  Nev.); *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127 (2nd Cir. 2001) Similarly, less weight should be afforded to a reviewing physician as compared to a examining or treating physician. *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001) citing *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996).  Opinions of treating physicians are to be given substantial, and sometimes even controlling, weight.  *Skretvedt v. E.I. Dupont De Nemours and Co.*, 268 F.3d 167, 184 (3rd Cir. 2001); *Edgerton v. CNA Insur. Co.*, 215 F. Supp.2d 541 (E.D. Pa. 2002)

The treating physician, having observed a patient over an extended period, is in a unique position to fully assess a claimant's functional capacity.  *Edgerton v. CNA Insur. Co.*, 215 F. Supp.2d 541 (E.D. Pa. 2002) citing *Skretvedt v. E.I. Dupont De Nemours and Co.*, 268 F.3d 167 (3rd Cir. 2001); *Cohen v. Standard Ins. Co.*, 155 F. Supp.2d 346, 352 (E.D.Pa. 2001); *Siebert v. Standard Ins. Co. Group LTD Policy*, 220 F.Supp. 2d 1128 (C.D.Ca. 2002); *Walker v. LTD Plan of Sponsor Tri-Valley Growers*, 2002 WL 467684 (N.D.Ca. 2002).

Reliance upon a "paper" review for the purpose of rejecting a treating doctor's opinion without obtaining additional medical evidence or testing is evidence of abuse of discretion.

*Hines v. Unum Life Ins. Co. of Am.*, 110 F. Supp.2d 458, 463 (W.D.Va. 2000) A court may review skeptically an administrator's decision to afford decisive weight to the opinions of its own staff and to minimize those of the treating doctor. *Id.* At 467; See also *Pappas v. Reliance Standard Ins. Co.*, 20 F. Supp.2d 923, 931 (E.D.Va. 1998). A non-examining, reviewing physician cannot ignore consistent conclusions of disability by a claimant's treating physician, choosing to rely only on those parts of the record to justify a denial while ignoring contrary objective information. *Hozschuh v. Unum Life Ins. Co. of Am.*, 2002 U.S. Dist. LEXIS 13205, *22-26 (E.D. Pa. 2002).

      C. *The nonexamining reviewer employed by CNA is regularly utilized for the purpose of procuring claim denials.*

      Network Medical Review (NMR) is a company regularly utilized by benefit plans to procure medical evidence to base denial decisions. *Piscottano v. MetLife Ins. Co.,* 118 F. Supp. 2d 200 (Conn. 2000), *Dew v. MetLife Ins. Co.*, 69 F. Supp. 898 (S.D.Tx. 1999), *Wojciechowski v. MetLife Ins. Co.*, (S.D.N.Y. 1999), *Voight v. MetLife Ins. Co.*, 28 F. Supp. 2d 569 (Central Dist. CA 1998). It has been held to be "continually"used by Metropolitan Life Insurance Corporation for this express purpose. *Vartanian v. MetLife*, 2002 WL 484852 (N.D. Ill.)

      In *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001) it was held that:

> the conflict of interest when benefit plans repeatedly hire particular physicians as experts [since] these experts have a clear incentive to make a finding to save their employers money and to preserve their own consulting arrangements.

This exact language was cited again favorably in *Darland v. Fortis Benefits Benefits Insur. Co.*, 2003 WL 141620 (6th Cir.(Ky)).

Further evidence of NMR's bias was set forth in *Austin v. Continental Casualty Co.*, 2002 WL 1969342 (W.D.N.C.) which stated that NMR's internet materials described the purpose of their reviewing function as to "support the retained functional abilities of an individual." This statement made it clear to the court that this source of referral was not to an "independent" medical examiner as asserted by the defendant. *Id.* at FN1

In particular, the review findings by the NMR physician were accorded less weight than the treating physician since the treatment providers were in a better position to evaluate the extent and severity of Claimant's condition. *Piscottano v. MetLife,* 118 F. Supp. 2d 200 (Conn. 2000) citing *Durr v. MetLife Ins. Co.*, 15 F. Supp. 2d 205, 213 (D. Conn. 1998).

It is more disturbing that the insurer seeks to base its denial on the findings of a nonexamining reviewer, but will not give credence to the opinions of the other treating and examining physicians. For this reason, the insurer has engaged in "opinion shopping" to suit its purposes of claims denial as has been made evident by the "rush" solicitation for NMR assistance in this matter.

