UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEAL S. SMITH                              *

     Plaintiff,                           *

v.                                         *        Civil Action No. WDQ 02-CV-3049

CONTINENTAL CASUALTY COMPANY               *

     Defendant.                           *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION TO
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

Bryan D. Bolton
Federal Bar No. 02112
Hisham M. Amin
Federal Bar No. 15570
Peter C. Ismay
Federal Bar No. 27118

Funk & Bolton, P.A.
Twelfth Floor
36 South Charles Street
Baltimore, Maryland  21201-3111
410.659.7700 (telephone)
410.659.7773 (facsimile)

Attorneys for Continental Casualty Company

Dated:        May 2, 2003

<u>TABLE OF CONTENTS</u>

I.   PRELIMINARY STATEMENT ................................................................................1

II.  STATEMENT OF MATERIAL FACTS.............................................................................2

     A.   Relevant Policy Provisions ...............................................................2

     B.   Mr. Smith's Claim For Benefits.........................................................2

     C.   The Initial Review And Denial Of Mr. Smith's Claim.......................................6

     D.   The Appeal.............................................................................................7

     E.   Remand For Further Investigation And Good Faith Payment Of Claim ..........................10

     F.   The Peer Review Report ...............................................................11

     G.   The November 21, 2001 Termination Of Benefits ............................................12

     H.   The Second Appeal And Additional Documentation ..........................................13

     I.   The Final Decision ..............................................................................14

III. ARGUMENT .....................................................................................................14

     A.   The Court Should Review Continental's Decision For Abuse Of Discretion ..................14

     B.   Continental's Decision Was Reasonable And Should Not Be Disturbed.........................15

          1.   Continental Engaged In A Sound Decision-Making Process ...............................16

               a.   The Social Security Administration's Determination Of
                    Disability Is Not Controlling ..................................................17

               b.   The "Treating Physician Rule" Has No Bearing On This
                    Case...........................................................................18

               c.   Dr. Soriano Rendered An Independent Evaluation Of Mr.
                    Smith's Condition .............................................................22

        d.    Mr. Smith's Remaining Arguments Also Are Unfounded ........................24

    2.    Substantial Evidence Supported Continental's Decision.......................................25

IV.   CONCLUSION.............................................................................................................26

Defendant Continental Casualty Company ("Continental"), pursuant to Federal Rule of Civil Procedure 56 and Local Rule 105.1, submits the following memorandum in support of its cross-motion for summary judgment and in opposition to the cross-motion for summary judgment filed by plaintiff, Neal S. Smith.

## I.    PRELIMINARY STATEMENT[1]

In this action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, Mr. Smith seeks to recover benefits under group long-term disability policy no. SR-83126022 (the "Policy"), which Continental issued to Mr. Smith's employer, J.J. Haines & Company ("J.J. Haines").[2]    According to Mr. Smith, he is "disabled" under the Policy's terms due to impairments to his back.

Mr. Smith has acknowledged that the Policy conferred upon Continental discretionary authority to make eligibility determinations with respect to claims for benefits brought under the Policy, and that a deferential standard of review of its decision to deny Mr. Smith's claim for benefits is appropriate.  (*See* Paper No. 9, Pl.'s Mot. to Revise Sch. Order at 1.)    The Court, therefore, should not reverse Continental's decision to deny Mr. Smith's claim unless the Court finds that Continental abused its

---

[1] The Court's March 31, 2003 Notice of Electronic Filing of Paper No. 17 states that Neal Smith filed the administrative record in this case.  Mr. Smith, however, did not file the administrative record in this case.  As Mr. Smith's "Notice of Filing of Lengthy Exhibits" indicates on its face, Mr. Smith filed only the "exhibits referred to in [his] Cross Motion for Summary Judgment."  (*See* Paper No. 17, Pl.'s Notice of Filing of Lengthy Exs.)  In order to avoid further confusion, Continental will be filing a complete copy of the administrative record and relevant policy documents associated with this matter.  The parties have conferred as to the contents of the administrative record.  (*See, e.g.,* Paper No. 11, Def.'s Resp. to Mot. to Revise Sch. Order ("[T]he parties agree to designate a single set of documents constituting the administrative record and will cite to it in their motions and briefs.").)

[2] Mr. Smith also seeks "Waiver of Premium" coverage under a group life insurance policy Continental Assurance Company issued to J.J. Haines.  Mr. Smith could be entitled to waiver of the premium on the life insurance policy only if Continental found that he was "disabled."  (*See* CCC 0600, 0608.)  Because Continental found that Mr. Smith was not disabled, he was not entitled to the premium waiver.  (*See* CCC 00002 (stating that the Waiver of Premium claim was "partnered" with the disability claim).)  Further, because Mr. Smith's entitlement to the premium waiver turns on the disability determination, there is no reason here to address the waiver issue separately.

1

discretion.  Continental's decision was reasonable, followed a deliberate review process, and was supported by substantial evidence in the record.  Accordingly, the Court should not disturb the decision.  The Court also should reserve a ruling on the issue of attorney's fees (*see* Pl.'s Cross-Mot. Summ. J. at 32-33) until after the Court has adjudicated the merits and the parties have briefed that issue, if necessary.

## II.   STATEMENT OF MATERIAL FACTS

### A.   Relevant Policy Provisions

Pursuant to the Policy, a covered person has a "disability" or is "disabled" if he satisfies the "Occupation Qualifier," which states:

> "*Disability*" means that *Injury* or *Sickness* causes physical or mental impairment to such a degree of severity that *You* are:
>
> 1. continuously unable to perform the *Material and Substantial Duties* of *Your Regular Occupation*; and
> 2. not working for wages in any occupation for which *You* are or become qualified by education, training or experience.

(CCC 0577) (emphasis in original).[3]  Further, when considering a claim under the Policy, Continental had "discretionary authority to determine … eligibility for benefits and to interpret the terms and provisions" of the Policy.  (CCC 0572.)

### B.   Mr. Smith's Claim For Benefits

On February 23, 2001, Mr. Smith, a Vice President of Sales at J.J. Haines, submitted an application for Policy benefits.  (CCC 0524-25, 0529.)  The application included an Employer's Statement completed by Marilyn Schwartz, J.J. Haines' Human Resources Director (CCC 0525), and a

---

[3] The italicized terms are defined in the Policy's glossary.  (CCC 0588-89.)

"Physician's Statement" prepared by Jon Lowe, M.D., Mr. Smith's primary care physician (CCC 0530-31).

