IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NEAL S. SMITH,                                              )
                                                           )
                      Plaintiff,                           )
                                                           )
v.                                                         )     Civil Action No.:S 02-3049
                                                           )
CONTINENTAL CASUALTY COMPANY                               )
                                                           )
                      Defendant.                           )

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGEMENT

Plaintiff, by and through counsel, hereby sets forth his Memorandum of Points and

Authorities in Support Plaintiff's Opposition to Defendant's Motion for Summary Judgement

and, in doing so, states the following:

SUPPLEMENTAL FACTUAL STATEMENT:

A. *Defendant attempts to mischaracterize Plaintiff's medical condition.*

After four years of extensive evaluation, Plaintiff's primary physician, Dr. Lowe

completed a "Physician's Statement" for CNA dated 2/23/01 (CCC 0530 -1) stating that

Claimant suffered from persistent pain with decreased range of motion of the lumbosacral spine.

Dr. Lowe further stated that Claimant could not stand or walk for more than five minutes and

could not sit in a chair without arm rests for more than 10 minutes.  He further noted that

Claimant had undergone surgery, physical therapy, acupuncture and massage therapy and now

suffered from a "poor" prognosis for recovery or return to work..  Dr. Lowe disabled Claimant as

of the date he completed this form. The Defendant fails to address the many findings by Dr.

Lowe (Defendant's Cross Motion for Summary Judgement, hereinafter DCMSJ, (p.3) since the

1

findings undermine its position that Plaintiff is not disabled.  Further, these answers were in response to Defendant's own inquiry for an assessment.  Given the findings, there was little more to be done as indicated by Dr. Lowe's statement that he was "doubtful" that further treatment would be required.  So,  follow-up exams were scheduled in accordance with that finding.  Defendant's characterization of decreased treatment due to nondisability is undermined by the specific findings made.

Defendant undertook the same conduct of mischaracterization with the reports of Plaintiff's treating neurosurgeon, Clifford Solomon.  Defendant cited the 5/6/97 report which stated that "Mr. Smith was clearly getting better.(CCC 0566) (DCMSJ p.3).  The entirety of the statement is: "He is clearly getting better from bilateral laminotomies at L3-4 and 4-5 for neurogenic claudication [limping]."  This finding was subsequently clarified in the following report dated 4/2/98 (CCC 0565) following a repeat CT scan.  At this time, Dr. Solomon stated that Plaintiff was having "tremendous left leg pain" as a result of severe stenosis at L2-3, 3-4, 4-5 and bulging disks at L4-5 and L5-S1.  When addressing the question of future surgery, Dr. Solomon stated:

> I think no matter what we do can make him feel better, but I do not think he will ever make him pain-free based on how significant his arthritis is.

Dr. Solomon wrote that: "The best surgery we do for this bar far is none" on 5/6/98 (CCC 0564).

Again, Defendant minimized Plaintiff's difficulties in its sole citation that Plaintiff was "walking much better"(DCMSJ p.3) in Dr. Solomon's 11/6/98 report (CCC 0560).  The report went on to state that Plaintiff was affected by a new condition of a  left C6 stinger which affected him multiple times the previous day.   Dr. Solomon further recommended that Plaintiff avoid repetitive forward flexing and needed to "take it easy until he totally heals."  Such progress

shortly following Plaintiff's second surgery serves as a mark of improvement from a post-surgical state only.  In no way does such reporting serve as evidence that Claimant had improved to the point that he could return  to work as Defendant contends.

Toward the same end, the Defendant again partially quoted Dr. Solomon (7/2/99 report, CCC 0558, DCMSJ, p.4) stating that Plaintiff's condition had improved for a few months, but failed to mention that Claimant's new diagnoses included claudication in the left leg into the foot resulting either from nerve root compression at L4-5 or L5-S1 necessitating a prescription for demerol for pain relief.

Similarly, the Defendant failed to cite the full findings from the 8/1/98 report of Randy F. Davis (CCC 0562 - 3).  Dr. Davis stated that: "He previously had physical therapy and he remains miserable and is convinced the symptoms are getting worse."  Dr. Davis went on to state a prognosis that Plaintiff would be candidate for extensive revision surgery with bilateral laminectomy and decompression from L2 down to L5. Although Dr. Davis stated that Plaintiff had a 65 - 70% chance of being helped, "the chance of relieving all of his symptoms is zero." Although Defendant cited to Dr. Davis' finding that Plaintiff had symmetric reflexes in his 7/21/99 report (CCC 0555 -6, DCMSJ, p. 4), it failed to address the other findings including: left-sided leg pain to the calf, CT scan revealing joint compression at L3/4 and L4/5, and the prospect of more surgery, this time with hardware installed.  It should be noted that the presence of reflexes in no way minimizes the presence of pain suffered by the Claimant and is only a "red herring" argument in an effort to find any negative findings in the medical record to support Defendant's poorly supported denial of benefits.

Defendant's citation to the negative disk distention evaluation by Dr. Thompson is

clarified in the report which notes Plaintiff's "asymptomatic status may relate to an epidural analgesic effect." (CCC 0547).  This same surprising effect was noted by Dr. Solomon on 7/14/99 (CCC 0549) despite the fact that Plaintiff's pain flared with any prolonged sitting, standing, or walking.  The relief provided by the lumbar nerve block injection had decreased to only four hours by 3/8/00 (CCC 0539).  Again, the Defendant mischaracterized evidence to its favor and ignored the bulk of the evidence which clearly favors Plaintiff's disability.

Defendant failed to properly cite the findings of pain management specialist, Brian Kahan (C.V. at CCC 0359 - 0367), on 3/28/01 (CCC 0031 - 3) who diagnosed Plaintiff with lumbar radiculopathy and post lumbar laminectomy syndrome (as previously objectively confirmed by EMG/NCV testing at 0064 -5), noting an antalgic gait, pain at neutral back position and with end range flexion.  Instead, the Defendant cites changing "functional rating," ranging from 29/40 reduced from an initial 34/40.  There is no definition to "functional rating" and the insurer chose not to contact Dr. Kahan for clarification or an explanation as to why Plaintiff's condition continued to deteriorate.

Defendant's consistent course of improper selective citation and mischaracterization of the evidence of record is strong of evidence of abuse of discretion.

