UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NEAL S. SMITH, | * |
|    Plaintiff, | * |
| v. | *  Civil Action No. WDQ 02-CV-3049 |
| CONTINENTAL CASUALTY COMPANY, | * |
|    Defendant. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

CONTINENTAL CASUALTY COMPANY'S
REPLY MEMORANDUM IN FURTHER SUPPORT OF
<u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

     Defendant, Continental Casualty Company ("Continental"), pursuant to Maryland Local Rule 105, submits the following reply memorandum in further support of its cross-motion for summary judgment.

## I.    PRELIMINARY STATEMENT

     Citing *Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579 (D. Md. 2002) and *Laser v. Provident Life & Accident Insurance Co.*, 211 F. Supp. 2d 645 (D. Md. 2002), Mr. Smith contends Continental abused its discretion by denying his application for disability benefits. Rather than supporting Mr. Smith's position, these cases, in fact, demonstrate that Continental acted well within its authority and discretion in denying Mr. Smith's claim. Continental followed a deliberate review process, its determination was reasonable, and the determination was supported by substantial evidence. The Court, therefore, should not disturb Continental's discretionary determination.

II.   ARGUMENT

A.   In Contrast To *Watson* And *Laser*, Continental's Review And Decision Were Completely Correct

In *Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579 (D. Md. 2002), Valerie Watson, a legal secretary suffering from, *inter alia*, heart disease, sought to overturn a denial of disability benefits. 185 F. Supp. 2d at 581. The Court in *Watson* recognized that the case turned upon an "extraordinary foul-up," namely, the failure to notice that the medical records in the claim file were for the wrong person. *Id.* at 581-82. Given this "foul-up," the Court concluded that the insurer "never looked at the records in the first instance." *Id.* at 585. The Court further noted that the insurer did not obtain an independent medical evaluation, but rather elected to rely upon in-house reviews. *Id.* at 582, 587-88. Under such circumstances, the Court found it "impossible" to conclude that the insurer had conducted a reasoned and principled review of the benefits claim. *Id.* at 585.

In *Laser v. Provident Life & Accident Insurance Co.*, 211 F. Supp. 2d 645 (D. Md. 2002), yet another cardiac case, the Court confronted a situation with no independent medical review of the medical evidence in the claim file. 211 F. Supp 2d at 650. This shortcoming was highlighted by the fact that the insurer committed a "material error" by mistakenly believing that an ear, nose and throat specialist was a cardiologist. *Id.* at 652 n.17. Notably, however, the Court did not overturn the decision in *Laser*, but rather remanded the claim for further consideration. *Id.* at 658.

In this case, Continental committed no equivalent "extraordinary foul-up," "material error," or other similar claim malady. Continental simply reached a conclusion with which plaintiff is dissatisfied. That dissatisfaction, however, does not alter the fact that Continental put forth considerable efforts over a period of fourteen months to review plaintiff's claim. The investigation commenced with Mr. Smith's February 23, 2001 application for disability benefits (CCC 0525) and ended with Continental's final

determination of May 2, 2002 (*id.* at 0210). For over a year, Mr. Smith submitted additional documentation to support his claim. He received the benefit of two separate administrative appeals; the first resulted in a remand to Continental's claims administrator for further evaluation (CCC 0342), and the second resulted in a final denial of the claim (*id.* at 0210). He also benefited from Continental's good faith payment of benefits during the administrative review, even though Continental ultimately concluded that Mr. Smith was not disabled according to the terms of the policy.

      Likewise, Continental did not fail to submit Mr. Smith's records to independent medical review. In this case, Continental obtained an independent medical evaluation from Dr. Marc Soriano, through an organization known as Network Medical Review ("NMR") regarding, *inter alia*, the following areas: 1) "test result interpretation as it impacts functionality"; 2) "clarification of reasonable duration"; 3) "assessment of functionality vs. job requirements"; 4) "obtain and/or report information regarding functionality vs. job requirements" after discussing the same with Dr. Solomon; and 5) "clarify what evidence [Dr. Solomon believes] supports occupational restrictions." (*See* CCC 0006.) In addition to these five areas, Continental propounded six explicit questions to determine, *inter alia*, if "the records demonstrate[d] a functional impairment that would have continuously prevented [Mr. Smith] from performing his occupation from 2/23/01 through the present[.]" (*Id.*)

      Continental and Dr. Soriano did not engage in a selective review of the evidence, (*see* Pl.'s Mem. in Opp. Def.'s Cross-Mot. for Summ. J. ("Pl.'s Opp. Mem.") at 17), or "purposefully avoid" evidence favorable to Mr. Smith (*see id.* at 4). On its face, Dr. Soriano's report indicates that he received records from Drs. William Launder, Clifford Solomon, R.F. Davis, Jon B. Lowe, Brian S. Kahan, and Frederick T. Sutter. (*See* CCC 0283.) Dr. Soriano also considered the vocational assessment conducted by Martin Kranitz and several objective diagnostic reports. (*See id.*) In other words, Continental provided Dr.

