IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

NEAL S. SMITH,                          *

     Plaintiff,                         *

v.                                       *    CIVIL NO.:  WDQ-02-3049

CONTINENTAL CASUALTY COMPANY,  *

     Defendant.                         *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

<u>MEMORANDUM OPINION</u>

The plaintiff, Neal S. Smith ("Mr. Smith"), has sued the defendant, Continental Casualty Company ("Continental Casualty"), for wrongful denial of his claim for long-term disability benefits, pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  Mr. Smith seeks payment of back benefits together with interest, future benefits, reinstatement of his term life insurance under a group policy issued to his employer, J.J. Haines and Company ("J.J. Haines"), "waiver of premium" coverage under that policy, and reasonable attorneys' fees and costs.  Both parties have moved for summary judgment.  No hearing is necessary.  Local Rule 105.6 (D. Md. 2001).

BACKGROUND

On February 23, 2001, Mr. Smith, a vice president of sales at J.J. Haines, submitted an application for long-term disability benefits under the ERISA plan that Continental Casualty administered on behalf of his employer.  CCC 0524-25, 0529 (2.23.01 employer's and employee's statement).[1]  The application indicated that Mr. Smith suffered from degenerative disk and joint disease of the lumbar spine.  CCC 0530 (2.16.01 physician's statement).  Between April 1997 and May 2000, he had undergone three surgeries on his back, as well as physical therapy and acupuncture.  CCC 0532-33 (record of treatment).

His condition sometimes improved, sometimes worsened.  On January 14, 2001, however, when watching a football game, he jumped up to celebrate a touchdown and his "back went out again." CCC 0043 (2.09.01 notes of Lowe, M.D.).  Afterward, he said that he could "not walk more than five minutes or sit longer than 10 minutes without excruciating pain."  CCC 0042 (2.23.01 notes of Lowe, M.D.).

---

[1]The 633-page administrative record is cited by reference to Bates numbers.  It is divided into three parts:  documents in the series CCC 0001-0615; documents in the series CNA 000001-000006; and documents in the series PLS 000001-000012.

By letter dated April 16, 2001, Continental Casualty's claims unit advised Mr. Smith that it had denied his claim. CCC 0500-02 (4.16.01 initial denial). Represented by counsel, Mr. Smith appealed the denial decision pursuant to a procedure outlined in the plan as mandated by ERISA. CCC 0425-38 (7.25.01 letter of appeal). He supported his appeal with additional documentation. CCC 0344-0424, 0439-55.

By letter dated September 17, 2001, Continental Casualty's internal appeals committee informed Mr. Smith, through counsel, that it had remanded his file to the claims unit for further review and investigation. CCC 0342 (9.17.01 letter to plaintiff's counsel). The claims unit, in turn, forwarded Mr. Smith's file to Elite Physicians, a division of Network Medical Review ("NMR"), for independent analysis. CCC 0004-06 (11.8.01 facsimile transmission to NMR). M. Marc Soriano, M.D. ("Dr. Soriano"), a neurosurgeon, performed the analysis on behalf of NMR. CCC 0284-87 (11.16.01 report of Soriano, M.D.). His "paper" review of the record concluded that a "diagnosis of a total impairment is not reasonable on the basis of Mr. Smith's self-reported complaints." CCC 0285.

Relying primarily on Dr. Soriano's opinion, Continental Casualty's claims unit decided again that Mr. Smith did not

qualify for benefits.  CCC 0290-91 (11.21.01 second denial).  By

letter dated March 21, 2002, Mr. Smith, through counsel,

appealed.  CCC 0222-30 (3.21.02 letter of appeal).  Again, he

submitted additional documentation, including a finding of

disability by the Social Security Administration.  CCC 0244-50

(2.25.02 decision by Due, ALJ).  On May 2, 2002, the appeals

committee issued a final decision affirming the denial of

benefits.  CCC 0210-14 (5.2.02 final denial).

    By letter dated May 13, 2002, Continental Casualty (or its

parent CNA Financial Corporation) separately denied Mr. Smith's

claim for "waiver of premium" coverage under the J.J. Haines

group life insurance policy because he was "not totally disabled

from any occupation as defined by the policy."  PLS 000006-07

(5.13.02 initial life insurance denial); *see also* CCC 0608 (J.J.