The nonreviewing examiner has relied on insubstantial information. The review by Dr. Soriano of NMR is not based on a physical examination. Therefore, if he were to base his assessment on the medical reports, there is no means for him to deny disability given the concert of opinion contrary in support of disability. Further, Dr. Soriano made no effort to contact any treating physicians other than Dr. Solomon as part of his partial and incomplete review.

The single contact with Dr. Solomon involved a hearsay phone conversation (0285 - 286) for which no verification of facts was presented to Dr. Solomon for signature. In the disability context, all doctor opinions must be signed in the Social Security disability system, 20 C.F.R. §

404.1519(o), a standard which should be employed in this setting in order to prevent such bad faith conduct by unscrupulous insurers as has occurred in this case.

As part of his second appeal for benefits, Plaintiff produced a verified statement from Dr. Solomon which stated that he had not been examined by him recently and no opinions could be expressed for Plaintiff's condition at the time of claim denial.

Dr. Sorian's constant criticism that Plaintiff's physicians based their opinion on self-reported complaints is absolutely ridiculous.  Pain is subjective by definition.  There is no meter which can be inserted into a human being to measure that person's level of pain.  Only the person suffering with pain can appreciate the sensation and  explain its severity.  To express opinions contrary to this simple premise is wholly irresponsible and demonstrative of undue bias.  Dr. Sorian's comment that Plaintiff's limp was a "patient controlled phenomenon" is offensive.  Certainly, the Plaintiff would not wish to limp if he could avoid doing so.  Further, there would no reason for him to limp while being surreptitiously videotaped if he could not help doing so.  Without such a statement, there would be no evidence to contradict the videotape surveillance evidence.  This is merely another overt effort to create contrary evidence in a claim in which there is a clear and overwhelming concert of support.

Given the facts as alleged, the opinion of the nonexamining reviewer can be given no credence whatsoever.  For this reason, use of his opinion is transparent evidence of arbitrary and capricious claims review.

The overall conduct exhibited by CNA is reminiscent of that in *De Dios Cortes v. MetLife, Inc.* 122 F. Supp.2d 121, 132 (D. Puerto Rico 2000) where MetLife, acting as plan insurer and administrator, was ruled to have abused its discretion and finding a claimant not

disabled by failing to set forth any substantial evidence to contradict the treating physician

opinion relying solely on a review by NMR, failed to independently observe any activities, and

failed to order an independent medical examination.

     C. *CNA Failed to Afford Appropriate Weight to the Findings of the Social Security Administration.*

     This findings by the ALJ Due are fully supported the applicable case law.  The Social

Security Rulings 96-9p, 85-15, 83-10, and 83-14 support the premise that the inability to stoop

significantly erodes the occupational base so as to preclude employment.  As cited in the

attached pertinent portions of <u>Social Security Issues Annotated</u> by Sandra Bohr, Esq. and

Chantal Harrington, Esq. and <u>Social Security Rulings</u> by Ralph Wilborn, Esq., (0368 -

0405)these rulings have formed a well-defined body of law which set forth this premise.  SSR

83-10 set forth the fact that Plaintiff's inability to stoop is considered a nonexertional

impairment.  SSR 83-14 sets forth that stooping is performed in most sedentary and light jobs,

needing to be performed occasionally.  Further enhancement of this concept was presented in 85-

15 which stated that stooping is a progressively more strenuous form of bending.  If a person can

only stoop occasionally in order to lift objects, the sedentary and light occupational base is

virtually intact.  SSR 96-9p definitely stated the latest and complementary portion of the law.

This ruling provides that the inability to stoop occasionally is required in most unskilled

sedentary occupations.  It went on to state that a complete inability to stoop significantly erodes

the unskilled sedentary occupational base.

     Further support is gleaned from in the extensive body of Social Security

Disability law..  In <u>Luna v. Shalala</u>, 22 F.3d 687, 690 (1994)(0409 - 0423) held that under SSR

83-14 that a person would need that ability to stoop occasionally to perform substantially all of

the exertional requirements of most sedentary jobs.  The ruling in <u>Hammond v. Heckler</u>, 765

F.2d 424, 426 (1985)(0406 - 0408)  which stated that a claimant could not perform a series of

activities including the inability to stoop which led to a decision remand when the ALJ found the

Claimant capable of work.  Please note that these cases were decided prior to the issuance of

SSR 96-9p which is far more instructive concerning the mandatory finding of disability due to

the inability to stoop.