Mr. Smith's job required him to "coordinate[] activities of one or more divisions of the sales department and aid[] other administrative officers in formulating and administering organization policies by performing" certain Essential Duties and Responsibilities and Supervisory Responsibilities.  (CCC 0526.)  His "role priorities" included strategic planning, sales growth, customer service, and problem resolution.  (*Id.*)  The "Physical Demands" of his job included frequent sitting, the ability to stand and walk, and extensive automobile travel.  (CCC 0527.)

The Physician's Statement indicated that Dr. Lowe had diagnosed Mr. Smith with degenerative disk and joint disease of the lumbar spine.  (CCC 0530.)  The Statement also revealed that Mr. Smith had undergone three surgeries on his back, as well as physical therapy and acupuncture treatment, and that Dr. Lowe believed it "doubtful" that further treatment would be required.  (CCC 0530-31.)  Dr. Lowe's records documented medical procedures and evaluations over approximately four years, but reflected only three appointments between July 2000 and February 2001.  (CCC 0533.)

Mr. Smith's application also contained several letters from Clifford T. Solomon, M.D., a neurosurgeon who performed the first surgery on Mr. Smith's back and assisted in the other two surgeries.  (CCC 0562.)  Dr. Solomon's letters reflect test results and post-surgical reports from March 1997 through July 2000.  In March 1997, Dr. Solomon indicated that Mr. Smith suffered from "significant" stenosis at certain points in his spine.  (CCC 0567.)  Following surgery in April 1997, Dr. Solomon reported that Mr. Smith was clearly getting better."  (CCC 0566.)  In April 1998, a CT scan indicated that Mr. Smith again suffered from severe stenosis and bulging disks.  (CCC 0565.)  MRI testing in May 1998 confirmed a finding of stenosis.  (CCC 0564.)

3

In August 1998, Randy F. Davis, M.D., found that Mr. Smith had symmetric reflexes and no identifiable, specific motor weakness, even though the April 1998 MRI and CT testing showed spinal canal stenosis and/or lateral disk herniation.  (CCC 0562.)  According to Dr. Davis, stenosis was the "most impressive finding." (*Id.*)  In September 1998, Dr. Solomon remarked that Mr. Smith had "severe congenital stenosis."  (CCC 0561.)  Mr. Smith underwent his second surgery later that month.  (CCC 0532.)

By November 1998, Dr. Solomon reported that Mr. Smith was "walking much better."  (CCC 0560.)  In January 1999, a physical examination indicated symmetric reflexes and X-ray testing revealed "excellent maintenance of alignment of the spine."  (CCC 0559.)  A June 1999 examination by Dr. Davis also indicated symmetric reflexes.  (CCC 0557.)  In July 1999, Dr. Solomon reported that Mr. Smith's condition had improved but that he had experienced new pain.  (CCC 0558.)  Dr. Solomon's review of MRI and CT testing from June 1999 suggested that Mr. Smith again suffered from stenosis. (*Id.*)  According to Dr. Davis, the June 1999 testing revealed "broad-based dis[k] bulging," joints that looked "far from normal," and "a possibility of early lateral recessed stenosis."  (CCC 0555.)  Later in July 1999, Dr. Solomon opined that Mr. Smith's pain emanated from "compressive effects" in his spine. (CCC 0556.)

In August 1999, Sarah M. White, M.D., conducted Motor Nerve Conduction and Sensory Nerve Conduction tests.  Those tests produced findings "consistent with mild chronic … radiculopathy," yet an absence of "peroneal, tibial, or sural mononeuropathy, or myopathy/myositis."  (CCC 0554.)  In October 1999, Kerry J. Thompson, M.D., conducted a "Disk Distention Evaluation" that provided "clinical[ly] insignificant" results.  (CCC 0547.)  Dr. Thompson's testing showed "no clinical provocation of complaint nor … other subjective or objective evidence for an underlying discopathic pain mechanism."

4

(*Id.*)  Dr. Thompson noted, however, that Mr. Smith's "entirely asymptomatic status at the time of discharge," may "relate to an epidural analgesic effect."  (*Id.*)

An MRI report from February 2000 revealed that Mr. Smith had "[m]ulti level lateral dis[k] bulging" but that the dimension of his lumbar spinal canal was within normal limits.  (CCC 0545.)  In March 2000, Dr. Solomon noted that Mr. Smith had injured himself while bending down to pick up an airplane ticket.  (CCC 0544.)  To alleviate Mr. Smith's pain, Dr. Solomon recommended that he undergo selective nerve blocks and visit Brian S. Kahan, D.O.  (*Id.*)  On March 2, 2000, Mr. Smith received "nerve blocks," following which he reported less than a 50% decrease in his symptoms.  (CCC 0542.)  On March 3, 2000, Dr. Solomon noted that testing performed March 1, 2000 showed "marked degenerative changes" in Mr. Smith's lumbar spine and a less than 50% decrease in nerve pain.  (CCC 0541.)  On March 8, 2000, Dr. Solomon reported that MRI testing showed a bulging disk and "moderate neuroformamenal lateral recess stenosis."  (CCC 0539.)  On March 21, 2000, Dr. Solomon opined that Mr. Smith had a "very classic symptom for a mechanical radicular pain."  (CCC 0537.)  He further indicated that a "reasonable" solution would be to perform another surgical procedure "to free up" a nerve root.  (*Id.*)  On May 3, 2000, Mr. Smith underwent his third back surgery.  (CCC 0533.)

In June 2000, Dr. Solomon reported that Mr. Smith felt 50% better following surgery.  (CCC 0535-36.)  In July 2000, Dr. Solomon stated that the surgery was "not a cure-all" but "will make a huge step forward."  (CCC 0534.)  In fact, Mr. Smith did not see Dr. Solomon from July 11, 2000 through the first week of March 2001.  (CCC 0513.)

Mr. Smith re-aggravated his back in January 2001 celebrating a touchdown while watching a football game.  (CCC 0513.)  Thereafter, "if he walked too far, he couldn't do anything for 2-3 weeks afterwards."  (*Id.*)  When Dr. Solomon examined Mr. Smith in March 2001, he suggested that Mr.