B.  *Defendant purposefully avoided reference to many findings which support Plaintiff's disability.*

Defendant failed to make reference to the 6/25/99 MRI report (CCC 0552) which revealed disc bulging at L2-3 with nerve root impingement, L3-4 disc bulge with neural foramina encroachment, and  L4-5 disc bulge flattening the ventral thecal sac with displacement. This objective testing reveals significant spinal conditions causing the resulting neurologic

symptoms recorded by all the examining physicians.  The CT scan on the same day (CCC 0551)

stated:   "The findings are too numerous to concisely summarize," noting multiple spinal disc

involvement with narroing, lateral recess stenosis, and facet arthopathy.

Dr. Solomon noted that lateral flexion/extension maneuvers done on 3/1/00 showed

marked degenerative changes in the lumbar spine with only minimal motion occurring at L4/5,

the only level that moved at all. (CCC 0541)

Although Defendant was quick to note a temporary improvement in Plaintiff's condition

following his surgery (CCC 0535), it failed to mention (CCC 0534) Dr. Solomon's statement:

"He will tell you that he is better, but he is hardly cured."

Plaintiff's previous orthopedist, Frederick Sutter, (C.V. at CCC 00357 - 8) on 6/11/01

(CCC 0027  - 8) diagnosed advanced lumbar spondylosis at multiple levels, most notably at L4-5

where there was no meaningful disc space present with L5 numbness with a significant posterior

element spondylosis and some scoliosis induced by pelvic inequity (left leg 1cm shorter than

right).

Defendant completely ignored the effects of Claimant's narcotic medication regimen.

Claimant's medications include large doses of oxycontin, vicodin, and neurontin (CCC 0344,

0458), the side effects of which include drowsiness, lethargy, etc. as noted in the attached

pertinent portions of the *Physicians Desk Reference*, 55th ed.( 2001) (CCC 0469 - 0483).  The

effects of this medication and the pain caused were addressed by Dr. Launder in answering

propounded interrogatories.  (See below)

Plaintiff underwent an independent medical examination by orthopedic surgeon, William

Launder dated 7/2/01. (0009).  Dr. Launder (C.V. at 0024 - 6) diagnosed Claimant with a failed

back syndrome stating that Plaintiff "has reached maximum medical improvement and is completely disabled permanently" despite "exemplary" treatment.  Dr. Launder set forth a series of functional capacity limitations (0017 - 0023) which recited that Plaintiff :

- Can only stand or sit for less than thirty minutes and cannot alternate between these positions on a continuous basis throughout an eight hour day without interruption due to pain.

- Can stand or walk less than one hour throughout an eight hour workday.

- Can sit for less than one hour during an eight hour workday.

- Cannot walk without experiencing pain.

- Is only able to lift less than ten pounds on an intermittent basis (a few times, but unable to do consistently).

- Is unable to climb, balance, crouch, crawl, stoop, bend, and reach; and can kneel only on an intermittent basis

- Requires three to more hours of rest during daytime hours and suffers a 36% or greater loss of productivity (in terms of the inability to sustain concentration, attention, focus, persistence and pace) due to the effects of pain and pain medication.

- Is unable to complete an eight hour work day on a sustained basis (five days per week, 50 weeks per year with one to one and half sick days per month).

Claimant underwent a functional capacity evaluation on 12/20/21 (0232 - 0234) performed by physiatrist, Stephen Macedo (C.V. at 0235 - 0237) and Eric Myer, D.C.  This testing included National Institute for Occupational Safety and Health (NIOSH) postural testing,

static muscle/joint tests, and dynamic functional analysis.  The anticipated result of a normal patient should fall within 75% of the population.  Due to his condition, Plaintiff failed to make this standard.   The static muscle testing revealed that Claimant suffered weakness in his lumbar and hip areas with the left side testing weaker than the right. The dynamic functional analysis demonstrated that the Claimant was unable to stand or walk for period greater than 3 minutes, squat for longer than 5 minutes, or sit for longer than 10 minutes.  It was noted that Claimant could not stand without severe pain and could only find relief in a reclined posture.  The job strength analysis demonstrated that the Claimant could lift 12.7 to 28lbs. on an occasional basis and 5.3 to 14lbs. on a frequent basis.  Dr. Macedo stated that although the lifting results are compatible with light duty, the postural deficits clearly preclude even sedentary labor.  The functional limitations were wholly related to Claimant's spinal injuries.

The Defendant's abject failure to address these many medical findings supporting Plaintiff's disabled status in accordance with the policy definition is wholly demonstrative of an abuse of discretion.

C. *Defendant makes multiple reference to predisability medical reporting to support a subsequent position for claim denial.*

The undisputed fact is that the Plaintiff reinjured himself in January, 2001 (CCC 0513).  The Defendant seeks to undermine the reinjury by stating that the Claimant carried firewood and rode his bicycle around the neighborhood before this time.  Such retrospective and irrelevant reference serves no purpose to the discussion of whether Plaintiff became disabled in January, 2001, especially given the facts that (1) Plaintiff did not make a claim until February 23, 2001 and (2) Defendant paid Plaintiff disability benefits from the onset of disability through November 6, 2001 (CCC 0309 - 12).  Again, such argument by Defendant serves to illustrate the

7

lengths it will go to as part of its bad faith conduct, highlighting the results of its conflict of interest in its dual role in administering and insuring the subject disability claim.

D. *Defendant failed to give any weight to several important vocational findings.*

Defendant continues to ignore the statement of Marilyn Schwartz, Director of Human Resources of J.J. Haines, who voiced her concerns about the denial of benefits to Plaintiff since he was unable to function in his capacity, being unable to travel for the purpose of seeing clients or training sales employees. (CCC 0111). The Defendant partially cited to the observations of Bob Thompson, President of J. J. Haines & Comp., noting Plaintiff's inability to drive more than an hour without the need to lie down, inability to stand for more than five minutes, inability to travel by plane 8 -9 months prior to applying for disability benefits. The Defendant failed to address Mr. Thompson's additional observations that Plaintiff's was limited to traveling once a week with interruptions to lie down and was spending most of workday lying on the floor (CCC 0516, 0211). As noted by Mr. Thompson, Plaintiff's position required travel of 3 - 4 days per week, mostly by car. It was no surprise that Defendant made no representation concerning this statement (DCMSJ, p. 6).

Plaintiff's position description for Vice-President of Sales for the Floor Covering Department (CCC 0079 - 0080) specifically included the following

C      Ability to travel independently up to 60% of the time within the Domestic United States to attend various meeting with other personnel and public.