Soriano with the documents that Mr. Smith provided to Continental, and Dr. Soriano, in turn, conducted "[a] thorough review of the medical records submitted …." (*Id.* at 0284.)

Dr. Marc Soriano's complete review of Mr. Smith's medical records on behalf of NMR and Continental led him to a different conclusion from those reached by some, but not all, of Mr. Smith's treating physicians. Dr. Soriano opined, for example, that Dr. Launder's diagnosis of failed back syndrome was not supported by clinical findings. (*Id.*) According to Dr. Soriano:

> [D]espite a paucity of clinical findings, Mr. Smith was declared totally disabled by Dr. Launder. His exam revealed negative straight leg raising signs, nontender spine, no spasm in the paralumbar muscles, but a great deal of difficulty getting on and off the exam table. Mr. Smith's reflexes were normal, sensory was intact in all dermatomes and normal range of motion was noted in the hips, knees, ankles, and feet, with no instability. Coordination was noted to be normal. No atrophy was detected in the lower extremities. Flexion was limited, but this is noted as a patient-controlled phenomena. Mr. Smith's gait was also slow and shuffling, which is often an indication of functional illness and symptom exaggeration. Without significant clinical findings, Dr. Launder diagnosed a failed back syndrome on that day, which is based on self-reported complaints only.

(*Id.*) Dr. Soriano believed, from his perspective as a neurosurgeon, that Mr. Smith was mildly impaired due to his multiple surgeries, but that his self-reported complaints exceeded clinical findings. (*Id.* at 0285.) Mr. Smith's history, physical examinations, and testing did not support a diagnosis of failed back syndrome or indicate that Mr. Smith's condition rendered him unable to satisfy the duties of his job. (*Id.*)

In a telephonic conference between Dr. Soriano and Dr. Clifford Solomon, Mr. Smith's treating surgeon, Dr. Solomon conceded that "Mr. Smith's complaints were excessive and often did not correspond well to Mr. Smith's clinical X-ray findings or neurological exam." (*Id.*) In fact, "Dr.

Solomon agreed that there were no significant physical findings, either neurologically or on an orthopedic basis, and … that Mr. Smith was probably not totally disabled ….." (*Id.*)

Based upon the entirety of the information he reviewed, Dr. Soriano concluded that "[t]he records do not demonstrate a functional impairment that would have prevented Mr. Smith from performing his occupation from 02/23/01 through the present. … The more recent information submitted and reviewed on Mr. Smith does not provide any documentation supporting the diagnosis of total impairment or disability." (*Id.*)  Continental relied upon Dr. Soriano's opinion given the thorough nature of his review.

> B. Plaintiff Seeks To Discredit Continental's Reliance Upon The Opinions Of His Physicians

In *Laser*, the Court concluded that the insurer "repeatedly minimized and ignored the opinion of plaintiff's long-time treating cardiologist[.]"  211 F. Supp. 2d at 651.  By contrast, Mr. Smith, not Continental, seeks to minimize the opinions of his long-time treating physicians, Drs. Jon Lowe and Clifford Solomon.

Although the administrative record reflects that correspondence between Drs. Lowe and Solomon dates back to 1997, Mr. Smith accuses Continental of "mak[ing] multiple reference to predisability medical reporting to support a subsequent position for claim denial." (Pl.'s Opp. Mem. at 7.)  To further establish this position, Mr. Smith argues as follows:

> The undisputed fact is that the Plaintiff reinjured himself in January, 2001 (CCC 0513).  The Defendant seeks to undermine this injury by stating that the Claimant carried firewood and rode his bicycle around the neighborhood before this time.  Such retrospective and irrelevant reference serves no purpose to the discussion of whether plaintiff became disabled in January, 2001, especially given the facts that (1) Plaintiff did not make a claim until February 23, 2001 and (2) Defendant paid disability benefits from the onset of disability through November 6, 2001.