Haines group life insurance policy)("In order to qualify for

Waiver of Premium benefit, the employee must be continuously and

totally disabled from performing the duties of each and every

occupation for which they [sic] may be qualified by reason of

education, training, and experience . . . ."); CCC 0002 (7.5.02

final life insurance denial)(stating that the "waiver of premium"

claim "is partnered with the Long Term Disability claim," and

that because "Mr. Smith was not found to be disabled from his own

occupation . . . , he is not considered to be disabled from any

occupation"). Mr. Smith appealed, but the denial of "waiver of

premium" coverage was sustained. CCC 0002.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure,

summary judgment is appropriate when there is no genuine issue as

to any material fact, and the moving party is entitled to summary

judgment as a matter of law. In considering a motion for summary

judgment, "the judge's function is not . . . to weigh the

evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A fact issue is material if it must be decided to resolve

the plaintiff's substantive claim. *Id.* at 248. The "materiality

determination rests on the substantive law, [and] it is the

substantive law's identification of which facts are critical and

which facts are irrelevant that governs." *Id.*

A dispute about a material fact is genuine "if the evidence

is such that a reasonable [factfinder] could return a verdict for

the nonmoving party." *Id.* at 248. Thus, "the judge must ask

. . . not whether . . . the evidence unmistakably favors one side

5

or the other but whether a fair-minded [factfinder] could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the opponent must bring forth evidence upon which a reasonable fact finder could rely, *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  The mere existence of a "scintilla" of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment. *Anderson*, 477 U.S. at 252.

<u>STANDARD OF REVIEW OF DECISION DENYING BENEFITS</u>

The Court first decides *de novo* whether an ERISA plan grants the administrator discretion to determine eligibility for benefits, and, if so, whether the administrator acted within the scope of that authority.  *Gallagher v. Reliance Standard Life Ins. Co.*, 305 F.3d 264, 268 (4th Cir. 2002).  When the plan clearly confers discretion and the administrator acted within its scope, the Court reviews the administrator's decision only for an abuse of discretion.  *Booth v. Wal-Mart Stores, Inc. Assocs.*

*Health & Welfare Plan*, 201 F.3d 335, 341 (4th Cir. 2000).

Indisputably, the plan at issue grants Continental Casualty discretion to resolve benefits questions.[2] Further, Continental Casualty acted within the scope of its discretion when it denied Mr. Smith's claim for long-term disability benefits. The Court, therefore, must review Continental Casualty's decision under the abuse-of-discretion standard.

Accordingly, the Court may consider only evidence before the plan administrator at the time of the decision. *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994). The administrator's decision must stand unless unreasonable — even if the Court itself would have reached a different conclusion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989); *Booth*, 201 F.3d at 341, 344. In other words, the Court may reverse a denial of benefits only if the decision is unsupported by "substantial evidence" or "deliberate, principled reasoning." *Bernstein v. CapitalCare, Inc.*, 70 F.3d 783, 788 (4th Cir. 1995). Substantial evidence is "evidence

---

[2]The plan provides: "When making a benefit determination under the policy, [Continental Casualty] ha[s] discretionary authority to determine [a claimant's] eligibility for benefits and to interpret the terms and provisions of the policy." CCC 0572 (J.J. Haines ERISA plan).

which a reasoning mind would accept as sufficient to support a
particular conclusion . . . [and] consists of more than a mere
scintilla . . . but may be somewhat less than a preponderance."
*LeFebre v. Westinghouse Elec. Corp.*, 747 F.2d 197, 208 (4th Cir.
1984)(quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.
1966))(internal quotation marks omitted).

A plan administrator that operates under a conflict of
interest, however, deserves less deference. *Doe v. Group
Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir. 1993).
Such a conflict may arise when the same insurer not only
administers the plan but also pays for the benefits that the
participants receive. *Bedrick v. Travelers Ins. Co.*, 93 F.3d
149, 152 (4th Cir. 1996).

In this case, Continental Assurance Company funded the plan
in exchange for the payment of a fixed premium by J.J. Haines.
CNA 000001-06 (policy no. SR-83126023). Continental Casualty,
not Continental Assurance Company, administered the plan. CCC
0570-92 (J.J. Haines ERISA plan). Yet both entities were
subsidiaries of CNA Financial Corporation. *See* Def.'s Disclosure
of Corporate Affiliations and Financial Interests; CCC 0572,
0593-94, 0615; CNA 0000001. Thus, whenever Continental Casualty

8

denied benefits, profits accrued to its corporate sibling in the
amount of expenses avoided.   *See Doe*, 3 F.3d at 86.   Ultimately,
the corporate parent bore "the financial consequences — and
reap[ed] the financial rewards — of its [subsidiary's] coverage
decisions."   *Bedrick*, 93 F.3d at 151.   The corporate
relationships created a potential conflict between Continental
Casualty's interests and those of the plan's beneficiaries — a
conflict no less worrisome than if Continental Casualty had
funded and administered the plan itself.