The Social Security standard of disability is even more restrictive to the standard of

disability employed by the Defendant.  The Social Security standard states that a claimant must

demonstrate the inability to do any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months.  *Elliot v. Sara Lee Corp.*, 190 F.3d 601, 607, fn.5 (4th Cir.

1999) citing 20 C.F.R.  § 404.1505(a).  Given the similarity of definition of "disability" by SSA

and which should have been utilized by the Appellees, the fully favorable disability decision of

SSA should weigh more favorable and other evidence.  *Gallagher v. Reliance Standard Life Ins.*

*Co.*, 305 F.3d 264, 275 (4th Cir. 2002).  In fact, the more restrictive definition utilized by SSA as

compared to the pertinent SPD definition requiring that the Coffman only be disabled from his

occupation, should accord greater deference.

While insurer is not bound to the determinations by SSA, the similarity of definitions of

disability should have given the ALJ finding significant weight.  *Hines v. Unum*, 110 F. Supp. 2d

458 (W.Va. 2000).

The insurer's failure to weigh the findings of the Social Security Administration in their

denial of benefits constitutes arbitrary and capricious claims handling.  *Piscottano v. MetLife,*

118 F. Supp. 2d 200 (Conn. 2000) citing *Durr v. MetLife Ins. Co.*, 15 F. Supp. 2d 205, 213 (D.

Conn. 1998).  The *Durr* Court cited the Social Security standards as follows:

> (i) the frequency of examination and the length, nature, and extent of the
> treatment relationship; (ii) the evidence in support of the opinion; (iii) the
> opinion's consistency with the record as a whole; (iv) whether the opinion
> is from a specialist, and (v) other relevant factors.  *Id.* at 212, citing 20
> C.F.R. § 404.1527(d)(2) - (6)

These factors were described as "instructive" for this purpose.  *Durr*, *supra*, citing *Halpin*

*v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 n.11 (7th Cir. 1992), *Torix v. Ball Corp.*, 862 F.2d

1428m, 1431 & n.6 (10th Cir. 1988), *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420-21 & n.6 (11th

Cir. 1984). To this end, NMR's report was found to be "largely conclusory in nature" and did not

constitute "substantial evidence" for determination of ineligibility.  *Id.*  (denial upheld on bases

of treatment provider reports and observed political campaign activities).

It was further held in *Austin v. Continental Casualty Co.*, 2002 WL 1969342 (W.D.N.C.)

Failing to consider the ultimate vocational determination of the Commissioner of Social Security

is done at an administrator's peril since federal courts are keenly aware the close scrutiny Social

Security disability benefit decisions receive.

The denial letter by CNA dated 5/2/02 stated their decision was made "independent of"

the favorable decision by the Social Security Administration dated 2/25/02  (R0210 - 0214 at

0211).   This pronouncement by CNA runs contrary to the cited law and serves as additional

evidence of arbitrary and capricious claims handling.

D.  *CNA failed to undertake any meaningful vocational assessment in this matter.*

CNA failed to undertake any significant analysis concerning Plaintiff's ability to perform

31

his past position as Vice-President of Sales for the Floor Covering Department.  Claimant's past work involved traveling up to 60% of the time, mostly by automobile, as well as the ability to work long hours while sitting and standing.  The functional capacity findings set forth by Dr. Launder from his independent medical examination and by Dr. Macedo derived from a functional capacity evaluation led to limitations stating that Plaintiff could not perform work, especially his past prior job.  These findings were further buttressed by the conclusions of vocational rehabilitation expert, Martin Kranitz, who found that Claimant could not perform any type of employment.

It was considered "not only high-handed, but also certainly evidence of a conflict" where a plan administrator rejected the conclusion of its own human resources manager that the participant was no longer capable of performing his former position.  *Nord v. Black & Decker*, 296 F.3d 823 (9th Cir. 2002).   In this case, CNA ignored the statements of both the Plaintiff's Human Resources Director and company President who both noted that Claimant was unable to perform his position.