Smith's problems were mechanical, but he was unable to identify the exact problem. (CCC 0514.) According to Bob Thompson, J.J. Haines' president, Mr. Smith could not drive for more than an hour without needing to lie down, could not stand for more than five minutes, and could not travel by plane over the eight to nine months before submitting the disability application. (*Id.*)

C.     The Initial Review And Denial Of Mr. Smith's Claim

On April 9, 2000, a Continental vocational consultant sent Dr. Lowe a questionnaire, asking him why he believed that Mr. Smith could not stand or walk for more than five minutes, as he reported in the Physician's Statement. (CCC 0503.) The consultant also asked Dr. Lowe whether he believed that Mr. Smith could perform work that allowed him to control time spent sitting and standing. (*Id.*)

Dr. Lowe responded that Mr. Smith would be able to perform work allowing him to control the amount of time spent sitting and standing. (*Id.*) Dr. Lowe also forwarded his most recent file notes. (CCC 0504-08.) Dr. Lowe's February 9, 2001 note indicated that Mr. Smith carried firewood and rode his bicycle around the neighborhood before aggravating his back condition on January 14, 2001. (CCC 0507.) A February 23, 2001 note stated that Mr. Smith "simply can not [sic] walk more than five minutes or sit longer than 10 minutes without excruciating pain in his back." (CCC 0506.) Dr. Lowe remarked, however, that treatment with Neurontin had helped Mr. Smith's sciatic radiating pain "dramatically." (*Id.*) Dr. Lowe's March 27, 2001 note further documents Mr. Smith's medications, as well as problems he experienced on a vacation to the Caribbean. (CCC 0504.)

By letter dated April 16, 2001, Continental advised Mr. Smith that it had denied his claim. (CCC 0500-02.) Continental noted that Mr. Smith had ceased physical therapy approximately one month before the date he submitted his claim and that, upon discharge, he was fully ambulatory and was set to begin home exercises. (CCC 0500.) Continental also referenced the fact that Mr. Smith was essentially

6

pain free as of November 2000, although he had experienced a relapse in January 2001. (*Id.*) Continental further remarked upon the aid that treatment with Neurontin provided for Mr. Smith's sciatic pain and Dr. Lowe's statement that Mr. Smith could perform work that allowed him the flexibility to control the time he stands and sits. (CCC 0501.)

Continental also relied upon information received directly from Mr. Smith. In a March 16, 2001 telephone conversation with Pam Ward of Continental, Mr. Smith disclosed his ability to change positions or utilize a folding stool if standing became intolerable. (CCC 0501, 0514.) Mr. Smith also described his activities as including stretching, riding a recumbent exercise bicycle between twenty-five minutes to an hour, and driving fifteen to twenty minutes at a time. (CCC 0501, 0514.)

Continental concluded that Mr. Smith's functional capabilities exceeded the physical demands of his job as Vice President of Sales because the job allowed him the flexibility to change positions as needed. (CCC 0501.) Continental further concluded that no medical evidence indicated that Mr. Smith's functional ability continuously limited him from performing the duties of his job. (*Id.*) Accordingly, Continental determined that Mr. Smith was not "disabled" pursuant to the Policy. (*Id.*)

D.    The Appeal

On April 20, 2001, Mr. Smith requested a copy of the evidence Continental reviewed in reaching a decision on his claim. (CCC 0498.) On April 25, 2001, Ms. Schwartz inquired about the denial of Mr. Smith's claim and asserted that Mr. Smith was unable to engage in the travel necessary to perform his job. (CCC 0495.)

On May 9, 2001, Mr. Smith's counsel requested copies of the Policy and Continental's claim file, and he notified Continental that Mr. Smith intended to appeal the denial decision. (CCC 0487.) Continental forwarded the requested information and offered to extend the time for filing an appeal.

7

(CCC 0485.)  On June 7, 2001, Continental granted counsel's request for a sixty-day extension to appeal.  (CCC 0205.)

By letter dated July 25, 2001, Mr. Smith, by counsel, appealed the denial decision.  (CCC 0425-38.)  Counsel summarized Mr. Smith's medical history and noted that Mr. Smith's examining physicians had diagnosed and confirmed Mr. Smith's back problems.  (CCC 0425-28.)  Counsel also reiterated Mr. Smith's job description.  (CCC 0428-31.)  Counsel further stated that Social Security Administration disability decisions supported Mr. Smith's claim.  (CCC 0434-35.)

Counsel submitted several documents with the appeal letter.  Those documents included a March 13, 2001 report from Dr. Solomon, noting that Mr. Smith had "tremendous pan-stenosis of his whole lumbar spine."  (CCC 0468.)  Dr. Solomon's report also noted that Mr. Smith was able to ride a recumbent bicycle for twenty-five minutes, but that the time he was able to walk without pain had decreased from eight to five minutes.  (*Id.*)  Dr. Solomon recommended against performing additional surgery.  (*Id.*)

The documents also included Dr. Kahan's report of a March 28, 2001 examination of Mr. Smith for treatment of leg and back pain.  (CCC 0461-63.)  Dr. Kahan described Mr. Smith's pain as "7/10" and his "functional rating" as "34/40."  (CCC 0461.)  Dr. Kahan opined that Mr. Smith suffered from lumbar radiculopathy and post-lumbar laminectomy syndrome.  (CCC 0462.)  Dr. Kahan recommended home exercises, a possible corticosteroid injection, and, potentially, spinal cord stimulators.  (*Id.*)  He further recommended that Mr. Smith continue short-term disability.  (*Id.*)

On April 25, 2001, Dr. Kahan reported that Mr. Smith had a functional rating of "29/40."  (CCC 0459.)  Further, although Mr. Smith had altered his medication regimen, including increased use of

8

Neurontin for pain relief and Celebrex (an anti-inflammatory agent), he felt only "a little bit better." (*Id.*) Dr. Kahan restated his recommendation of corticosteroid injections. (*Id.*)

In a one-page document submitted with his appeal, Mr. Smith reported his status as of April 26, 2001. (CCC 0458.) Mr. Smith indicated that his medications and vitamins included Celebrex, Neurontin, Oxycontin, Vicodin, Acetaminophen (Extra Strength Tylenol), Glucosamine/Chondroitin DS, Toprol XL, and Aspirin. (*Id.*) He further indicated that he could not walk for longer than five minutes or sit or drive a car for more than twenty minutes without severe back pain. (*Id.*) Mr. Smith claimed that when his back pain "fires off," he could not stand erect and pain traveled down his leg. (*Id.*) Mr. Smith stated that he lay supine to relieve pain, and that he did so while talking on the telephone, visiting friends and family, spending time at home, and, intermittently, while working on the computer. (*Id.*) He also stated that he reclined in his automobile when dining out with friends or family. (*Id.*)

Mr. Smith's appeal also included reports from William Launder, M.D., an orthopedic surgeon and Martin Kranitz, a vocational consultant, both of whom examined Mr. Smith for the first time after Continental denied his claim, and from Frederick T. Sutter, M.D., who had not examined Mr. Smith in several years. On July 2, 2001, Dr. Launder diagnosed Mr. Smith with failed back syndrome in answering "Interrogatories." (CCC 0446-52.) In a report directed to Mr. Smith's counsel and dated July 19, 2001, Mr. Kranitz concluded that Mr. Smith was not capable of performing any significant, gainful employment. (CCC 0441-45.) In a June 11, 2001 report copied to Mr. Smith's counsel, Dr. Sutter declined to make a disability determination but noted that Mr. Smith had advanced lumbar spondylosis at multiple levels, as well as posterior element spondylosis and scoliosis. (CCC 0456.) Mr. Smith's appeal also included photocopies from several medical texts and pamphlets (CCC 0469-83), sections

9

from Social Security disability law practice handbooks, and three decisions by the Social Security Administration, each unrelated to Mr. Smith (CCC 0356-0423).