C      Ability to visit suppliers and customers

C      Ability to regularly work 50+ hours a week and occasional weekends

C      The physical demands described her are representative of those that must be met by an

employee to successfully perform the essential functions of this job.

C       While performing the duties of this job, the associate is frequently required to sit; use hands to finger, handle, or feel; reach with hands or arms; and talk or hear.  The associate is required to stand and walk.  The associate must occasionally lift and/or move up to 10 pounds.  Specific vision abilities required by this job include close vision, distance vision, color vision, peripheral vision, depth perception, and ability to focus.

C       Extensive automobile required to visit suppliers and customers

Plaintiff was assessed by vocational rehabilitation expert, Martin Kranitz, MA, CRC, CVE, CPS.  In his report dated 7/19/01 (R0012 - 6), Mr. Kranitz (C.V. at 0351 - 4) summarized Claimant's medical conditions, residual physical functional capacity, recreational activities and work duties as well as including a personal interview.   Following this summary, Mr. Kranitz concluded as follows:

> Neal Smith, is a 59 -year-old college graduate who has worked in wholesale sales for many years.  In 1995, he began experiencing back problems which resulted in three surgeries (2 fusions) between 1997 and 2000.  Since his last surgery,  he experienced a brief recovery followed by a gradual decline which currently limits his physical functioning considerably.  He reports and physicians support, that he is unable to stand, walk or sit for any length of time and, indeed, finds that he lays down the vast majority of the day.  He reports a pain level of 5 if he stays in the house which increases to 7 - 8 if he leaves that house.  Even without leaving the house, he experiences a level 10 pain at least once a day, lasting for about 45 minutes on each occasion.

> Given these kinds of limitations...it is my belief and opinion that he is not capable of performing any significant gainful employment.  That is, competitive employment which requires consistent and ongoing activities in the range of 35 - 40 hours per week.

> Given the difficulties with walking, standing, and sitting I do not believe there is competitive work which he could perform.

9

Given the decrease in production, described by Dr. Launder (36%), it is my belief and opinion that an individual with a 36 percent decrease in production would not be able to perform any type of competitive employment.

Given an individual who has to lay down 75 percent of the day, it is my belief and opinion that there is no competitive employment that such an individual could perform.

The above are my findings and opinions to reasonable degree of professional certainty....

As part of his report, Vocational expert Kranitz reviewed the entire medical record including functional capacity findings and interviewed the Plaintiff, at which time he noted that the Plaintiff was restricted to 15 minutes sitting then lied down on the floor for the remainder of the interview.

The Addendum Report by Vocational Expert, Martin Kranitz, dated 2/8/02 (0238 - 242) states the following:

I have reviewed the Functional Capacity Evaluation, dated December 20th, 2001, signed by P. Stephen Macedo, M.D. and Eric Meyer, D.C., performed on Neal Smith. This report based on objective findings, helps to confirm my opinions concerning Mr. Smith. It is significant that Mr. Smith failed six of the postural tests and functioned below the 75th percentile on many tasks he was asked to perform.

The limitations for sitting, standing, and walking are even greater than those estimated by Mr. Smith in July, 2001. The report goes on to say that: when the lifting ability is combined with the patient's dynamic functional deficits, his functional capacity is below the sedentary work threshold.

I see nothing in this report that would contradict my conclusions stated in my July, 2001 report. In fact, I believe the limitations found in the Functional Capacity Evaluation strengthen my conclusions.

Instead of considering the overwhelming vocational evidence of record supporting Plaintiff disability, Defendant relies upon Dr. Lowe's finding that Claimant would be able to

10

perform work which allowed him to control the amount of sitting and stand he performed. (CCC 0500 citing CCC 0503).   Unfortunately, Dr. Lowe is not a vocational expert and, as stated, did not render an vocational opinion.   Therefore, Defendant's use of this statement as evidence that Plaintiff had flexibility to change positions at his job is unsupported.   Further, the substantial evidence of record from all the treatment providers, independent medical examination, and functional capacity evaluation render findings which clearly preclude Plaintiff from performing his past prior work.

Instead of addressing this evidence of record, Defendant chose to deny benefits based on its own assumption that Plaintiff perform the duties of his job since the job "allowed him the flexibility to change positions as needed." (CCC 0501).   There is no evidence in the claims file which has documented that Plaintiff had such flexibility. Further, as his superiors at his employment have indicated, Plaintiff's condition precluded him from performing his past prior work.   Common sense dictates that Plaintiff could not have flexibility to change positions during extensive travel by motor vehicle or airplane.   The insurer's conduct in ignoring the vocational the evidence and inventing its own physical requirements for Plaintiff's past work is definitive evidence of abuse of discretion.

E. *Defendant failed to give any weight to Claimant's report of activities of daily living.*

Defendant's claims manager, Pam Ward, summarized Plaintiff's file in her 3/16/01 memorandum (0513 - 7) which included a section of activities of daily living (ADL's) which stated the following concerning the Plaintiff:

C    Needs to lie on the floor to talk during twelve minute of the interview

C    Must stay off feet with most comfortable place on floor

C      Needs to use stool in shower

C      Dresses in stages

C      Can cook for 5 minutes, breakfast only

C      Does not grocery shopping, cleaning or laundry

C      Can sit for five minutes in a chair without arms, 10 minutes with arm chair, longer in recliner

C      Walks with combination stool/chair

C      Was in wheelchair prior to 5/00 surgery

C      Can drive 15 minutes to Dr. Solomon's office, but must lay down in waiting room

These statements were never contradicted by the insurer and are buttressed by many other similar observations in the claims file by others including Dr. Lowe (CCC 0506), independent medical examiner, Dr. Launder (00017 - 00023) , and,  most notably, the inability of the Defendant to obtain any meaningful videosurveillance evidence despite many attempts (CCC 0007 - 8, 0331 - 0335).  The Defendant's choice to deliberately  ignore these important facts demonstrates an abuse of discretion.

F. *The Defendant places undue reliance on the findings of a nonexamining medical reviewer.*

The insurer ordered the review from Network Medical Review (NMR) on a "priority" basis and paid a 50% surcharge (paying $915.00 by invoice dated 11/16/01 CCC 0282) for a report completion in three days utilizing an order form (CCC 0004) which included a  "Brief Summary" (CCC 0005) which stated:

> clmt advised that he is able to perform his activities of daily living, including folding clothes, leaving home without assistance, stretching exercises, recumbent bike riding & driving.  Clmt.
> indicates his most comfortable position is lying on the floor.  Please refer

to surveillance report for observations.