5

(*Id.*)  Continental fully considered Dr. Lowe's office notation indicating that Mr. Smith, on January 14, 2001, injured his back celebrating a Baltimore Ravens touchdown.  (*See* CCC 0507.)  This, in fact, is the same office notation containing the information concerning the firewood and bicycle activities.  When Continental investigated the information revealed by Dr. Lowe, he answered affirmatively Continental's question of whether Dr. Lowe "believe[d] Mr. Smith is able to perform work which allows him to control the amount of sitting and standing he perform[s]."  (CCC 0503.)  Mr. Smith now seeks to minimize Dr. Lowe's opinion:

> Defendant relies upon Dr. Lowe's finding that Claimant would be able to perform work which allowed him to control the amount of sitting and stand[ing] he performed.  (CCC 0500 citing CCC 0503).  Unfortunately, Dr. Lowe is not a vocational expert and, as stated, did not render a[] vocational opinion.  Therefore, Defendant's use of this statement as evidence that Plaintiff had flexibility to change positions at his job is unsupported.

(Pl.'s Opp. Mem. at 10-11.)

   Mr. Smith's effort to minimize Dr. Lowe's opinion is similar to his treatment of Dr. Solomon.  After Dr. Solomon reported that Mr. Smith "was probably not totally disabled," (CCC 0285-86), Mr. Smith sought to distance himself from Dr. Solomon in an effort to undermine Continental's reliance upon his remarks.  To this end, Mr. Smith submitted a statement signed by Dr. Solomon indicating that "[Dr. Solomon] ha[d] not examined Neal Smith since 6/11/01 and [could not] render any opinion concerning his condition or functional capacity after that date." (*Id.* at 0231.)  Although Continental's investigation was based on information that Mr. Smith supplied, Mr. Smith now argues that Continental's reliance upon information he provided through Dr. Lowe is misplaced, Continental's reliance upon Dr. Solomon is erroneous, and its reliance upon facts prior to January 2001 is

"indisputably" wrong. Mr. Smith's arguments must fail as they are nothing more than his contrary views of what the evidence reveals.

>   C.   The Opinions Of Mr. Smith's Physical Therapist And Treating Physician Undermined Mr. Smith's Allegations Concerning The Severity Of His Re–injury

Continental's investigation revealed inconsistencies in Mr. Smith's claim that he became disabled in January 2001 due to a re-injury of his back. Kristi Campbell, a vocational consultant with Continental, reviewed Mr. Smith's medical chronology and investigated the facts contained therein. According to the chronology, Mr. Smith attended his final physical therapy session on January 26, 2001. (CCC at 0533.) Thereafter, he attended an appointment with Dr. Lowe on February 9, 2001. (*Id.*) In conducting her investigation of these and other facts, Ms. Campbell sought to "assess [Mr. Smith's] level of functionality" in order to "appropriately assess his return to work options." (*Id.* at 0503.)

During the course of the investigation, Mr. Smith's physical therapist "noted that when he released Mr. Smith from therapy Mr. Smith was ambulating with no problems and could stand up straight with no difficulties. He noted that the patient was doing well and was given home exercises to perform." (*Id.*) Given that Mr. Smith's final physical therapy session occurred on January 26, 2001 (*id.*; *see also* CCC 0533), this session would have occurred *after* the January 14, 2001 incident involving the touchdown celebration, which is now Mr. Smith's "undisputed" date of disability. (*See* Pl.'s Opp. Mem. at 7.)

Dr. Lowe did not opine that Mr. Smith was unable to work as of February 9, 2001. According to Dr. Lowe, the "Date [he] first advised [the] patient to cease work" was February 23, 2001. (*See* CCC 0530 (Physician's Statement on Disability Application).) Thus, although Mr. Smith seeks to establish an undisputed disability date in January 2001, by February 9, 2001, Dr. Lowe had not yet confirmed Mr.

Smith's inability to function at work. Still further, by April 2001, Dr. Lowe "believe[d] Mr. Smith [was] able to perform work which allow[ed] him to control the amount of sitting and standing he perform[s]." (*Id.* at 0503.)

      D.    The Record Does Not Support Plaintiff's Assault On Dr. Soriano Simply Because He Was Located Through The Network Medical Review

Mr. Smith's attempt to malign NMR is predictable, but unfounded. Mr. Smith casts a broad anti-insurance industry net to attack NMR, as was the case in *Coffman v. Metropolitan Life Insurance Co.*, 217 F. Supp. 2d 715 (S.D.W.V. 2002). In that case, counsel for plaintiff "describ[ed] NMR as 'a shill for insurance defense causes.'" *Id.* at 734 n.6. He "fault[ed] NMR physicians generally for being biased and controlled by the companies that employ their services." *Id.* Although the allegations in *Coffman* bear a surprisingly similar shrill sound to the invective tone advanced in this case, the *Coffman* Court rejected the allegations and concluded that plaintiff had failed to show that NMR or its physicians were improperly biased. *See* 217 F. Supp. 2d at 734 n.6. Accordingly, the Court upheld the insurer's determination.