Accordingly, the Court lessens the deference due Continental
Casualty's decision "to the degree necessary to neutralize any
untoward influence resulting from the conflict."   *Doe*, 3 F.3d at
87; *see also Booth*, 201 F.3d at 343 n.2 (explaining that a
"fiduciary's conflict of interest, in addition to serving as a
factor in the reasonableness inquiry, may operate to reduce the
deference given to a discretionary decision of that fiduciary").
The more compelling the administrator's incentive to sacrifice a
plan beneficiary's interests to its own, "the more objectively
reasonable the administrator's . . . decision must be and the
more substantial the evidence must be to support it."   *Ellis v.
Metro. Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997).   In the

final analysis, the Court must ensure that the claimant received
a full and fair review. *Laser v. Provident Life & Accident Ins.
Co.*, 211 F. Supp. 2d 645, 650 (D. Md. 2002); *see* 29 U.S.C. §
1133(2)(mandating that every ERISA plan "afford a reasonable
opportunity to any participant whose claim for benefits has been
denied for a full and fair review by the appropriate named
fiduciary of the decision denying the claim").

ANALYSIS

Pain finally drove Mr. Smith to seek long-term disability
benefits.  An asserted failure of its proof grounded Continental
Casualty's decision to deny his claim.  Continental Casualty
conceded that Mr. Smith might "have some back pain and
difficulties associated with his longstanding back-pain history
and surgeries."  CCC 0213 (5.2.02 final denial).  It also
acknowledged that "his back pain was further aggravated" by the
touchdown celebration on January 14, 2001.  *Id.*  Nevertheless,
Continental Casualty concluded:  "The primary limiting factor
affecting Mr. Smith is his pain complaints, which are
disproportionate when compared to the diagnostic and physical
findings presented."  *Id.*  Without objective medical proof to
verify the intensity and severity of the pain that Mr. Smith

reported, Continental Casualty simply disbelieved him.

Of course, Continental Casualty had the discretion to do so. Any disability adjudicator must "make credibility determinations — and therefore sometimes must make negative determinations — about allegations of pain." *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985)(reviewing denial of social security disability claim). Continental Casualty abused its discretion, however, if it discredited Mr. Smith without substantial evidence that he was exaggerating.

No test can measure how much pain a person feels. Indeed, each person's experience of pain is unique. To the Black Knight, the traumatic amputation of both arms seems "just a flesh wound." MONTY PYTHON AND THE HOLY GRAIL (Columbia/Tri-Star Studios 1975). To another, a pinprick causes a cascade of tears. Recent scientific research has even uncovered a physiological basis for individual differences in pain sensitivity.[3] Pain, moreover, often persists

_____

[3]See *Brain Imaging Confirms that People Feel Pain Differently, Report Researchers at Wake Forest University Baptist Medical Center*, Wake Forest University Baptist Medical Center News Release, at http://www.wfubmc.edu/news_sys/fullstory.php?articleid=4241 (June 24, 2003):

> Using magnetic resonance imaging (MRI) to assess brain function, [Robert C.] Coghill[, Ph.D.,] and colleagues found that study participants who said that a heat stimulus was intensely painful had pronounced activation of brain regions that are important in pain. In contrast, people who said that the same stimulus was only mildly painful had minimal activation of these same areas.

despite ignorance of its precise etiology.

The evidentiary assessment of pain cannot reasonably differ whether a claimant seeks disability benefits under a private plan of insurance or under the public scheme of social security. *Willis v. Baxter Int'l, Inc.*, 175 F. Supp. 2d 819, 833 (W.D.N.C. 2001); *Palmer v. Univ. Med. Group*, 994 F. Supp. 1221, 1233 (D. Or. 1998), *abrogated on other grounds by Hensley v. Northwest Permanente P.C. Retirement Plan & Trust*, 258 F.3d 986, 994-95 (9th Cir. 2001). Proof is proof. Thus:

> Once an underlying physical or mental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the [plan administrator] must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, its intensity can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motory disruption), if

---

"One of the most difficult aspects of treating pain has been having confidence in the accuracy of patients' self-reports of pain," said Coghill, an assistant professor of neurobiology and anatomy. "These findings confirm that self-reports of pain intensity are highly correlated to brain activation and that self-reports should guide treatment of pain."

12

> available, should be obtained and considered.
> Because pain is not readily susceptible of
> objective proof, however, the absence of
> objective medical evidence of the intensity,
> severity, degree or functional effect of pain
> is not determinative.