Remand occurred where a plan administrator failed to view medical evidence in the context of the claimant's physically demanding job and discounted treating physicians' opionions as done in this case.  *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp. 2d 645, 656 (D.Md. 2002).

Counsel for Plaintiff is entitled to legal fees as a result of Defendant's conduct.

In accordance with 29 U.S.C. 1132(g)(1), a party who prevails on a significant issue is entitled to receive attorney's fees.  This statute has been interpreted by the Fourth Circuit to include the following five factor test:

(1) degree of opposing party's culpability or bad faith;
(2) ability of opposing party to satisfy an award of attorney's fees'
(3) whether an award of attorney's fees against the opposing party would deter other persons acting under similar circumstances;
(4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal questions regarding ERISA itself; and
(5) the relative merits of the parties' positions.

*Austin v. Continental Casualty Co.*, 216 F. Supp.2d 550, 561 (W.D.N.C. 2002) citing *Martin v. Blue Cross & Blue Shield of Virginia, Inc.*, 115 F.3d 1201, 1209-10 (4th Cir. 1997) citing *Denzler v. Questech, Inc.* 80 F.3d 97, 103 (4th Cir. 1996).

The five factor test is not meant to serve as a rigid test, but rather, provide general guidelines for the Court. The Fourth Circuit has recognized that some of the factors may be inapplicable or inappropriate in any given case. *Rego v. Westavaco Corp.*, 2002 WL 1009599 (M.D.N.C.) citing from *Denzler*, *supra*, at 104; *Johannsen v. District No. 1 – Pacific Coast District*, 2001 WL 77097 (D.Md.); *Metropolitan Life Ins. Co. v. Pettit*, 164 F.3d 857, 865 - 6, (4th Cir. 1998). Further, "The foremost principle...of attorneys' fees awards under ERISA is the discretion the statute grants to the district court. *Quesenberry*, *supra*, at 1029 citing *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266.

Plaintiff contends that all five factors of the test have been met and, if so determined by this Court, should result in an award of attorney's fees in this case.

CONCLUSION:

The Defendant, Continental Casualty Company, through its parent corporation, CNA, has served as both insurer and administrator concerning the Plaintiff's claim for long term disability benefits. This dual role is rife with conflict of interest as is evidenced throughout the case law. This inherent conflict of interest has been demonstrated throughout the claims process

33

in this case.  To this end, CNA has ignored the medical findings of all of the many treatment

providers and an independent examining specialist, all of whom have set forth findings fully

supportive of Plaintiff's disability.   These findings are backed by MRI, EMG, long term clinical

tests and observation by the trained treatment professionals.  CNA has further ignored the

findings of an independent functional capacity evaluation as well as the conclusions of a

vocational rehabilitation expert both which set forth findings that Plaintiff is not capable of

working.

This conduct by CNA is made more disconcerting given the fact that Plaintiff had been

approved for benefits, but was suddenly denied benefits almost immediately thereafter without

any substantial evidence to justify this action.  Following the benefits denial, Plaintiff, at his own

expense underwent a  functional capacity assessment which rendered results demonstrating his

complete disability.  This was again reviewed by a vocational rehabilitation expert who

concluded again that Plaintiff was disabled from all work.  At no time was there any change in

Plaintiff's condition so as to warrant any change in his disability benefit payment status.

In choosing to ignore the well-documented medical, functional capacity, and vocational

evidence supporting disability, CNA decided to embrace the findings of a nonexamining medical

reviewer from Network Medical Review.  As the claims file details, this review was done on a

"rush" basis as CNA was desperate to obtain any evidence on which to base a denial of a

previously approved claim.   The conclusions rendered by nonexamining reviewer only pointed

to Plaintiff's reports of pain as caused by his disabling condition.  The fact that Plaintiff has

undergone several surgeries to relieve his back condition, albeit unsuccessfully, which resulted

in a failed back syndrome was completely ignored by the reviewer.   It is absolutely clear that the

34

reviewer had no basis for the conclusions he rendered let alone substantial evidence on which to base his unsupported opinions.