Continental construed the appeal as a request for reconsideration by its Claims Unit and a request for review by its Appeals Committee.  (CCC 0355.)  By letter dated July 30, 2001, Continental informed Mr. Smith, through counsel, that the Claims Unit had sustained its initial denial.  (*Id.*)  According to Continental, a review of the additional information submitted did not change its position.  (*Id.*)

On August 20, 2001, Mr. Smith's counsel submitted a July 2, 2001 report of the self-described "Independent Medical Evaluation" conducted by Dr. Launder in response to a referral from Mr. Smith's counsel.  (CCC 0343-46, 350.)  Dr. Launder observed that Mr. Smith experienced great difficulty "manipulating about" the examination table, but noted that he was spasm free and not tender in the region surrounding the large surgical scar along the spine.  (CCC 0345.)  Dr. Launder indicated that Mr. Smith demonstrated "good range of motion and full motor strength in the hips, knees, ankles and feet with no instability."  (*Id.*)  Dr. Launder also found that Mr. Smith had a "slow and shuffling" gait, and he again diagnosed Mr. Smith as suffering from failed back syndrome.  (CCC 0346.)  Dr. Launder concluded that Mr. Smith had reached maximum medical improvement and was completely and permanently disabled.  (*Id.*)

E.      Remand For Further Investigation And Good Faith Payment Of Claim

By letter dated September 17, 2001, Continental's Appeals Committee informed Mr. Smith, through counsel, that it had remanded his file to the Claims Unit for further investigation.  (CCC 0342.) On October 9, 11, 12, 13, and 17, 2001, Continental conduced surveillance on Mr. Smith.  (CCC 0322-32, 0326-30.)  By letter dated October 26, 2001, Continental informed Mr. Smith, through counsel, of its interest in conducting a functional capacity assessment and an independent medical evaluation to further

its review, and that it may seek to obtain a vocational assessment.  (CCC 0315.)  On the same date, Mr.

Smith's counsel challenged Continental's entitlement to further review.  (CCC 0314.)  Counsel asserted

that Continental already had delayed rendering a decision without good cause, and that it should have

performed a functional capacity assessment before denying Mr. Smith's claim.  (*Id.*)  According to

counsel, Continental was not entitled to conduct further evaluations without paying benefits forward

from the date of Mr. Smith's application.  (*Id.*)  By letter dated November 6, 2001, Continental, in good

faith, decided to pay benefits while further reviewing Mr. Smith's claim.  (CCC 0309-12.)

F.    The Peer Review Report

To further its review, Continental forwarded Mr. Smith's claim file to Elite Physicians, a

division of Network Medical Review ("NMR"), for independent analysis.  (CCC 0004-06.)  Continental

requested an interpretation of test results as they related to potential occupational restrictions, an

assessment of Mr. Smith's overall ability to function in terms of the physical demands of his job, and an

opinion as to the estimated duration of Mr. Smith's disability, if confirmed.   (CCC 0004, 0006.)

Continental also requested that NMR conduct a telephone interview with Dr. Solomon to address (1) Dr.

Solomon's opinion regarding Mr. Smith's ability to meet the physical demands of his occupation, and

(2) the particular medical evidence that supported Dr. Solomon's finding of a functional impairment.

(CCC 0006.)

Marc Soriano, M.D., a neurosurgeon, performed the review on NMR's behalf.   Dr. Soriano

reviewed the evidence provided by Drs. Launder, Solomon, Davis, Lowe, Kahan, and Sutter; the

vocational assessment conducted by Martin Kranitz; X-ray, CT/MRI, and EMG/NCS reports from June

1999 to March 2000; a surveillance report; Mr. Smith's job description; and "miscellaneous" documents

dating from February 23, 2001 to March 16, 2001.  (CCC 0283.)  Dr. Soriano found that Dr. Launder's

diagnosis of failed back syndrome was not supported by clinical findings, but, instead, was based upon Mr. Smith's self-reported complaints. (CCC 0284.) Dr. Soriano believed that Mr. Smith was mildly impaired but that his self-reported complaints exceeded the clinical findings. (CCC 0285.) According to Dr. Soriano, Mr. Smith's history, physical examinations, and testing did not indicate that his condition rendered him unable to satisfy the duties of his job. (*Id.*)

Dr. Soriano also reported that, during a telephone conference with Dr. Solomon, the latter conceded that Mr. Smith's complaints were "excessive" and often did not correspond well to clinical findings. (*Id.*) In fact, Dr. Solomon agreed that "there were no significant physical findings, either neurologically or on an orthopedic basis, and . . . that Mr. Smith was probably not totally disabled." (*Id.*) Dr. Soriano concluded that the records did not demonstrate a functional impairment that would have prevented Mr. Smith from performing his occupation from February 23, 2001 forward. (*Id.*) Dr. Soriano agreed that certain, specific limitations on Mr. Smith's functional ability existed, including: (1) the need to refrain from lifting more than 35 pounds; (2) the need to avoid sitting or standing for prolonged periods over 1-2 hours; (3) the need to change positions frequently; and (4) the need to limit walking to less than one hour at a time without changing positions. (CCC 0285-86.)

G.    The November 21, 2001 Termination Of Benefits

Following review and consideration of Dr. Soriano's report, the Claims Unit concluded its investigation and terminated Mr. Smith's benefits, by letter dated November 21, 2001. (CCC 0290-91.) Again, Continental determined that "Mr. Smith's records did not demonstrate a functional impairment that would have prevented him from performing the duties of his occupation." (CCC 0291.) Continental concluded that Mr. Smith's physical restrictions "could be easily accommodated" based

upon his job description.  (*Id.*)  Continental then forwarded Mr. Smith's claim file to the Appeals

Committee for final review.  (*Id.*)

      H.      The Second Appeal And Additional Documentation

      On December 12, 2001, Mr. Smith's counsel again requested Mr. Smith's claim file and notified

Continental that he would file an appeal on Mr. Smith's behalf.  (CCC 0266-67.)  On January 10, 2002,

Continental provided counsel with a copy of the evidence reviewed to evaluate Mr. Smith's claim, and it

advised that Mr. Smith would have until April 1, 2002 to perfect an appeal.  (CCC 0263.)  By letter

dated March 21, 2002, Mr. Smith, by counsel, appealed the termination of Mr. Smith's benefits.  (CCC

0222-30.)