The Defendant terms the NMR report a "Peer Review Report" (DCMSJ, p.11) although the report fails to bear any such title. (CCC 0283).  Absent evidence that the reviewer is a practicing clinician and surgeon and, certainly, does not perform independent medical examinations, the reviewer cannot be considered a "peer" to Claimant's practicing treatment providers.

The report from Dr. Soriano of NMR is unreliable and contains multiple unsupported conclusions.  Dr. Soriano attributes several hearsay statements to Dr. Solomon which were not verified by Dr. Solomon.  Further, the substance of hearsay remarks attributed to Dr. Solomon are contradicted  by his signed verification stating that he has not expressed any opinion concerning Claimant's condition or functional capacity which extends past his last date of examination of 6/11/01. (0231) Since Dr. Solomon had made no finding beyond his original findings of post-surgical disability extending for three months, there was no contradictory evidence for Claimant to return to work based on the previous estimated opinion at which time Claimant had been approved for benefits by CNA.  All subsequent opinions of all other treatment providers, IME by Dr. Launder and FCE by Dr. Macedo all confirmed Plaintiff's continuing disability.  Further, Dr. Soriano contradicts Dr. Launder's diagnosis based on clinical testing without  undertaking an independent medical examination. (CCC 0009 - 00011)  Instead, Dr. Soriano only makes naked, blanket statements that the "self-reported" complaints of Plaintiff exceed the clinical findings without ever once citing to a single clinical or residual physical functional capacity finding and stating why the finding was inaccurate.  Further, his finding that Plaintiff should return to work in 1 -3 months following each of his surgeries is another blanket

13

statement for which no support was offered.  Dr. Soriano's bias is further demonstrated in his statement that a functional capacity evaluation would be of no value again demonstrates his predetermined conclusion of nondisability.  Further, were the Defendant to have relied upon this statement by Dr. Soriano as the other statements he made, it would not have noted Plaintiff's refusal to undergo functional capacity testing directed by the Defendant.

The poorly supported findings of Dr. Soriano serve to underscore the interest of his employer NMR in rendering desired results to insurers and, in doing so, issuing medical decisions created to support claim denials.

SUPPLEMENTAL LEGAL ARGUMENT:

*A.  Defendant's financial conflict of interest and consequential should result in a "sliding scale" review under the abuse of discretion standard.*

Continental Casualty Company and CNA are financially related entities as set forth in the Disclosure of Corporate Affiliations and Financial Interests filed by the Defendant on 1/6/03.  This Disclosure specifically states that: (1)  CNA Financial Corporation, the claims administrator, is the parent company of Continental Casualty Company, the insurer and (2) that Loews Corporation owns approximately 85% of CNA Financial Corporation's outstanding stock.  It is rather hard to ignore the fact that a clear conflict of interest exists where a parent company administers claims on behalf of its subcorporation who in the actual insurer, both of which share the same financial in generating profits.  Defendant's naked denial that such a close financial relationship fails to serve as evidence of potential conflict is self-serving and nonsensical.

Moreover, material, probative evidence of a conflict of interest may consist of inconsistencies in the plan administrator's reasons, *Lang v. Long Term Disability Survivorship Plan*, 266 F.3d 794, 799 (9th Cir. 2001), insufficiency of those reasons, *Tremain v. Bell Indus.,*

14

*Inc.*, 196 F.3d 970, 977 (9th Cir. 1999), or procedural irregularities, *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999). Procedural anomalies should be reviewed with under a sliding scale due to the conflict presented with decisions reviewed with a "high degree of skepticism." *Pinto v. Reliance Standard Life Ins. Co.*, 214 F.3d 377, 393 - 395 (3rd Cir. 2000) or receive close scrutiny of the plan administrator's decision by the court. *Austin v. Continental Casualty Co.*, 2002 WL 1969342 (W.D.N.C.) citing *Holder v. Woodmen of the World*, 11 Fed. Appx. 104 (4th Cir. 2001); *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993). In particular, the *Lang* court stated that the opinion of an often-used reviewing physician to procure a medical basis to buttress a benefits denial decision was insufficient when compared to the clear evidence from the claimant's treating physicians. Defense counsel's claim that this authority is "misleading" constitutes a naked conclusion without justification no different than the unsupported underlying determinations that Plaintiff is not disabled made by the insurer which defense counsel represents.

Defense counsel's unsupported statement is further undermined by the findings of several other courts including this one. Where the defendant "bears the financial consequences – and reaps the financial rewards – of its won coverage decisions" a modified abuse of discretion standard will be applied. *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp.2d 645 (2002) quoting *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 151 (4th Cir. 1996) and applying the modified abuse of discretion standard set forth in *Bernstein v. CapitalCare, Inc.*, 70 F.3d. 783, 788(4th Cir. 1995); *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80 (4th Cir. 1993) and quoting from *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 355, 343 (4th Cir. 2000) stating "[a] fiduciary's conflict of interest, in addition to serving as a factor in the

15

reasonableness inquiry, may operate to reduce the deference given to a discretionary decision of that fiduciary." To this end, the Defendant in its correct in its footnote assertion that the law in this jurisdiction is well-established, but fails to admit that this authority does not support the Defendant's position.        Where Continental Casualty Company **could** have funded and administered a plan, lessened deference to the degree necessary to neutralize any untoward influence resulting from the conflict of interest was undertaken. *Shields v. Continental Casualty Co.*, 209 F. Supp.2d 1167 (2002). This matter contains admitted evidence of financial self-dealing and actual funding and administering of the plan by related entities. In *Spanos v. TJX Comps., Inc.*, 220 F. Supp.2d 67, fn10 (2002), the court stated that a presumption of a conflict of interest occurs if CNA were to be both the funding source and plan administrator. Rulings have gone so far as to presume that if a plan fails to produce evidence demonstrating that the conflict of interest did not affect the decision to terminate benefits, a *de novo* standard of review will apply. *Lang v. Long Term Disability Survivorship Plan*, 266 F.3d 794, 798 (9th Cir. 2001), insufficiency of those reasons, *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 976 (9th Cir. 1999); also cited in *Waggener v. Unum Life Ins. Co. of Am.*, 238 F. Supp.2d 1179 (2002). See Also *Medford v.* MetLife, 244 F. Supp.2d 1120 (D. Nev. 2003); *Sanderson v. Continental Cas. Co.*, 2003 WL 470539 (D.Del.)