Plaintiff's counsel continues the same unsubstantiated attack in the case *sub judice* arguing that NMR is continually used by the Metropolitan Life Insurance Corporation for the "express purpose" of "procu[ing] medical evidence [upon which] to base denial decisions." (Pl.'s Cross-Mot. for Summ. J. at 26.) Metropolitan Life Insurance Corporation is not a party to this action and the claims review practices of that insurance company are wholly irrelevant to this case. Furthermore, there is no evidence in the record demonstrating that Continental interacted with Metropolitan or adopted its claim review practices in relation to Mr. Smith's claim for benefits. Mr. Smith's attempt to smear NMR by raising irrelevant and baseless allegations is unfounded. As in this case, in *Adamson v. Metropolitan Life Insurance Co.,* No. Civ. JFM 00-1018, 2001 WL 111227 (D. Md. Feb 6., 2001), "[a]lthough Adamson

8

cast[] aspersions on the impartiality of NMR, she [did] not produce[] evidence demonstrating bias or predisposition with regard to the medical examinations conducted in her case." *Id.* at *6 n.10.  Finding nothing improper with the insurer's reliance upon NMR, the court found the insurer's claim determination to be reasonable and entered judgment in the insurer's favor.  *Id.* at *4, *7.

Eschewing his original promise to limit the evidence to the facts contained in the administrative record (*see* Paper No. 9, Pl.'s Mot. to Revise Sch. Order), Mr. Smith reaches to evidence in the case law suggesting that NMR is a bad actor beholden to the insurance industry.  Continental could respond by marshalling a variety of cases where courts relied upon NMR to uphold a disability determination.  *See, e.g., Sullivan v. Raytheon Co.*, 262 F.3d 41 (1st Cir. 2001); *Coffman*, 217 F. Supp. 2d at 715; *Adamson*, 2001 WL 111227.  Continental also could respond by presenting cases suggesting that plaintiff sought to involve individuals who testify against the insurance industry and in favor of the disability plaintiff's bar.  *See, e.g., Cossio v. Life Ins. Co. of N.A.*, 240 F. Supp. 2d 388 (D. Md. 2002) (discussing and rejecting the report of Martin Kranitz in support of plaintiff).  Although Continental could reflect upon the roles played by individuals in *other cases* not at issue here, the relevant inquiry is contained in the administrative record.  Nothing in that record suggests any improper bias or motive by NMR.

To the extent that Mr. Smith seeks to discredit the NMR report on the ground that Dr. Soriano did not physically examine Mr. Smith, courts have "held that it is not improper to rely on the opinions of nonexamining physicians who had before them the entire record of medical evidence, more evidence than was available to any one doctor who saw plaintiff previously."  *Etkin v. Merk & Co.,* No. CIV.A.00-5467, 2001 WL 1346368, at *6 (E.D. Pa. October 30, 2001) (citations omitted).  *See also Coffman v. Metro. Life Ins. Co.*, 217 F. Supp. 2d at 733 n.5 ("[Plaintiff] faults [NRM's] failure[] to personally examine him.  That failure, however, is of no great moment.  As in *Ellis [v. Metro. Life Ins.*

9

*Co.*, 126 F.3d 228 (4th Cir. 1997)], functional capacity assessments were made, and other conclusions drawn, by independent physicians without a personal examination of the claimant. Further, the reviewing physicians closely examined the reports of [plaintiff's] treating physicians in making their determinations."). Similarly, Mr. Smith already has conceded that "[t]he applicability of the treating physician rule remains undetermined at this time." (Pl.'s Opp. Mem. at 24.) Thus, although Dr. Soriano never examined Plaintiff, it was entirely proper, and not arbitrary and capricious, for Continental to rely on his report.

    E.    <u>Plaintiff's Claim For Benefits Received A Full And Fair Review</u>

Plaintiff claims that he did not receive the full and fair review required by 29 U.S.C. § 1133. (Pl.'s Opp. Mem. at 17.) Section 1133 provides:

> In accordance with regulations of the Secretary, every employee benefit plan shall
>
> (1)     provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2)     afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

Thus, "[i]n order for a plan administrator to meet the requirements of a 'full and fair review,' an administrator must provide [the claimant] with an opportunity to examine [the] evidence and to submit written comments or rebuttal documentary evidence." *Russell v. Paul Revere Life Ins. Co.,* 148 F. Supp. 2d 392, 410 (D. Del. 2001) (alteration in original) (citation omitted).