*Hyatt v. Sullivan*, 899 F.2d 329, 337 (4th Cir. 1990). Because a

claimant need not present clinical or diagnostic evidence to

support the severity of pain, a plan administrator cannot

discount self-reports of disabling pain *solely* because the

objective medical evidence does not fully support them. *Hawkins*

*v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 919

(7th Cir. 2003); *O'Donnell v. Barnhart*, 318 F.3d 811, 816 (8th

Cir. 2003); *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th

Cir. 1997). "'Excess pain' is, by definition, pain that is

unsupported by objective medical findings." *Cotton v. Bowen*, 799

F.2d 1403, 1407 (9th Cir. 1986).

In addition to objective medical evidence, an evaluation of

the vocational impact of pain must also consider:  the claimant's

work history; observations of the claimant by third parties, such

as coworkers and superiors; the professional opinion of treating

and examining physicians; the claimant's history of pain

management and drug therapy; the dosage, effectiveness, and side

effects of medications; the claimant's reputation for

13

truthfulness; the consistency (or lack thereof) in the claimant's own statements; the congruity (or lack thereof) between the reported symptoms and the claimant's daily activities. *O'Donnell*, 318 F.3d at 816; *Light*, 119 F.3d at 792; *Palmer*, 994 F. Supp. at 1233.  The last merits particular scrutiny.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994)(Hall, J., announcing and concurring in the judgment)("The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life.").

All the objective medical evidence indicates that Mr. Smith had a physical impairment that could cause pain.  Even Dr. Soriano concurred.  CCC 0285 (11.16.01 report of Soriano, M.D.) ("Based on the medical records, from a neurosurgeon's perspective, Mr. Smith has a mild impairment based on [his] multiple surgeries.").  Almost no such evidence substantiates the intensity of the pain that Mr. Smith said he was feeling.  *See, e.g*, CCC 0032 (3.28.01 report of Kahan, D.O.)(finding no neurologic deficits, "muscle stretch reflexes equal and intact," and all "provocative" musculoskeletal tests "negative"); CCC 0010 (7.2.01 report of Launder, M.D.)(finding reflexes at the knee and ankle "equal and intact," his surgical scar "free of spasm," and

"a good range of motion and full motor strength in the hips,
knees, ankles, and feet with no instability"); *but see* CCC 0232-
34 (12.20.01 report of Macedo, M.D., and Meyer, D.C.)(finding
markedly diminished "strength functioning").  Although Dr.
Soriano emphasized that Mr. Smith's self-reported pain exceeded
the pain that would "normally" accompany his physical impairment,
his opinion offers *no* evidence impeaching the veracity of Mr.
Smith's account.  CCC 0285 (11.16.01 report of Soriano, M.D.)
("Mr. Smith's self-reported complaints exceed his clinical
findings."); *see Hawkins*, 326 F.3d at 918-19 (reversing ERISA-
plan administrator's denial of disability benefits which relied
on a similarly irrelevant opinion of the plan's medical
consultant).  The record, moreover, contains ample evidence
corroborating Mr. Smith's subjective complaints.  Some of that
evidence, Continental Casualty noted but finally disregarded;
some, it utterly ignored.

On March 16, 2001, Mr. Smith reported that he was using a
stool to bathe in the shower; he could dress only in stages; he
could cook breakfast for himself, but only if it required less
than five minutes to prepare; he could do some laundry, but no
housecleaning and no grocery shopping; he could sit in a

reclining rocking chair no more than twenty minutes, in a chair
with arms no more than ten minutes, and in any other chair no
more than five minutes without severe pain; he could walk short
distances with a combination cane/stool; he was riding a
recumbent bicycle about twenty-five minutes every day; he could
drive no more than twenty minutes; and he spent much time lying
supine on the floor, because there he felt "most comfortable."
CCC 0514 (3.16.01 notes of defendant's disability consultant).

On April 26, 2001, he reported that he couldn't "stand or
walk for more than five minutes, sit or drive an automobile for
more than twenty minutes without severe pain."  CCC 0212 (5.2.02
final denial); CCC 0458 (4.26.01 status report of plaintiff).
Whenever his back "fired off," he couldn't stand straight;
squatting or lying down for five minutes might provide "temporary
relief."  CCC 0212, 0458.  If the pain persisted more than ten
minutes, he would also need ice and heat packs.  CCC 0212, 0458.
"Lying supine," he said, was "the only position [in which he
felt] pain-free."  CCC 0212, 0458.  Whether conversing on the
telephone, working on the computer, or visiting family and
friends, he would often have to lie down.  CCC 0212, 0458.  When
dining out with family or friends, he usually ordered his meal,

then went "to the car and lay down until the food [was] served.
If anyone want[ed] dessert, [he would] go back to the car."  CCC
0212, 0458.