The motivation for the NMR reviewer's conduct  is obvious and has been noted in several cases.  NMR is a company solely employed by plans for the purpose of creating medical evidence on which to base denial of disability benefits.  There is little doubt that CNA sought the services at NMR at the last minute for this express purpose.  Such action was made necessary after CNA was unsuccessful in securing any videotape evidence to contradict Plaintiff's disability despite five days of surveillance netting approximately one minute of videotaped activity.  The videotape shows Plaintiff  using a cane while he limped a short distance from his car to his doctor's office and back.  The rest of the surveillance revealed nothing as Plaintiff remains housebound most of the time due to his constant pain.

In addition, CNA specifically stated that it chose to ignore the findings of the Social Security Administration.  The standard for determination of disability by SSA is even stricter than that which was employed by CNA.  Despite this fact, CNA denied the claim without considering this finding of disability by SSA as part of its arbitrary and capricious determination.

Given the overwhelming support in favor of Plaintiff's disability, CNA sought to limit any inquiry in order to avoid creating any positive evidence of disability.  Even in its minimal inquiries, CNA learned that Plaintiff was able to sit for only very short periods of time, then would need to lie down to seek relief from his pain.  It also learned that Plaintiff needed the assistance of a cane with an attached seat (converting to a stool) so he could rest after walking short distances.

Even when making inquiries, CNA chose to ask very short and misleading questions in

its attempt to create evidence for potential claims denial.  Further, CNA attempted to rely on outdated findings from Dr. Solomon without making any inquiry as to whether Plaintiff was even being seen by him.  As it turns out, Plaintiff had been receiving treatment elsewhere as Dr. Solomon, the neurosurgeon undertaking all of Plaintiff's past procedures, previously indicated that further surgical intervention was contraindicated.   In addition, the medical reviewer failed to review or deliberately misquoted Dr. Launder's finding that Claimant has experienced limb atrophy. This bad faith conduct only serves to underscore Defendant's apparent conflict of interest as both insurer and administrator in the subject benefits claim.

Further, there was no time that CNA acknowledged the many duties and responsibilities involved with Plaintiff's past work as the Vice-President of Sales for Flooring.  The Plaintiff was a responsible sales executive who has worked his way to the top of the corporate ladder through his exemplary work.  This work involved keeping personal contact with both his customers and sales representatives.  This required substantial amounts of traveling for the purpose of sales and training meetings.  Plaintiff was a highly compensated employee who worked as long as he could despite his ongoing problems with his degenerating back condition. This is made even worse by CNA's choice to ignore communications from the Plaintiff's Human Resource Manager and corporation President, both of whom stated that Plaintiff was unable to perform the duties of his past work.  Further support is gleaned from the vocational expert assessment who also concluded that Plaintiff was not capable of performing any work. Rather than acknowledging these well-established facts, CNA chose to manufacture a claims denial for the obvious purpose of limiting its liability caused by Plaintiff's disability.

CNA's conduct is not unlike that of many other insurers who are attempting to hide

behind the abuse of discretion standard afforded by ERISA.  Even given this standard, it is

patently obvious that Continental Casualty through its parent company CNA has engaged in

arbitrary and capricious claims handling in this matter.  There is a clear absence of any

substantial evidence upon which to base a denial of Plaintiff's claim for disability and other

benefits.  This denial has been made for the purpose of creating a savings to the company rather

than adhering to the fiduciary responsibilities owed to the Plaintiff.

The self-serving and unjustified conduct exhibited by the Defendant and its parent

company is without factual or legal support.  For this reason, Plaintiff respectfully requests that

this Court award benefits to Plaintiff including all long term disability benefits withheld with

interest, granting of future benefits given Plaintiff's ongoing condition, waiver of all future

premium payments, restoration of his life insurance, as well as an award of attorney fees due to

Defendant's poor conduct in this matter.

Respectfully submitted,


_____
Scott B. Elkind #10810
Stephen F. Shea #4066
Elkind & Shea
801 Roeder Rd., Ste. 550
Silver Spring, MD 20910
P: (301) 495-6665
F: (301) 565-5111
Attorneys for Plaintiff


Plaintiff hereby requests oral argument on all issues addressed herein.


_____

Scott B. Elkind

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of April, 2003, a copy of Plaintiff's Cross Motion for Summary Judgement was mailed, first class, postage prepaid to:

Hisham M. Amin, Esq.
Bryan D. Bolton, Esq.
Bolton & Funk, P.A.
36 S. Charles St., 12th Floor
Baltimore, MD 21201-3111
Counsel for Defendants


_____
Scott B. Elkind