      Counsel also submitted several documents with the March 21, 2002 appeal letter, including (1)

Dr. Solomon's statement that he has not examined Mr. Smith "since 6/11/01 and cannot render any

opinion concerning his condition or functional capacity after that date"  (CCC 0231); (2) a functional

capacity evaluation conducted on December 20, 2001, by P. Steven Macedo, M.D., and Eric Meyer,

D.O., of the Washington Medical Group, suggesting that, but for his "dynamic functional deficits," Mr.

Smith could complete "light duty" work, as defined by the Department of Labor (CCC 0234); (3) a

single-page report addressed to Mr. Smith's counsel in which Mr. Kranitz indicated that the Washington

Medical Group report did not contradict his conclusions (CCC 0238); (4) and the "fully favorable"

decision of February 25, 2002 by Administrative Law Judge Douglas R. Due regarding Mr. Smith's

application for social security disability benefits (CCC 0244-50).

      By letter dated April 1, 2002, Mr. Smith's counsel addressed the surveillance reports Continental

obtained.  (CCC 0217-18.)  According to counsel, those reports contained no evidence contradicting Mr.

Smith's claimed disability.  (CCC 0218.)

I.    The Final Decision

On May 2, 2002, Continental issued a final decision, which affirmed the denial of benefits. (CCC 0210-14.)  Continental acknowledged the "fully favorable" disability decision by ALJ Due, but noted that its determination was "independent of" that ruling.  (CCC 0211.)  Continental also noted that Mr. Smith's occupation was managerial in nature and acknowledged the complications presented by Mr. Smith's inability to travel regularly.  (CCC 0210-11.)  Although the medical evidence indicated that Mr. Smith suffered degenerative disk disease, spinal stenosis, and subsequent failed back syndrome (CCC 0210), Continental determined that the record did not demonstrate a functional loss that would preclude Mr. Smith from performing the full duties of his regular occupation (CCC 210, 0213).   Continental concluded that the "primary limiting factor" affecting Mr. Smith was his pain complaints, which were "disproportionate when compared to the diagnostic and physical findings presented."  (CCC 0213.)

III.    ARGUMENT

A.    The Court Should Review Continental's Decision For Abuse Of Discretion

The Policy unquestionably conferred upon Continental discretion to determine eligibility for benefits and to interpret the Policy's terms and provisions.  (*See* CCC 0572.)  As a result, this Court should review for abuse of discretion Continental's decision to deny Mr. Smith's claim for benefits.  *See Sargent v. Holland,* 114 F.3d 33, 35 (4th Cir. 1997) (stating that if an ERISA plan   "gives the administrator … discretionary authority to determine eligibility for benefits or to construe the terms of the plan, courts must respect that authority and overturn only those decisions which result from an abuse of discretion") (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989)).[4]

---

[4] *See also Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir. 2002) ("It is well-established that a court reviewing the denial of benefits under ERISA initially must decide whether a benefit plan's language grants the administrator … discretion to determine the claimant's eligibility for benefits, and if so, whether the administrator acted within the scope of that discretion.").

Mr. Smith, however, contends that the Court should apply a "heightened" standard of review because Continental operated under a conflict of interest as both administrator of claims made under the Policy and the Policy's insurer.  (*See* Pl.'s Cross-Mot. Summ. J. at 20.)  No heightened standard of review is appropriate.  Where an ERISA plan administrator has a conflict of interest, a court simply should reduce the deference afforded the administrator's decisions "'to the degree necessary to neutralize any untoward influence resulting from the conflict.'"  *See Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 233 (4th Cir. 1997) (quoting *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996)).

Further, Mr. Smith has presented no evidence that Continental had a conflict of interest at the time it adjudicated his claim for benefits.  In arguing for a heightened standard of review, Mr. Smith relies solely upon Continental's disclosure, pursuant to Local Rule 103.3, that its parent company is CNA Financial Corporation.  The mere existence of that corporate relationship, however, does not establish a conflict of interest.  Moreover, even if the Court were to find that Continental operated under a *potential* conflict of interest, Continental denies that any potential conflict affected its decision-making.  In any event, there is no basis for the Court to depart from the abuse of discretion standard of review.[5]

B.    Continental's Decision Was Reasonable And Should Not Be Disturbed

Under the abuse of discretion standard of review, an ERISA plan administrator's decision on a claim for benefits will not be disturbed if it is "reasonable," even if a court reviewing the decision would have reached a different conclusion.  *Ellis*, 126 F.3d at 232.  A decision is reasonable if it is "'the result

---

[5] Mr. Smith's reliance upon authority from, for example, the Courts of Appeals for the Third and Ninth Circuits is misleading and unjustified.  (*See* Pl.'s Cross-Mot. Summ. J. at 20-22.)  The law in this Circuit is settled on the standard of review properly applied in this case.

of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Id.* (quoting *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997)).  In this case, Mr. Smith has failed to meet his burden of showing that Continental's decision was procedurally or substantively flawed.

        1.        <u>Continental Engaged In A Sound Decision-Making Process</u>

During the initial consideration of Mr. Smith's claim, Continental reviewed all then-existing medical records pertaining to his back condition.  Continental knew, therefore, that Mr. Smith had undergone three surgeries on his back and that Dr. Lowe had diagnosed Mr. Smith with degenerative disk and joint disease of the lumbar spine (CCC 0530).  Continental also knew that, in July 2000, Dr. Solomon found that Mr. Smith's third surgery would be a "huge step forward" (CCC 0534), and that Mr. Smith did not see Dr. Solomon again until after he submitted his claim for benefits (CCC 0513).  Finally, Continental learned that, although Mr. Smith's functional abilities deteriorated after he re-injured his back in January 2001, he was able to work, so long as he was able to control the amount of time he stood or sat (CCC 0503), and that use of Neurontin treated his pain (CCC 0506).

On appeal, Continental considered additional medical reports and several other documents submitted by Mr. Smith's counsel.  This new information led Continental's Appeals Committee to remand Mr. Smith's claim to the Claims Unit for further review.  After the Claims Unit decided that the new information did not alter its decision, the Appeals Committee sought to conduct a functional capacity assessment and an independent medical examination of Mr. Smith.  Mr. Smith's counsel denied Continental the opportunity to perform those tests.  (CCC 0314.)  Continental thereafter paid benefits to Mr. Smith and forwarded Mr. Smith's file for an independent peer review.