Given the significant evidence concerning the inconsistencies in reasoning, insufficiency of explanation, and procedural irregularities demonstrate that little deference should be afforded to the Defendant's decision that Plaintiff is not disabled. Defendant's argument that a reduction in deference given to the plan administrator's decision should be applied instead of a heightened standard of review urged by the Plaintiff is a distinction without a difference.

16

B. *Defendant conducted an unfair and biased review of the evidence.*

ERISA requires that a plan participant appeal is entitled to a "full and fair review."  29

U.S.C.A. § 1133(2)(2001).  A full and fair review accomplishes two goals: to allow plan

fiduciaries to administer plans without a formal adversarial process; and to protect a participant

from arbitrary and unprincipled decision making.  *Weaver v. Phoenix Home Life Mut. Ins. Co.*,

990 F.2d 154, 157 (4th Cir. 1993)(quoting *Grossmueller v. Int'l. Union, United Auto. Aerospace*

*& Agric. Implement Workers of Am.*, 715 F.2d 853, 857 (3rd Cir. 1983)

1. Defendant's use of improperly selective medical evidence is unfair and does not
constitute substantial evidence on which to base a denial of the claim.

An administrator's decision will be upheld if its decision is the "result of deliberate,

principled reasoning process...supported by substantial evidence *Bernstein v.* CaptialCare, 70

F.3d 783, 788 (4th Cir. 1995);  Ranson *v. Unum Life Ins. Co. of Am.*, 2003 WL 1192839

(E.D.Va.) .citing *Pappas v. Reliance Standard Life Ins. Co.*, 20 F. Supp. 2d 923, 929 (E.D.Va.

1998).

Substantial evidence has been defined as more than a scintilla, yet somewhat less than a

preponderance.  *Ellis v. MetLife*. 1996 WL 673307 (E.D.Va. 1996)(unpublished) quoting

*LeFebre v. Westinghouse Elec. Corp.* 747 F.2d 197, 208 (4th Cir. 1984); *Holder v. Woodmen of*

*the World*, 11 Fed. Appx. 102, 2001 WL 369680 (4th Cir. 2001)(unpublished).   Substantial

evidence has also been defined as "evidence which a reasoning mind would accept as sufficient

to support a particular conclusion. *Gilley v. Holland*, 2002 WL 28338 (W.D.Va.) citing *Laws v.*

*Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

The recent case of *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp.2d 645

(D.Md. 2002) called attention to "numerous instances in which defendant mischaracterized

evidence" and pointed to the failure to undertake an independent medical examination as bases for the finding of abuse of discretion.  In this case, the use of Network Medical Review constitutes little more than an internal review due to its close relationship with the insurance industry Where the medical evidence is not reasonably read by an insurer, a denial of benefits cannot be supported.  *Myers v. Hercules*, 253 F.2d 761 (4th Cir. 2001)(insurer citing to only small portions of medical record and taking evidence out of context).  Similar conduct occurred when the insurer overlooked crucial evidence, choosing to evaluate only some of the evidence of record.  *Hines v. Unum*, 110 F. Supp.2d 458 (S.D.Va. 2000).

Many other cases have addressed this often seen, improper tactic of improperly selective reliance on treatment notes as a basis for denying benefits.  *Rosenthal v. LTD Plan of Epstein Becker & Green, P.C.*, 1999 U.S. Dist. LEXIS 21443, No. CIV-98-4246, 1999 WL 1567863 (C.D. Cal. Dec. 21, 1999); *Ebert v. Reliance Standard Life Ins. Co.*, 171 F.Supp.2d 726 (S.D. Ohio 2001) (citing *Castle & Govindarajan v. FMC Corp.*, 932 F. Supp.2d 634, 637 (7th Cir. 1991)(a selective review of the evidence is an abuse of discretion and will support reversal of the administrator's decision); *Davies v. Paul Revere*, 147 F. Supp.2d 347 (E.D.Pa. 2001)(noting Courts have overturned adverse benefits decisions based upon selective reading of medical records by a captive consultant, including a "one-sided, adversarial consideration of the reord" as opposed to "an impartial evaluation," referring only to those parts of a treating doctor's report that were adverse to a claimant's position, ignoring or disregarding pertinent portions of the record, without discussing the medical significance of all of the evidence of record.); *Pinto v. Reliance Stand. Life. Ins. Co.*, 214 F.3d 377 (3rd Cir. 2000) ("we look not only at the result – whether it is supported by reason – but at the process by which the result was achieved."0(There

18

is rarely a "'smoking gun' direct evidence of purposeful bias." *Pinto* at 379; *Castel v. Reliance Standard Life Ins. Co.*, 162 F. Supp. 2d 842, 2001 U.S.Dist. LEXIS 14625, 2001 WL 1090772 at *11 (finding a plan administrator's selective review of the administrative record arbitrary and capricious); *Hess v. Hartfor Life & Accid. Ins. Co.*, 274 F.3d 456; 27 EB Cases 1205 (E.D.Pa. 2001) (reliance almost exclusively upon the opinion of a non-examining physician raises doubts about the reasonableness of the denial of benefits); *Peterson v. Continental Casualty Co.*, 116 F.Supp.2d 532 (S.D.N.Y. 2000)(ignoring relevant factors of failing to base the decision on substantial evidence); *Lake v. UNUM Life Ins. Co.*, 50 F. Supp.2d 1243 (M.D.Ala. 1999)(failure to consider relevant evidence showed bad faith and justified the application of the de novo standard of review.); *Clausen v. Standard Ins. Co.*, 961 F. Supp. 1446, 1451 - 1457 (D.Co. 1997)(abuse of discretion to undervalue and/or ignore medical evidence, opinions and records supplied by the treating physicians that support a diagnosis); *Miller v. United Welfare Fund*, 72 F.3d 1066 at 1073 (2d Cir. 1995); *Thorpe v. Continental Casualty Comp.* 2002 (E.D.Pa. 2002); *Spangler v. Lockheed Martin Energy Systems, Inc.*, 2002 U.S. App.LEXIS 25733 (6th Cir. 2002); *Norris v. Citibank, N.A. Disability Plan*, 2002 U.S.App.LEXIS 21996 (8th Cir. 2002); *Dorsey v. UnumProvident*, 167 F.Supp.2d 826 (E.D.Pa. 2001)(Findings the medical review of the plaintiff's claims file "incomplete and inaccurate" –the "most unreasonable" being the hired records reviewer's review; further stating at 856 -7: "The medical reviews conducted by Provident were incomplete and disregarded the substantial evidence...[from] treating physicians. [Provident's] consultant's evaluation inadequately addressed plaintiff's ability to return to her job...For these reason, Provident's denial of plaintiff's benefits is simply not supported by reason.  Even when viewed in the light most favorable to the defendant, Provident's denial

19

Dorsey's claim is arbitrary and capricious, there is no genuine issue of material fact, and the plaintiff is entitled to judgment as a matter of law.  In fact, this court finds that the evidence weights so heavily in favor of the plaintiff that plaintiff's motion would succeed even if the court were to apply a deferential arbitrary and capricious standard.").