In support of his contention, Mr. Smith misstates the facts regarding Continental's good faith payment of benefits during the course of the claim investigation. Continental did not "approve" Mr.

10

Smith's claim for disability benefits in this case, and there was no subsequent reversal of a prior approval. Although Continental paid Mr. Smith benefits during the administrative review, Continental's payment was not connected with an "original benefits approval," as Mr. Smith contends. (*See, e.g.,* Pl.'s Opp. Mem. at 20-22.) To the contrary, Continental's payment of benefits was connected with an initial claim denial, rather than an approval.

After the Claims Unit denied the claim, Continental's Appeals Committee elected to conduct further evaluation:

> We have completed our review of your client's appeal, which you had requested on July 25, 2001 and that was forwarded for an appeal review on July 30, 2001. …
> We are aware that Mr. Smith ha[d] a series of back surgeries and continues with medical treatment for his back pain, to include the use of pain medication; however, to obtain a complete overview of Mr. Smith's condition and how it impacts his functionality, we are remanding Mr. Smith's file back to the Claims Unit for further review and investigation.

(*See* CCC 0342.) Continental thereafter informed Mr. Smith that it sought to conduct a functional capacity assessment and an independent medical evaluation. (*Id.* at 0315.) Mr. Smith, in turn, demanded that benefits be paid during the pending review:

> Please set forth all grounds which entitle you to a second tier of review. You should have considered performing the functional capacity assessment prior to denying Mr. Smith's benefits. Since you have breached the contract, you are not entitled to such an exam unless you bring his benefits up to current.

(*See* CCC 0314.) In light of Mr. Smith's adversarial posture, Continental agreed to pay benefits "in good faith" until it rendered a final determination. (*See id.* at 0309-10.) Neither the Appeals Committee nor the Claims Unit ever "approved" the payment benefits to Mr. Smith based upon a determination that he was disabled under the terms of the relevant policy. Indeed, Mr. Smith has cited to no evidence that any such determination was ever made by Continental. This, of course, is because it never happened.

11

In terms of procedural discrepancies, therefore, at most, the administrative record reveals that Continental's Appeals Committee internally remanded Mr. Smith's disability claim to the Claims Unit to obtain further information. (*See id.* at 0342.) Upon receipt of further information, including an independent evaluation from the Network Medical Review, the Appeals Committee confirmed that Mr. Smith's claim for benefits should be denied. (*Id.* at 0210-0214.) At all times, therefore, neither the Appeals Committee nor the Claims Unit ever concluded that Mr. Smith was entitled to disability benefits based upon a determination that he was disabled under the terms of the policy at issue.

Given this course of events, Continental's determination should not be viewed with skepticism because it committed procedural "irregularities," such as "[a] reversal of a decision to grant long term disability benefits without sufficient new medical information to justify that decision …." (Pl.'s Opp. Mem. at 14-15; 20-21.) The fact is that no reversal ever occurred in this case.

Equally specious is Mr. Smith's contention that Continental's "[t]ermination of benefits without a change in claimant's condition" demonstrates that it acted pursuant to a conflict of interest. (*Id.* at 20.) In Mr. Smith's case, benefits were never approved, so proving a change in condition is a non-issue.

The review process in this case was not marked by unfairness or procedural irregularities, and Continental did not obstruct Mr. Smith's numerous efforts to provide additional information at the appropriate time. Indeed, Mr. Smith's application for disability benefits received two full administrative reviews by Continental's claims review staff. In sum, Continental satisfied its duty to provide Mr. Smith a full and fair review. Continental's determination was reasonable, followed a deliberate review process, and was supported by substantial evidence in the record.

III. <u>CONCLUSION</u>

For the foregoing reasons, and those set forth in its memorandum in support of its cross-motion for summary judgment, Continental Casualty Company respectfully requests that the Court grant its cross-motion for summary judgment and deny the cross-motion for summary judgment filed by Neal S. Smith.

Respectfully submitted,

_____
Bryan D. Bolton
Federal Bar No. 02112
Hisham M. Amin
Federal Bar No. 15570
Peter C. Ismay
Federal Bar No. 27118

Funk & Bolton, P.A.
Twelfth Floor
36 South Charles Street
Baltimore, Maryland  21201-3111
410.659.7700 (telephone)
410.659.7773 (facsimile)

Attorneys for Continental Casualty Company

Dated:        May 27, 2003

20024.014: 64311
resaved from 64212v.2