Bob Thompson ("Mr. Thompson"), the president of J.J. Haines
and Mr. Smith's supervisor, said that since his last back surgery
in May 2000, Mr. Smith could no longer travel by plane.  CCC 0516
(3.26.01 notes of defendant's disability consultant).  Mr.
Thompson further stated that Mr. Smith could drive no more than
half an hour to an hour without stopping to lie down because of
pain.  *Id.*  In fact, from 2000 until he ceased working, Mr. Smith
was able to travel only a single week.  *Id.*  Beginning in
November 2000, Mr. Thompson noted, Mr. Smith spent most of his
time at work "l[]ying on [the] floor in [the] back of [his]
room."[4]  *Id.*  Continental Casualty referenced Mr. Thompson's
comments, but gave them little, if any, weight.  CCC 0211 (5.2.02
final denial).

Although Continental Casualty attempted to obtain videotape
evidence to refute Mr. Smith's disability claims, it failed.  The
investigator it hired conducted surveillance of Mr. Smith's

_____

[4]Mr. Smith himself, however, indicated that November 2000 "was the best
he felt after his surgery," and that he only began "lying on the floor for
much of the time he was at work" as his condition deteriorated in December
2000.  CCC 0013 (7.19.01 report of Kranitz, M.A.).

17

residence on October 9, 11, 12, and 13, 2001. CCC 0008 (10.17.01 report of surveillance technician). Mr. Smith, however, never emerged from his home. *Id*. On October 17, 2001, surveillance yielded about seventy seconds of videotaped activity. The investigator followed Mr. Smith as he drove fifteen minutes from his home to his doctor's office. *Id*. He then taped Mr. Smith walking from his car into the office — about thirteen seconds. *Id*.; videotape. Mr. Smith "was using a cane in his right hand and carrying a black bag in his left." CCC 0008; *see also* videotape. Forty minutes later, the investigator taped Mr. Smith walking out of the doctor's office and getting back into his car — about twenty-five seconds. CCC 0008; videotape. Mr. Smith "appeared to be relying on the cane more than before he went inside the office." CCC 0008; *see also* videotape. The investigator continued to videotape the parked car, though Mr. Smith was no longer visible, until Mr. Smith drove away — about thirty-one seconds later. Videotape. He followed Mr. Smith back to his home, but decided "to terminate the surveillance" one hour later because "no further activity" occurred. CCC 0008.

    Thus, if the surveillance proves nothing, it also disproves nothing. It leaves all other evidence of Mr. Smith's pain

uncontradicted.  *Cf. Coffman v. Metro. Life Ins. Co.*, 217 F.
Supp. 2d 715, 725-26 (S.D.W. Va. 2002)(discussing videotape that
showed insured engaging in numerous activities that he had
claimed his pain precluded).

Continental Casualty completely ignored Mr. Smith's
prescribed analgesic medications and their side effects.  On
February 9, 2001, Jonathan Lowe, M.D. ("Dr. Lowe"), one of Mr.
Smith's treating physicians, prescribed a schedule of gradually
increasing doses of Neurontin, the brand name of the drug
gabapentin.  CCC 043 (2.9.01 notes of Lowe, M.D.); PHYSICIAN'S DESK
REFERENCE 2655 (56th ed. 2002)[hereinafter PDR].  The Federal Drug
Administration has approved gabapentin for the treatment of
epilepsy.  *TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 74
(D.D.C. 2003); PDR at 2656.  Doctors, however, more often
prescribe Neurontin for the treatment of neurodegenerative
diseases than for the treatment of epilepsy.  *Warner-Lambert Co.
v. Apotex Corp.*, 316 F.3d 1348, 1353 (Fed. Cir. 2003).  By April
23, 2001, Mr. Smith was taking 300 mg of Neurontin three times a
day — a "large" dosage.  CCC 0030 (4.23.01 notes of Kahan, D.O.);
CCC 0344 (7.2.01 report of Launder, M.D.); CCC 0458 (4.26.01
status report of plaintiff).  Neurontin, moreover, can cause

drowsiness, dizziness, and fatigue.  PDR at 2657.  And Mr. Smith reported that it reduced his ability to concentrate.  CCC 0514 (3.16.01 notes of defendant's disability consultant).

On April 23, 2001, Brian Kahan, D.O., another of Mr. Smith's treating physicians, prescribed 20 mg of OxyContin twice a day. CCC 0029 (4.25.01 notes of Kahan, D.O.).  Mr. Smith adhered to the prescription.  CCC 0458 (4.26.01 status report of plaintiff). OxyContin is the brand name of the drug oxycodone, a narcotic and controlled substance similar to morphine.  PDR at 2912.  Doctors use oxycodone to manage "moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time."  *Id.*  Its most common, non-serious side effects include drowsiness and dizziness.  PDR at 2915.