Dr. Soriano, who conducted the peer review, found that Mr. Smith was mildly impaired, but that his medical history, testing, and examinations failed to demonstrate that his condition rendered him

16

unable to satisfy the duties of his job.  (CCC 0285.)  Dr. Soriano's conversation with Dr. Solomon confirmed that Mr. Smith's medical records did not demonstrate a functional impairment that would prevent him from performing his occupation since his claimed date of disability.  (*Id.*)  Continental then terminated Mr. Smith's benefits.  Mr. Smith appealed that decision and supported his appeal with, *inter alia*, a functional capacity evaluation *that he arranged* and ALJ Due's decision.  After considering the new information, Continental upheld its termination decision.

<blockquote>
a.      The Social Security Administration's Determination Of
        Disability Is Not Controlling
</blockquote>

According to Mr. Smith, Continental should have accorded "significant weight" to ALJ Due's finding that he was entitled to social security disability benefits.  (*See* Pl.'s Cross-Mot. Summ. J. at 29-31.)[6]  A decision of the Social Security Administration ("SSA") could be relevant to Continental's decision-making only if the Policy's definition of "disability" "in any way mirrors" the SSA's definition.  *See Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 275 (4th Cir. 2002); *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir. 1999).  Under the Policy, Mr. Smith was disabled only if he was "unable to perform the *Material and Substantial Duties* of [his] *Regular Occupation*."  (CCC 0577.)  Pursuant to the SSA's regulations, a finding of disability turns on whether a claimant is unable to engage in any "substantial gainful activity."  20 C.F.R. § 404.1505(a).

Not only do the definitions materially differ in their terms, but, in their application, the definitions could lead to different results under numerous sets of facts.  Because the SSA and Policy

---

[6] Mr. Smith also places great emphasis on Social Security Rulings that purportedly address the ability to "stoop" (Pl.'s Cross-Mot. Summ. J. at 29-30), but his ability to stoop was, at most, a small issue in his claim before Continental and was not referenced at all in ALJ Due's decision.  In fact, ALJ Due's decision also does not reference the Rulings Mr. Smith cites.

definitions differ substantively, there was no reason why Continental should have given ALJ Due's decision greater weight in its decision-making process than any other evidence. This is true even if the SSA's disability definition establishes a stricter standard than the Policy's definition. Continental was not a party to the proceedings before the SSA. No doubt, the only evidence ALJ Due considered was evidence that favored Mr. Smith's claim. Continental's decision-making, on the other hand, properly included evidence provided by Mr. Smith and evidence obtained independently. Continental, therefore, reasonably determined that ALJ Due's decision did not control its decision.

Moreover, Continental could not attach significant weight to ALJ Due's decision without breaching its fiduciary obligation to make claims decisions in accordance with the Policy language. *See* 29 U.S.C. § 1104(a)(1)(D); (*see also* CCC 0211-12). Continental had an obligation to weigh all the evidence and could not give great weight to the ALJ's disability determination. *See Elliott*, 190 F.3d at 607.

   b. The "Treating Physician Rule" Has No Bearing On This Case

Mr. Smith incorrectly contends that, pursuant to the "treating physician rule,"[7] the opinions of his treating physicians were entitled to greater weight than the opinions of any other physicians who examined his medical records.[8] (*See* Pl.'s Cross-Mot. Summ. J. at 23-26.) Neither the Court of Appeals for the Fourth Circuit nor this Court has adopted the treating physician rule. *See Elliott v. Sara Lee*

---

[7] The treating physician rule arose from a case involving disability determinations by the SSA's administrative law judges. *See Gold v. Secretary of Health, Education and Welfare*, 463 F.2d 38, 42-43 (2d Cir. 1972). The SSA later adopted a regulation requiring its administrative law judges to apply the rule. *See* 20 C.F.R. § 404.1527(d). The treating physician rule the Ninth Circuit applies in ERISA cases, such as *Regula v. Delta Family-Care Disability Survivorship Plan*, *infra*, is a version of the SSA rule that the Ninth Circuit applies in SSA cases.

[8] Mr. Smith may have several treating physicians, but that group does not include Drs. Launder and Sutter. Dr. Launder did not see Mr. Smith until after Continental denied his claim initially, and Dr. Sutter saw Mr. Smith for the first time in several years after the initial denial of his claim.

*Corp.*, 190 F.3d 601, 607 (4th Cir. 1999); *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp. 2d 645, 655 (D. Md. 2002).[9]  In fact, in *Laser*, this Court specifically refrained from applying the treating physician rule when the plaintiff argued in support of its application, relying upon the same authority Mr. Smith relies upon here, *viz.*, *Regula v. Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130 (9th Cir. 2001).  *Compare Laser*, 211 F. Supp. 2d at 655 *with* (Pl.'s Cross-Mot. Summ. J. at 24-25).

There are several reasons why the treating physician rule has no place in this case – or in any case under ERISA.  The most significant reason, perhaps, is that the rule is based upon a false assumption that a treating physician is the most responsible and credible physician to determine a claimant's disability.  The rule fails to take into account the quality of the treating physician's opinion, the length of time he has treated the patient, the physician's experience with similar impairments, and his training.  Indeed, a treating physician may or may not be the most responsible or knowledgeable medical professional to assess a patient's disability.  A treating physician, for example, may have little or no experience or training concerning the treatment of back pain.  A consulting neurologist, however, may have treated thousands of cases presenting similar medical issues.  Through experience and training, the neurologist may be better situated than the treating physician to assess the extent of the patient's impairment.

The rule also inappropriately assumes that treating physicians will provide objective diagnoses of a patient's disability.  Yet, due to the shift in medical decision-making from independent physicians to managed care institutions, treating physicians have become advocates for their patients in obtaining insurance benefits.  *See, e.g.*, *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001)

---

[9] Mr. Smith contends that a treating physician's opinion is entitled to greater deference than the employee of an administrator/insurer (*see* Pl.'s Cross-Mot. Summ. J. at 26), but whether that is true is not relevant to this case.  Continental did not credit the opinion of any of its employees over the opinion(s) of any of Mr. Smith's treating physicians.

("Treating physicians often succumb to the temptation to accommodate their patients … at the expense of third parties such as insurers, which implies attaching a discount rather than a preference to their views."). In fact, a large number of treating physicians admit that they make false diagnoses and reports to help patients obtain insurance payments. *See, e.g.*, Wynia, Physician Manipulation of Reimbursement Rules for Patients, 283 *J. Am. Med. Ass'n* 1858 (April 12, 2001). A blanket rule giving treating physicians' opinions preference over other physicians' opinions carries an inherent risk of bias that cannot possibly justify the adoption or application of such a rule.