Social Security decisions have found similarly that selective reviews of medical evidence are improper.  *Holohan v. Massanari*, 246 F.3d 1195)(9th Cir. 2001), *McBride v. Massanari*, 169 F.Supp.2d 857 (N.D.Ill. 2001); *Stein v. Sullivan*, 892 F.2d 43, 47 (7th Cir. 1989).

The partial and selective medical review undertaken demonstrates that Defendant's decision to deny benefits was not the result of a reasoned and principled decision making process.  Rather, it was an unprincipled and irrational course to a predetermined result of benefits denial.

2.  <u>Defendant fails to address the fact that it terminated Plaintiff's disability benefits despite no clinical evidence demonstrating improvement in his condition following a period of claims approval and payment.</u>

As stated by the Defendant, benefits were paid to Plaintiff on 11/6/01 following his first appeal for benefits.  There is no evidence in the claims record which demonstrates any improvement in Plaintiff's condition following this original benefits approval.  Rather, the Defendant took it upon itself to conduct a "continuing review" to deny benefits followed by a "good faith" review in order to procure and sustain a denial of long term disability benefits.

Termination of benefits without a change in claimant's condition and sudden rejection of the treating physician opinion has been ruled to be a material, probative evidence of conflict for these purposes.  *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1134, 1146 - 7 (9th Cir. 1999)   The facts in this matter demonstrate material, probative evidence beyond the

mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breached in its fiduciary duty to the beneficiary.  *Frost v. Intel Corp.*, 2002 WL 1287889 (9th Cir. Ariz.) citing *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1323 (9th Cir. 1995).  For these reasons, sliding scale analysis as set forth in *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997) should have been undertaken in this case.

A decision by the insurer that a claimant was no longer disabled is unreasonable when contradicted by contrary evidence in the claims record. *Hozschuh v. Unum Life Ins. Co. of Am.*, 2002 U.S. Dist. LEXIS 13205, *22-26 (E.D. Pa. 2002);   *Levinson v. Reliance Standard Life Ins. Co.*, 245 F.3d 1321 (11th Cir. 2001) citing *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir. 1996..  It is incumbent upon an insurer previously paying benefits to produce evidence that a claimant had recovered the ability to perform his past work.  *Walke v. Group Long Term Insur.*, 256 F.3d 835 (8th Cir. 2000).  This includes a "sudden and thinly supported departure from the prevailing diagnosis"offered by the treating doctors.  *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1130, 1147 (9th Cir. 1999) as was evidence in this case where no significant change in the claimant's condition had been demonstrated by the insurer.  See also *Carugati v. LTD Plan for Salaried Employees* 2002 WL 441479 (N.D.Ill.); *McOsker v. Paul Revere Life Ins. Co.*, 279 F.2d 586, 589 (8th Cir. 2002)

A reversal of a decision to grant long term disability benefits without sufficient new medical information to justify that decision is reason to treat that decision with "significant skepticism." *Thorpe v. Continental Casualty Co.*, 2002 WL 31845876 (E.D. Pa.) at *4 citing *Holzschuh v. Unum Life Ins. Co. of Am.*, 2002 U.S. Dist. LEXIS 13205, at *18 (E.D.Pa.)

Even cursory examination of the defendant's decision-making process indicates that it

21

failed to consider all of plaintiff's medical evidence or consider all of his conditions in conjunction with each other and took an "adversarial" approach. *Laser v. Provident Life & Accident Insur. Co.*, 211 F. Supp.2d 645, 656 (D. Md. 2002) citing *Williamson v. A.T. Massey Coal Co., Inc.*, 56 F. Supp.2d 656, 661 (S.D.W.Va. 1998) and as cited favorably in *Willis v. Baxter Int'l, Inc.* , 175 F. Supp.2d 819, 831 (W.D.N.C. 2001). To this end, where plans repeatedly hire the same experts as physicians, there is a conflict of interest. *Regula v. Delta Family Care Disability Survivorship Plan*, 266 F.3d 1134(9th Cir. 1999) cited favorably in *Walker v. LTD Plan of Sponsor Tri-Valley Growers*, 2002 WL 467684 (N.D.Ca. 2002).

     3. *Defendant failed to consider an appropriate job description.*

Defendant's reliance on the holding in *Gallagher v. Reliance Stand. Life Ins. Co.*, 305 F.3d 264 (4th Cir. 2002) is misguided. Unfortunately, the Defendant failed to undertake an appropriate job description as required under this holding by inventing "flexibility" in position options not endorsed by anyone at Plaintiff's work or contained in the job description of record.

Further, it was considered "not only high-handed, but also certainly evidence of a conflict" where a plan administrator rejected the conclusion of its own human resources manager that the participant was no longer capable of performing his former position. *Nord v. Black & Decker*, 296 F.3d 823 (9th Cir. 2002) (case granted *cert.* to the Supreme Court on other grounds). In this case, CNA ignored the statements of both the Plaintiff's Human Resources Director and company President who both noted that Claimant was unable to perform his position. These undisputed facts cannot be overcome by the Defendant and demonstrate an abuse of discretion.

The failure of the Defendant to undertake an correct vocational analysis and its attempt to mischaracterize the vocational evidence are glaring examples of abuse of discretion.

Dr. Soriano's discounting of Plaintiff's pain runs contrary to the case law.  It has

been ruled in *Conrad v. Continental Casualty Co.*, 232 F. Supp.2d 600, 604 that:

> "[be]cause pain is not readily susceptible to objective proof...the
> absence of objective medical evidence of the intensity, severity, degree or
> functional effect of pain is not determinative." *Hyatt v. Sullivan*, 899 F.2d
> 329, 336 (4th Cir. 1990).  The Fourth Circuit has further held that "[t]he
> only fair manner to weigh a subjective complaint of pain is to examine
> how the pain affects the routine of life." *Mickles v. Shalala*, 29 F.3d 918,
> 920 (4th Cir. 1994) (J. Hall concurring).  Though these cases were decided
> in the context of Social Security Disability benefits, it is relevant and
> applicable in the context of an ERISA determination.  See, *Willis v. Baxter
> Int'l., Inc.*, 175 F. Supp.2d 819, 833 (W.D.N.C. 2001).