Mr. Smith was also taking Vicodin tablets, containing 7.5 mg of the drug hydrocodone and 750 mg of acetaminophen, as needed, "to knock down the pain once it fires off."  CCC 0458 (4.26.01 status report of plaintiff); CCC 0030 (4.23.01 notes of Kahan, D.O.); PDR at 517.  Like OxyContin, Vicodin is a narcotic.  PDR at 517.  It is used to relieve "moderate to moderately severe pain."  *Id.*

The Neurontin initially "helped [Mr. Smith's] sciatic radiating pain dramatically." CCC 0042 (2.23.01 notes of Lowe, M.D.). However, by April 26, 2001, Mr. Smith continued to experience significant pain — even though he had begun taking more powerful analgesics. CCC 0458 (4.26.01 status report of plaintiff). His entire drug regimen made him feel only "a little bit better." CCC 0029 (4.25.01 notes of Kahan, D.O.). It is, moreover, tantamount to "objective medical evidence" of disabling pain. *O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003).

To controvert Mr. Smith's evidence of the intensity and severity of his pain, Continental Casualty has pointed to an opinion of one of his physical therapists and another opinion of one of his physicians. Both, however, prove much less than Continental Casualty maintains.

On April 4, 2001, a Continental Casualty employee investigating Mr. Smith's claim spoke to Tom Simanski ("Mr. Simanski"), the physical therapist who had worked with Mr. Smith after his last back surgery. CCC 0503 (4.9.01 letter to Lowe, M.D.). Mr. Simanski told her "that when he released Mr. Smith from therapy, Mr. Smith was ambulating with no problems and could stand up straight with no difficulties." *Id*. He also "noted

[that Mr. Smith] was doing well and was given home exercises to perform." *Id.* The record reveals that Mr. Smith last attended physical therapy on January 26, 2001. CCC 0533 (record of treatment). Ergo, Continental Casualty concluded, less than two weeks after the critical touchdown celebration, Mr. Smith was "fully ambulatory." CCC 0500 (4.19.01 initial denial).

The record, however, also reveals a distinct break in his physical therapy: Mr. Smith began post-operative physical therapy on May 22, 2000. CCC 0533 (record of treatment). He worked with Mr. Simanski regularly — at two-day to two-week intervals — through July 10, 2000. *Id.* Thereafter, his physical therapy ceased — until, some six-and-a-half months later, he returned to the same physical therapy provider on January 26, 2001, for "10 lbs. traction" (a notation absent from all previous sessions). *Id.*

The record does not reveal whether Mr. Simanski himself treated Mr. Smith on January 26, 2001, nor whether Mr. Simanski was even aware that Mr. Smith received physical therapy on that date. More likely than not, Mr. Simanski's opinion refers to the condition of Mr. Smith on July 10, 2000, when it appears Mr. Smith was "released" from physical therapy. The subsequent one-

time "10 lbs. traction" session, then, would support, rather than

undermine, Mr. Smith's claim of final, disabling reinjury on

January 14, 2001: he first sought relief through physical

therapy; when that failed, he went to his doctor.

On April 12, 2001, Dr. Lowe responded to the following

inquiry from the same employee of Continental Casualty:

> Please advise if you believe Mr. Smith is
> able to perform work which allows him to
> control the amount of sitting and standing he
> perform[s].
>     Yes _____
>     No  _____ [I]f no, please provide
> medical evidence to support this opinion.

CCC 0503 (4.9.01 letter to Lowe, M.D.). He placed a checkmark

next to "Yes." So, Continental Casualty concluded, one of Mr.

Smith's own physicians, familiar with his complaints of pain,

believed that Mr. Smith could still work. CCC 0501 (4.16.01

initial denial); CCC 0212 (5.2.02 final denial).

Dr. Lowe, however, did not merely check "Yes." He

underlined the phrase "allows him to control the," and underlined

the word "control" four more times. CCC 0503. Further, despite

the request for medical evidence only if he checked "No," Dr.

Lowe wrote at the bottom of the letter, "Please see copy of

recent notes" — five pages of which he simultaneously faxed to

Continental Casualty.  CCC 0503-08.  The notes included the observation:  "[Mr. Smith] simply can not walk more than five minutes or sit longer than 10 minutes without excruciating pain in his back."  CCC 0506 (2.23.01 notes of Lowe, M.D.).