Further, a treating physician rule is inconsistent with ERISA's goal of not discouraging employers from adopting disability benefit plans and increasing the benefits of ERISA disability plans. *See Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996) (stating that in drafting ERISA it was Congress' concern "not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans"). That rule actually imposes an undue burden on lay plan administrators to rebut a treating physician's opinion by providing specific, legitimate reasons for rejecting a treating physician's opinion based on substantial evidence in the record. *See Regula*, 266 F.3d at 1140 (stating that "[i]f the treating physician's opinions are uncontroverted, the plan administrator may reject the treating physician's opinions only by providing 'specific, legitimate reasons' which must be 'clear and convincing' and 'based on substantial evidence in the record'") (quoting *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) and *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996)).[10] Placing this legal standard on ERISA plan

---

[10] The Ninth Circuit further stated that "[i]f the treating physician's opinions are controverted, the plan administrator may reject the treating physician's opinions only by giving 'specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" *Nord v. Black & Decker Disability Plan*, 296 F.3d 823, 831 (9th Cir. 2002) (quoting *Morgan*, 169 F.3d at 600). The propriety of the Ninth Circuit's application of the treating physician rule in the ERISA context currently is before the Supreme Court. *See Nord, supra*, cert. granted, 123 S. Ct. 817 (2003).

administrators forces them to hire expensive medical experts and to engage legal counsel to review their benefit denial decisions, thus raising the cost of plan administration, and making it more expensive for employers to offer benefits plans.

In addition, a treating physician rule ignores the fiduciary obligations already placed on ERISA plan administrators. *See* 29 U.S.C. § 1104(a)(1). Plan administrators, as fiduciaries, must discharge their duties with respect to the plan "solely in the interest of the [plan's] participants and beneficiaries" and, *inter alia*, for the "exclusive purpose" of providing benefits to participants and beneficiaries and "defraying reasonable expenses of administering the plan." *See* 29 U.S.C. § 1104(a)(1)(A). Failure to adhere to those duties subjects a person to personal liability. *See id.* § 1109(a). Thus, an adequate safeguard exists against the risk that an administrator would fail to give due credit to a treating physician's opinion.

A treating physician rule also infringes on the Department of Labor's ("DOL") authority to ensure that disability benefit plans provide a reasonable opportunity for a "full and fair review," *see* 29 U.S.C. § 1133(2), by the plan administrator of a denial of benefits. Indeed, the DOL's regulations never have imposed a treating physician rule on plan administrators.

Finally, a treating physician rule shifts the burden of proof in a case such as this from a claimant, who ordinarily must prove that an ERISA plan administrator's decision was an abuse of discretion, to the plan administrator, who would be required to show specific, legitimate reasons for rejecting a treating physician's opinion based upon substantial evidence in the record. The rule, therefore, is contrary to the Supreme Court's holding in *Firestone Tire & Rubber Co. v. Bruch*, *supra*, that the administrator's decision should be reviewed for abuse of discretion where the administrator has discretionary authority to make benefit decisions.

21

This case, in fact, demonstrates the risks inherent in applying a treating physician rule.  Not only does Mr. Smith fail to identify the "treating physician(s)" to whom Continental purportedly should defer, he has manipulated the status of his physicians – and, therefore, his ability to benefit from a treating physician rule.  Dr. Launder, for example, examined Mr. Smith on a referral from Mr. Smith's counsel while Mr. Smith's claim was pending on appeal.  (CCC 0344.)  Thereafter, Mr. Smith submitted with his administrative appeal a series of interrogatories completed by Dr. Launder requiring him to address particular deficiencies.  (*See* CCC 0446-0452.)  Dr. Launder's report cannot be considered unbiased, and it properly carries no weight as evidence from a treating physician.  Similarly, although Dr. Sutter first treated Mr. Smith before he submitted his claim for benefits, several years had elapsed before he saw Mr. Smith in June 2001.  Thus, Dr. Sutter's June 11, 2001 report, also made while Mr. Smith's appeal was pending, has little, if any, value as evidence from a treating physician.

Further, after Dr. Solomon reported to Dr. Soriano that Mr. Smith "was probably not totally disabled," (CCC 0285-86), Mr. Smith sought to disavow Dr. Solomon as a treating physician.  In an effort to undermine Continental's reliance upon Dr. Solomon's remarks, Mr. Smith submitted a statement that he prepared for Dr. Solomon's signature indicating that "[Dr. Solomon] ha[d] not examined Neal Smith since 6/11/01 and [could not] render any opinion concerning his condition or functional capacity after that date."  (CCC 0231.)  Because of Mr. Smith's manipulation of the status of his physicians, it would be difficult, if not impossible, meaningfully to apply a treating physician rule in this case.

> c.     Dr. Soriano Rendered An Independent Evaluation Of Mr.
>        Smith's Condition

Mr. Smith wrongly suggests that Continental could not appropriately consider Dr. Soriano's report because of his affiliation with NMR.  According to Mr. Smith, NMR is "regularly utilized … to

procure medical evidence to base denial decisions." (*See* Pl.'s Cross-Mot. Summ. J. at 26; *see also id.* at 35.) None of the cases to which Mr. Smith cites for that proposition, however, contain such a finding. In fact, two of those cases, *Dew v. Metropolitan Life Insurance Co.*, 69 F. Supp. 2d 898 (S.D. Tex. 1999), and *Wojciechowski v. Metropolitan Life Insurance Co.*, 75 F. Supp. 2d 256 (S.D.N.Y. 1999), do not even mention NMR. Further, in *Dew*, *Wojciechowski*, *Piscottano v. Metropolitan Life Insurance Co.*, 118 F. Supp. 2d 200 (D. Conn. 2000), and *Voight v. Metropolitan Life Insurance Co.*, 28 F. Supp. 2d 569 (C.D. Cal. 1998), the courts found that substantial evidence – which included medical reviews by NMR – *supported* the denial of benefits.

Moreover, even if Mr. Smith's case law implies that Metropolitan Life Insurance Company regularly employs NMR, that fact proves nothing concerning Continental's use of NMR, in general, or its referral of Mr. Smith's medical information to NMR, in particular. In addition, in no way does *Austin v. Continental Casualty Co.*, 216 F. Supp. 2d 550 (W.D.N.C. 2002), provide "evidence of NMR's bias." (*See* Pl.'s Cross-Mot. Summ. J. at 27.) Mr. Smith cannot rely upon evidence supposedly discovered in another case as probative on any point he seeks to assert in this case. Further, even if NMR does, or did, advertise the use of its services to "support the retained functional abilities of an individual," *see Austin*, F. Supp. 2d at 554 n.1, that fact no more indicates bias in an insurer's favor than in a claimant's favor. Again, the fact that several cases Mr. Smith cites found that a denial of benefits was reasonable, even when based, in part, on a medical review conducted through NMR, suggests that NMR provides independent medical reviews ultimately useful both to insurers and claimants.