This conduct by NMR has been criticized in several case including              *Regula v.

Delta Family-Care Disability Survivorship Plan*, 266 F.3d 1130, 1143 (9th Cir. 2001) in which it

was held that:

> the conflict of interest when benefit plans repeatedly hire particular
> physicians as experts [since] these experts have a clear incentive to make a
> finding to save their employers money and to preserve their own
> consulting arrangements.

 This exact language was cited again favorably in  *Darland v. Fortis Benefits Benefits Insur. Co.*,

2003 WL 141620 (6th Cir.(Ky)).

Further evidence of NMR's bias was set forth in *Austin v. Continental Casualty Co.*,

2002 WL 1969342 (W.D.N.C.) which stated that NMR's  internet materials described the

purpose of their reviewing function as to "support the retained functional abilities of an

individual."  This statement made it clear to the court that this source of referral was not to an

"independent" medical examiner as asserted by the defendant. *Id.* at FN1.  These cases clearly

hold that NMR is a entity beholden to the insurance industry and is continually employed for the

sole purpose of procuring medical support for disability benefits denials. *Vartanian v. MetLife*,

23

2002 WL 484852 (N.D. Ill.)

Surprisingly, the Defendant points to *Voight v. MetLife Ins. Co.*, 28 F. Supp. 2d 569 (Central Dist. CA 1998).  In *Voight*, the treating physicians were sent the NMR reports directly for comment and rendered equivocal opinions.  In the present, case no such correspondence was undertaken as the medical opinion was requested on a "rush" basis to procure a denial.  NMR was all too aware that correspondence requesting comment by Plaintiff's treatment provides would not result in favorable responses given the unsupported conclusions expressed in its report.  For this reason, Defendant's reliance on the *Voight* case ruling  is undermined by the actual facts.

As stated in *Watson v. UnumProvident Corp.*, 185 F. Supp.2d 579, 581-2) (D.Md. 2002), the decision of a parent company to rely upon a paper review without ordering an independent medial examination was a cause for concern. Cited favorably in *Laser v. Provident Life & Accident Ins. Co.*, 211 F. Supp.2d 645 (2002).

NMR's reputation for insurer friendly review to support claims denial is well-documented.  The unsupported and biased review rendered by NMR in this case only serves to buttress the conclusions of other courts as cited.


C. *The applicability of the treating physician rule remains undetermined at this time.*

The case of *Nord v. Black & Decker*, 296 F.3d 823 (9th Cir. 2002) was argued before the Supreme Court on 4/28/03.  The main issue was the applicability of the treating physician rule. Defendant's contention that the treating physician rule has no bearing is premature since no opinion has been issued by the Court and given the unsettled state of the law in this Circuit.

24

Further, contrary to Defendant's contention,  at no time has Plaintiff charged that an opinion of a physician employee of the Defendant had been credited over the treating physicians.  Plaintiff states that the nonexamining reviewer, NMR, should be given less deference that the treating and independent examining physicians in this case, especially given NMR's continual use by the insurance industry to create medical denials.

Defendant's contention that adoption of the treating physician rule is inconsistent with ERISA's goal of not discouraging employers from adopting disability benefit plans and increasing the benefits of ERISA disability plans is based wholly on conjecture.  The same substantial evidence required to justify a claims decision may be utilized for the purpose of substantiating its crediting the opinion of a reviewer over the treating physician.  Further, the fact the Department Labor has not endorsed a particular position does not serve as evidence that a rule has been held in disfavor.

Defendant's citation of *Peabody Coal Co. v. McCandless*, 255 F.3d 465 (7th Cir. 2001) is factually inaccurate.  The *Peabody* case involved a claim for insurance benefits and a difference in opinion between a treating physician and medical examiner concerning whether a claimant had died as a result of a particular disease process.  This case involved a difference of opinion which was resolved by the court finding a more credible medical basis voiced by the **examining** defense  physician who performed the actual autopsy.  Contrary to Defendant's ill-supported position, it has been held that a doctor who naturally advocates his patient's cause is not a good reason to reject his opinion as a treating physician.  *McGoffin v. Barnhart*, 288 F.3d 1248, 1253 (10th Cir. 2002).  See also *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).

Defendant's skepticism concerning the treating physician opinion has been addressed

25

specifically in *Hawkins v. First Union Corp. LTD Plan*, 2003 WL 1908088 (7th Cir.) in which it was held that:

> ...such skepticism may have a stronger basis when the treating physician squares off against a neutral consultant appointed by the Social Security Administration than when the consultant is hired by the administrator of a private plan and so may have a financial incentive to be hard-nosed in his claims evaluation to protect the financial integrity of the plan and of the employer that funds it.  *Id*. citing *Ladd v. ITT Corp.*, 148 F.3d 753, 754 (7th Cir. 1998); *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052 - 53 (7th Cir. 1989).  If the incentives of the treating physician and of the plan's consultant are assumed to be equal and opposite, consideration of incentives drops out and the superior information likely to be possessed by the treating physician, especially when as in this case **the consultant does not bother to examine the patient,** may support the treating physician presumption after all.  See *Bali v. Blue Cross & Blue Shield Ass'n.*, 873 F.2d 1043, 1048 (7th Cir. 1989); cf. *Whitson v. Finch*, 437 F.2d 728, 732 (6th Cir. 1971)(emphasis added).

Even when balancing the inequities, as it were,  the treating physician's findings should be afforded greater weight or great weight as has been voiced in the recently interpretive case law in *Conrad v. Continental Casualty Co.*, 232 F. Supp. 2d.  600, 605 (E.D.N.C. 2002) citing *Austin v. Continental Casualty Co.*, 216 F. Supp.2d 550, 558 (W.D.N.C. 2002).

D.  *The Defendant failed to give any weight to the findings of the Social Security Administration*.

The Defendant again mischaracterizes a legal argument made by Plaintiff in stating that the Plaintiff argues that the decision of the Social Security Administration should be controlling. The Plaintiff clearly argues that significant weight should have been accorded the decision of the Administration. From the claims record, it is absolutely clear that the insurer afforded the decision no weight.