Dr. Lowe's *full* response, therefore, defies the simplistic positive of his checkmark.  He equivocates.  And though his opinion may offer some greater counterweight to the abundant evidence of severe pain than the opinion of Mr. Simanski, it still registers insubstantially on the evidentiary scales.

Of course, whether Mr. Smith's pain made him totally disabled hinges on whether it made him "continuously unable to perform the material and substantial duties of [his] regular occupation."  CCC 0577 (J.J. Haines ERISA plan); *see also Gallagher*, 305 F.3d at 274.  Mr. Smith's job required him to "[d]irect[] and coordinate[] activities of one or more divisions of the sales department and [to] aid[] other administrative officers in formulating and administering organization policies by performing" certain specified duties and responsibilities.  CCC 0526 (2.20.01 description of occupation).  Role priorities included strategic planning, sales growth, customer service, and problem resolution.  *Id.*  Physically, his job demanded an ability

to sit frequently, to stand and walk, and to travel extensively
by automobile.  CCC 0527 (2.20.01 description of occupation).
More specifically, the job required him "to travel independently
up to 60% of the time within the [d]omestic United States to
attend various meetings with other personnel and [the] public."
*Id.*  Sometimes, air travel was necessary.  CCC 0516 (3.26.01
notes of defendant's disability consultant).

    Although J.J. Haines allowed Mr. Smith to travel less
frequently as his condition worsened, it could not accommodate an
almost total inability to drive.  *Id.*  As Mr. Thompson reported,
from 2000 until he stopped working, Mr. Smith fulfilled his
weekly travel obligations only once.  *Id.*  Already by November or
December 2000, Mr. Smith was spending most of his work time lying
supine on the floor of his office.  *Id.*; *see also* note 4 *supra*.
The January 2001 touchdown celebration diminished his waning
physical capabilities further still.  He could no longer sit more
than ten minutes or walk more than five minutes without
"excruciating pain."  CCC 0506 (2.23.01 notes of Lowe, M.D.); *see
also* CCC 0514 (3.16.01 notes of defendant's disability
consultant); CCC 0458 (4.26.01 status report of plaintiff).  Nor
could he stand more than five minutes.  CCC 0458.

Someone who can barely tolerate sitting, standing, or walking cannot perform the material and substantial duties of Mr. Smith's occupation.   The job may have afforded Mr. Smith the "flexibility to control the amount of sitting and standing [he] perform[ed]."   CCC 0501 (4.16.01 initial denial).   His minimal tolerance for either, however, renders such flexibility meaningless.

Crediting Mr. Smith's account of the effects of his pain, one of his physicians opined that he had "reached maximum medical improvement" but was "completely disabled permanently."   CCC 0011 (7.2.01 report of Launder, M.D.).   A vocational consultant who interviewed Mr. Smith believed that "there [was] no competitive employment that [Mr. Smith] could perform."   CCC 0016 (7.19.01 report of Kranitz, M.A.).   A functional capacity evaluation conducted on December 20, 2001, concluded that the limitations imposed by the pain Mr. Smith described rendered him incapable even of sedentary work.[5]   CCC 0234 (12.20.01 report of Macedo,

---

[5]Mr. Smith obtained and submitted this functional capacity evaluation on his own, late in Continental Casualty's internal appeals process.  Somewhat earlier, by letter dated October 26, 2001, Continental Casualty had informed Mr. Smith, through counsel, that it wanted to conduct independent functional capacity and medical evaluations to enhance its review.  CCC 0315.  That same date, counsel to Mr. Smith challenged Continental Casualty's entitlement to such assessments.  CCC 0314.  Continental Casualty pressed the matter no further.  Moreover, it neither denied Mr. Smith's claim because he refused to undergo the independent evaluations nor argues now that his refusal justifies its denial.

M.D., and Meyer, D.C.).

Dr. Soriano, the NMR physician who reviewed Mr. Smith's record for Continental Casualty, concluded otherwise *only by discrediting* Mr. Smith's representations.  So too did Clifford Solomon, M.D., another of Mr. Smith's treating physicians, in a telephone conference with Dr. Soriano.  CCC 0285 (11.16.01 report of Soriano, M.D.).  So too, ultimately, did Continental Casualty. CCC 0213 (5.2.02 final denial)("The primary limiting factor affecting Mr. Smith is his pain complaints, which are disproportionate when compared to the diagnostic and physical findings presented.").