In sum, Continental's referral of Mr. Smith's claim to NMR for an independent review is anything but "transparent evidence of arbitrary and capricious review," as Mr. Smith claims, (*see* Pl.'s Cross-Mot. Summ. J. at 28). *See Voight*, 28 F. Supp. 2d at 580 (stating that the acceptance of the

23

opinions of the NMR medical reviewers rather than those of the claimant's treating physicians "is not proof of arbitrary and capricious conduct"). Instead, Continental was entitled to rely upon Dr. Soriano's report as evidence concerning the nature and extent of Mr. Smith's claimed disability.

### d.    Mr. Smith's Remaining Arguments Also Are Unfounded

Mr. Smith contends that Continental either ignored or failed to consider certain evidence. That is simply untrue. Contrary to Mr. Smith's assertion, for example, Continental did not ignore ALJ Due's decision. (*See* Pl.'s Cross-Mot. Summ. J. at 30-31, 35.) Rather, Continental noted that its decision was, appropriately, "independent of" that ruling. (CCC 0211.) Similarly, Mr. Smith lacks proof that Continental did not consider the opinions of Ms. Schwartz or Mr. Thompson concerning Mr. Smith's ability to perform his job. (*See* Pl.'s Cross-Mot. Summ. J. at 12, 32, 36.) In fact, those opinions were before Continental when it reviewed Mr. Smith's claim on appeal. (*See* CCC 0211 (referencing information obtained from Mr. Thompson).)

Mr. Smith also mistakenly asserts that Continental's decision to terminate Mr. Smith's benefits was an unjustified "reversal" of a finding that he was entitled to benefits. (*See* Pl.'s Cross-Mot. Summ. J. at 22, 34.) In fact, Continental paid Mr. Smith benefits through December 31, 2001 in good faith, at the request of his counsel, and only because of the additional time spent considering his claim. (CCC 0309.) The record reflects no contemporaneous decision that Continental found Mr. Smith "disabled" when it decided to pay benefits during that period.

In addition, Mr. Smith cannot reasonably criticize Continental for not obtaining a functional capacity evaluation or a vocational assessment (*see* Pl.'s Cross-Mot. Summ. J. at 31-32) when he prohibited Continental from doing so. Continental recognized that an independent medical examination, a functional capacity evaluation, and a vocational assessment could be useful to its decision-making

(CCC 0315), but Mr. Smith deprived Continental of the opportunity to arrange for further testing (CCC 0314). Such testing may have supported Mr. Smith's claim, and, at a minimum, would have provided a more complete record for Continental to assess the claim.

2.     Substantial Evidence Supported Continental's Decision

Pursuant to the Policy, Mr. Smith was "disabled" only if he was "continuously unable to perform the *Material and Substantial Duties* of [his] *Regular Occupation*." (CCC 0577.) The medical evidence demonstrated that Mr. Smith's back condition did not preclude him from performing those duties, even if Mr. Smith's condition may have impaired his functionality to some degree. (CCC 0213.) In fact, two of Mr. Smith's treating physicians, Drs. Lowe and Solomon, found that he was able to work and was not totally disabled. (CCC 0285, 0503.) Dr. Soriano's review of Mr. Smith's medical records indicated that Mr. Smith did not suffer from an impairment that prevented him from performing his occupation. (CCC 0285.) Thus, even if Mr. Smith's back pain required accommodation as to some of the Physical Demands of his job, the evidence indicated that Mr. Smith could perform his job.

Significantly, Continental's decision to deny Mr. Smith's claim is not arbitrary and capricious simply because it accorded greater weight to Dr. Soriano's findings and opinions than to those of Mr. Smith's treating physicians. An ERISA administrator's decision, if appropriate, is entitled to deference even where it favors the recommendation of a medical consultant who relies on "cold" medical records and reports over the opinions of a treating physician. *See, e.g.*, *Shephard & Enoch Pratt Hosp.,* 32 F.3d at 126. Continental also operated within its discretion when it resolved the conflicting medical reports of Dr. Soriano and Mr. Smith's physicians, including Dr. Launder, against Mr. Smith. *Booth v. Wal-Mart Stores, Inc.*, 201 F.3d 335, 345 (4th Cir. 2000) (recognizing that "'it is not an abuse of discretion

for a plan fiduciary to deny … benefits where conflicting medical reports were presented'") (quoting *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999)); *Ellis*, 201 F.3d at 234.

Finally, Dr. Launder's "independent" medical examination (*see* Pl.'s Cross-Mot. Summ. J. at 5) has less evidentiary value than Mr. Smith believes because it was not actually "independent."   Mr. Smith's counsel referred Mr. Smith to Dr. Launder during the appeal of Mr. Smith's claim in an effort to support the claim.   (CCC 0344.)   Only Mr. Smith's self-interest, therefore, underlies use of "independent" to describe Dr. Launder's examination, and Dr. Launder's report should not be viewed as an unbiased statement of Mr. Smith's condition or functionality.   Similarly, Mr. Smith mislabels his functional capacity evaluation as "independent" and misstates that an "expert" performed his vocational assessment.   The functional capacity and vocational testing occurred only after Mr. Smith's claim was on appeal and he had great incentive to gather evidence to support his claim.   In fact, Mr. Kranitz, the vocational consultant, addressed both of his reports to Mr. Smith's counsel.   (CCC 0238, 0441-45.)   Mr. Smith's use of "independent" (*see* Pl.'s Cross-Mot. Summ. J. at 34) and "expert" (*id.* at 2, 10-11, 32, 34, 36) is a self-serving attempt to confer credibility upon those who provided evidence to bolster his claim.

## IV.   CONCLUSION

For the foregoing reasons, Continental Casualty Company respectfully requests that the Court grant its cross-motion for summary judgment and deny the cross-motion for summary judgment filed by Neal S. Smith.

Respectfully submitted,

_____

Bryan D. Bolton
Federal Bar No. 02112
Hisham M. Amin
Federal Bar No. 15570
Peter C. Ismay
Federal Bar No. 27118

Funk & Bolton, P.A.
Twelfth Floor
36 South Charles Street
Baltimore, Maryland  21201-3111
410.659.7700 (telephone)
410.659.7773 (facsimile)

Attorneys for Continental Casualty Company

Dated:          May 2, 2003

20024.014:63518 v2

27