The Defendant's argument concerning differing disability standards weighs heavily

against its position that Claimant is not disabled.  The Social Security standard states that a claimant must demonstrate the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  *Elliot v. Sara Lee Corp.*, 190 F.3d 601, 607, fn.5 (4th Cir. 1999) citing 20 C.F.R.  § 404.1505(a).  This standard is far more restrictive than the policy standard requiring that the Plaintiff be unable to perform the material and substantial duties of his regular occupation.

Defendant's contention that it was not a party before SSA is not supportable.  An insurer is not a proper party to a Social Security disability hearing because corporate entities are not the individuals or specified persons enumerated by the Social Security Act, or regulations with a potential stake in the award of Social Security benefits to the claimant.  *Crawford & Comp. v. Apfel*, 2000 U.S. App. LEXIS 31829, 14 Fla. Law W. Fed. C 257.

Defendant's contention that there was only favorable evidence considered by SSA and Administrative Law Judge Due is similarly flawed.  The reason Claimant was approved by an administrative law judge is a result of his being denied benefits at the initial application and reconsideration levels since the internal nonexamining reviewers utilized SSA through the Maryland Department of Disability Determination Services determined that Plaintiff was not entitled to benefits.  Plaintiff was awarded hearings only after being granted a hearing before an independent judge.  For these reasons, the SSA conduct is far more similar to the Defendant's conduct than it is aware.  Again, Plaintiff is required to call upon the judiciary to seek relief for his wrongful claims denial.

The insurer's failure to weigh the findings of the Social Security Administration in their denial of benefits constitutes arbitrary and capricious claims handling. *Piscottano v. MetLife,* 118 F. Supp. 2d 200 (Conn. 2000) citing *Durr v. MetLife Ins. Co.*, 15 F. Supp. 2d 205, 213 (D. Conn. 1998). The *Durr* Court cited the Social Security standards as follows:

> (i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist, and (v) other relevant factors. *Id*. at 212, citing 20 C.F.R. § 404.1527(d)(2) - (6)

These factors were described as "instructive" for this purpose. *Durr*, *supra*, citing *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 695 n.11 (7th Cir. 1992), *Torix v. Ball Corp.*, 862 F.2d 1428m, 1431 & n.6 (10th Cir. 1988), *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420-21 & n.6 (11th Cir. 1984). To this end, NMR's report was found to be "largely conclusory in nature" and did not constitute "substantial evidence" for determination of ineligibility. *Id*. (denial upheld on bases of treatment provider reports and observed political campaign activities).

It was further held in *Austin v. Continental Casualty Co.*, 2002 WL 1969342 (W.D.N.C.) Failing to consider the ultimate vocational determination of the Commissioner of Social Security is done at an administrator's peril since federal courts are keenly aware the close scrutiny Social Security disability benefit decisions receive.

Since SSA used a stricter disability standard than that included in the pertinent policy of insurance. and based its findings on the substantial medical evidence of record, the insurer should have afforded the decision proper weight. The lack of evidence demonstrating that the SSA disability opinion was considered by the insurer further demonstrates its abuse of discretion in making it decision to deny benefits to Plaintiff.

CONCLUSION:

The claims file is replete with evidence from treating and independent examining medical specialist sources, all of which support Mr. Smith's disability in accordance with the pertinent policy terms.  The Defendant fails to cite to any substantial evidence of record which contradicts the clear concert of opinion supporting Mr. Smith's disability.  Instead, the Defendant chose to mischaracterize evidence by improper selective citation and purposeful misconstruction.  To better its position, the Defendant acquired the services of a medical reviewing company with an extensive history for supporting defense interests.  The poorly supported and biased  report received from the nonexamining reviewer only serves to substantiate this fact.

Defendant further abused its discretion by failing to perform a proper vocational analysis as part of its review.  Instead, the Defendant attempted to advance completely unsupported physical requirements for Mr. Smith's past work despite clear contrary evidence from work supervisors.

The conduct by the Defendant demonstrates a consistent course of denying benefits under any circumstance and with little or no evidence to support its conclusions.  This is a product of its conflicted position as both insurer and administrator of this disability claim.  The insurer's conduct in ignoring the overwhelming evidence of record is so obvious that its unprincipled claims decision in this matter should be given no deference whatsoever.

Mr. Smith was a privileged individual who was very successful in business.  He did everything in his power to continue working in his position as Vice-President of Sales with J.J. Haines, Inc.  He discontinued working only due to the degenerative nature of his condition which prevented him from performing the necessary duties of his position, especially the travel

29

requirements as confirmed by the President and Human Resources Director of his former employer.

Rather than acknowledge the heavy medical and vocational support provided by Plaintiff's treating physicians and employer demonstrating his inability to perform his past prior work, the Defendant chose to elicit the support of a medical review services hired routinely for the purpose of denying claims by authoring "independent" medical reviews. Rather than accepting his fate, the Plaintiff marshaled his resources and paid for additional independent medical, functional capacity and vocational assessments, all of which confirmed that he was disabled in accordance with the pertinent policy provision. Very few claimants can afford to procure such additional, confirmatory assessments and testing. The fact that the Defendant could deny benefits given the overwhelming evidence supporting disability clearly demonstrates the economic motive behind its claims decision.

The insurer remained intent on denying this claim by any means necessary. Even after approving the disability claim, the insurer inexplicably denied that claim despite no recorded change in Plaintiff's condition. The only explanation for this conduct is the Defendant's interest in saving money rather than undertaking a full and fair assessment as required under ERISA as required. In fact, there is little more the Defendant could do to demonstrate more unreasonable or unprincipled decision making in this case since its conduct clearly borders on fraud.

This case should serve as a glaring example of the abuses insurers attempt only to hide behind purported deferential treatment under ERISA. Such conduct cannot be permitted in this case and, hopefully, will create a precedent for claimants who do not possess Mr. Smith's economic stamina to pursue this case to the fullest extent.

WHEREFORE, Neal Smith moves for an order granting his cross motion for summary judgement and denying the cross motion for summary judgement filed by Defendant, Continental Casualty Company, and enter judgement in favor as to all disputed matters in this case and granting the relief requested.

Respectfully submitted,

_____
Scott B. Elkind #10810
Stephen F. Shea #4066
Elkind & Shea
801 Roeder Rd., Ste. 550
Silver Spring, MD 20910
P: (301) 495-6665
F: (301) 565-5111
Attorneys for Plaintiff