The record contains no more than a scintilla of evidence supporting the conclusion that Mr. Smith could perform the material and substantial duties of his job on February 23, 2001, and beyond the ninety-day elimination period of the J.J. Haines ERISA policy.  Continental Casualty, therefore, abused its discretion in denying his benefits.[6]  Even if Continental

---

[6]In addition to its failure to render a decision grounded in substantial evidence, Mr. Smith also argues that Continental Casualty abused its discretion by: (1) placing undue reliance on the findings of Dr. Soriano, a nonexamining medical reviewer; (2) belittling or rejecting the opinions of his own treating physicians; (3) choosing between conflicting medical reports in the record; (4) giving insufficient consideration to the disability determination of the Social Security Administration; and (5) terminating the benefits it was paying him even though his condition had not improved.  Well-settled law refutes the first four contentions.  *See, e.g., Ellis*, 126 F.3d at

Casualty were accorded the full deference due a plan

administrator free of any conflict of interest, its decision was

unreasonable.

The decision to deny "waiver of premium" coverage under the

group life insurance policy, however, followed necessarily — and

reasonably — upon the determination (albeit erroneous) that Mr.

Smith was "not . . . disabled from *his own* occupation." CCC 0002

(7.5.02 life insurance final decision)(emphasis added).

Qualification for the waiver depends on a stricter definition of

disability than that of the ERISA plan itself, to wit: "the

employee must be continuously and totally disabled from

---

234 (finding that a plan administrator did not abuse its discretion by denying
benefits when the claimant's primary medical provider found disability but
independent medical consultants, reviewing the claimant's file, disagreed);
*Booth*, 201 F.3d at 345 (recognizing that it is the *duty* of the plan
administrator, not an abuse of discretion, to resolve conflicts in the
evidence); *Black & Decker Disability Plan v. Nord*, 123 S. Ct. 1965, 1972
(2003)(holding that ERISA does not require plan administrators to accord
special deference to the opinions of claimants' treating physicians);
*Gallagher*, 305 F.3d at 275 (determining that a plan administrator has no
obligation to weigh the Social Security Administration's disability
determination more favorably than other evidence when the social security
standard of disability differs from the standard under the plan).
    Finally, although a reversal of a decision of disability may warrant
significant skepticism when substantial evidence does not support the
conclusion that the disability has ceased, Continental Casualty never decided
that Mr. Smith was disabled. Rather, in response to Mr. Smith's demand that
he be paid benefits during the extended review process, *see* CCC 0314 (10.26.01
letter to defendant's disability consultant), Continental Casualty agreed to
pay him — retroactively from the time of his application and until it made its
final decision. CCC 0309 (11.6.01 letter to plaintiff's counsel). Thus, when
it finally found Mr. Smith not disabled and stopped paying him benefits, it
did not "reverse" any prior decision of disability. *See* CCC 0290-91 (11.21.01
letter to plaintiff's counsel).

performing the duties of each and every occupation for which they [sic] may be qualified by reason of education, training, and experience."  CCC 0608 (J.J. Haines group life insurance policy).

The relevant decision-maker, therefore, never considered all the record evidence.  It had no need to.  Accordingly, the Court will remand the matter to Continental Casualty for further consideration.  *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 609 (4th Cir. 1999)(indicating that remand to the plan administrator is "most appropriate" when "the plan itself commits the trustees to consider relevant information which they failed to consider" during their initial examination of a claim)(citation and internal quotation marks omitted).

CONCLUSION

For the foregoing reasons, the Court will GRANT Mr. Smith's motion for summary judgment in part, and will award retroactive long-term disability benefits allowed by the terms of the plan, together with interest, as well as future benefits until such time as Mr. Smith no longer qualifies for them.  The Court will DENY Mr. Smith's motion with respect to the denial of "waiver of premium" coverage under the group term life insurance policy, and will REMAND Mr. Smith's claim for such coverage to Continental

Casualty.  The Court will DENY Continental Casualty's motion *in pari materia*.

As a prevailing party, Mr. Smith also seeks an award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g)(1).  Such an award depends on consideration of five factors:  (1) the opposing party's bad faith; (2) its ability to pay; (3) the potential for deterrence; (4) whom the prevailing party sought to benefit by the suit or the significance of the legal question it sought to resolve; and (5) the relative merits of the parties' positions.  *Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1209 (4th Cir. 1997).  Because neither Mr. Smith nor Continental Casualty has adequately addressed these factors, the Court will postpone a decision on the amount of fees and costs, if any, to award until the parties have briefed the issue.

In the interim, respective counsel should discuss the actual dollar amount of monies owed, including prejudgment interest.  As this determination requires simple arithmetical computation, the parties are encouraged to agree on the correct number so as not to impose any unnecessary burden on the Court.  Counsel should communicate the result to the Court as soon as possible, but no later than the additional briefing has been completed.

A separate order follows.

_____
William D. Quarles, Jr.
United States District Judge

Date:  August 4, 2003